**No. 25-10154**

---

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE ELEVENTH CIRCUIT

---

CHARLES S. WEEMS, IV, KERRI WEEMS, CELEBRATION GLOBAL, INC.,
HONEY LAKE FARMS, INC., NORTHSTREAM MANAGEMENT GROUP, LLC,
AND WEEMS GROUP, LLC,

*Plaintiffs-Appellants,*

v.

ASSOCIATION OF RELATED CHURCHES, CHRIS HODGES, AND DINO RIZZO,

*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the Middle District of Florida
No. 3:23-cv-00811-MMH-LLL

---

### APPELLEES' ANSWER BRIEF

---

| | | |
|---|---|---|
| Niels P. Murphy | Edward McCarthy, III | Henry M. Coxe III |
| Vanessa Gray | Brian G. Kelley | Michael E. Lockamy |
| Murphy & Anderson, P.A. | Rogers Towers, P.A. | John G. Woodlee |
| 1501 San Marco Blvd. | 1301 Riverplace Blvd. | Bedell, Dittmar, DeVault, |
| Jacksonville, FL 32207 | Suite 1500 | Pillans & Coxe, P.A. |
| Tel: (904) 598-9282 | Jacksonville, FL 32207 | The Bedell Building |
| Fax: (904) 598-9283 | Tel: (904) 398-3911 | 101 East Adams Street |
| | Fax: (904) 396-0663 | Jacksonville, FL 32202 |
| | | Tel: (904) 353-0211 |
| | | Fax: (904) 353-9307 |

*Attorneys for Appellees Association of Related Churches,*
*Chris Hodges, and Dino Rizzo*

**No. 25-10154**

**Charles S. Weems, IV, et al. v. Association of Related Churches, et al.**

**CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT**

In addition to the interested persons disclosed in the Certificate of Interested Persons included in Appellants' initial brief, Defendants/Appellees disclose the following:

Association of Related Churches

Balogh, Bryan O.

Barksdale, Oliver David

Bedell, Dittmar, DeVault, Pillans & Coxe, P.A.

Buchalter, A Professional Corporation

Burr & Forman LLP

Carlisle, John A.

Celebration Church of Jacksonville, Inc.

Celebration Global, Inc.

Coxe, Henry M. III

George, Robert B.

Gray, Vanessa N.

Hayes, David A.

Hodges, Chris

Holland & Knight, LLP

**No. 25-10154**
**Charles S. Weems, IV, et al. v. Association of Related Churches, et al.**

Honey Lake Farms, Inc.

Horovitz, Samuel J.

Howard, Marcia Morales (District Judge)

Hulsberg, Sarah J.

Kelley, Brian G.

Lambert, Laura Lothman (Magistrate Judge)

Lockamy, Michael E.

McCarthy, Edward III

Murphy, Niels P.

Murphy & Anderson, P.A.

NorthStream Management Group, LLC, Plaintiff

Rizzo, Dino

Rogers Towers, P.A.

Siebeling, John

The Liles Firm, P.A.

Thomas, M. Scott

Turkel Cuva Barrios, P.A.

Vogt, Shane B.

Weems, Charles Stovall IV

Weems Group, LLC, Plaintiff

No. 25-10154
**Charles S. Weems, IV, et al. v. Association of Related Churches, et al.**

Weems, Kerri

Woodlee, John G.

## STATEMENT REGARDING ORAL ARGUMENT

Defendants—the Appellees here—believe oral argument is unnecessary because the matters presented for decision are adequately addressed in the briefs.

# TABLE OF CONTENTS

Certificate of Interested Persons and Corporate Disclosure Statement ................C-1

Statement Regarding Oral Argument........................................................................ i

Table of Contents ..................................................................................................... ii

Table of Citations ................................................................................................... iii

Jurisdictional Statement ......................................................................................... vi

Statement of the Issue ...............................................................................................1

Statement of the Case................................................................................................1

    A.    Nature of the Case ........................................................................1

    B.    Course of Proceedings in the District Court .........................................2

    C.    Statement of Facts .......................................................................7

    D.    Standard of Review ....................................................................18

Summary of Argument.............................................................................................18

Argument.................................................................................................................20

    A.    Resolving Plaintiffs' claims would impermissibly entangle the district court in a religious controversy. ..............................................22

    B.    The ecclesiastical-abstention doctrine is not limited to disputes between members of the same church or between churches and their members. .......................................................................28

    C.    This case cannot be resolved under neutral principles simply by determining whether Weems committed financial misconduct. .........40

Conclusion ...............................................................................................................42

Certificate of Compliance .......................................................................................44

Certificate of Service ..............................................................................................45

# TABLE OF CITATIONS

## Cases

*Baker v. City of Madison*, 67 F.4th 1268 (11th Cir. 2023) ........................................13

*Bell v. Presbyterian Church (U.S.A.)*, 126 F.3d 328 (4th Cir. 1997) .......... 24, 31, 32

*Bryce v. Episcopal Church in Diocese of Colo.*, 121 F. Supp. 2d 1327
    (D. Colo. 2000) ...........................................................................................31

*Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d 648
    (10th Cir. 2002) ........................................................... 30, 31, 32, 39

*Crowder v. S. Baptist Convention*, 828 F.2d 718
    (11th Cir. 1987) .................................. 6, 21, 22, 23, 24, 25, 28, 40

*EEOC v. CRST Van Expedited, Inc.,* 679 F.3d 657 (8th Cir. 2012) .......................34

*Eglise Baptiste Bethanie De Ft. Lauderdale, Inc. v. Bank of Am., N.A.*,
    321 So. 3d 245 (Fla. Dist. Ct. App. 2021) .....................................38

*Eglise Baptiste Bethanie De Ft. Lauderdale, Inc. v. Seminole Tribe of Fla.*,
    824 F. App'x 680 (11th Cir. 2020) ................................................23

*Farah v. Canada*, 740 So. 2d 560 (Fla. Dist. Ct. App. 1999) ................................27

*General Council on Finance & Administration of the United
    Methodist Church v. Superior Court of California*,
    439 U.S. 1355 (1978).................................................................... 29, 30

*Goodman v. Temple Shir Ami, Inc.*, 712 So. 2d 775
    (Fla. Dist. Ct. App. 1998) ..............................................................25

*Gupta v. McGahey*, 709 F.3d 1062 (11th Cir. 2013) ................................................18

*Hartwig v. Albertus Magnus College*, 93 F. Supp. 2d 200
    (D. Conn. 2000) ............................................................................39

*Hutchison v. Thomas*, 789 F.2d 392 (6th Cir. 1986) ................................................23

*Hutterville Hutterian Brethren, Inc. v. Sveen*, 776 F.3d 547
    (8th Cir. 2015)................................................................... 32, 33, 34

*Hutterville Hutterian Brethren, Inc. v. Sveen*, No. CIV 12-1010,
　　2013 WL 4679489 (D.S.D. Aug. 30, 2013)....................................................33

*Hutterville Hutterian Brethren, Inc. v. Waldner*, 791 N.W.2d 169
　　(S.D. 2010)......................................................................... 34, 35, 39

*Ingenuity, Inc. v. Linshell Innovations Ltd.*, 644 F. App'x 913
　　(11th Cir. 2016) ................................................................... 27, 41

*Kavanagh v. Zwilling*, 997 F. Supp. 2d 241 (S.D.N.Y. 2014),
　　*aff'd*, 578 F. App'x 24 (2d Cir. 2014)........................................39

*Kennedy v. Floridian Hotel, Inc.*, 998 F.3d 1221 (11th Cir. 2021) ...........................7

*Malicki v. Doe*, 814 So. 2d 347 (Fla. 2002) ............................................37

*McClure v. Salvation Army*, 460 F.2d 553 (5th Cir. 1972) ............................... 24, 26

*McRaney v. N. Am. Bd. of the S. Baptist Convention, Inc.*,
　　No. 23-60494, 2025 WL 2602899 (5th Cir. Sept. 9, 2025)........ 35, 36, 37, 39

*Myhre v. Seventh-Day Adventist Church Reform Movement
　　Am. Union Int'l Missionary Soc'y*, 719 F. App'x 926
　　(11th Cir. 2018) ........................................................... 23, 24, 28, 31

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732 (2020).......... 35, 37

*Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l
　　Presbyterian Church*, 393 U.S. 440 (1969)...................................37

*Raimi v. Furlong*, 702 So. 2d 1273 (Fla. Dist. Ct. App. 1997) ...............................27

*Realauction.com, LLC v. Grant St. Grp., Inc.*, 82 So. 3d 1056
　　(Fla. Dist. Ct. App. 2011) ...............................................................27

*Rutland v. Nelson*, 857 F. App'x 627 (11th Cir. 2021)................................ 22, 23, 31

*Serbian E. Orthodox Diocese for U.S. of Am. & Can. v. Milivojevich*,
　　426 U.S. 696 (1976)........................................................... 5, 22, 28

*SFM Holdings, Ltd. v. Banc of America Sec., LLC*, 764 F.3d 1327
　　(11th Cir. 2014)...............................................................27

*United States ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805
    (11th Cir. 2015)..............................................................................................12

*Watson v. Jones*, 80 U.S. 679 (1871) ................................................ 28, 40

*Weems v. Wedekind*, No. 5D2023-3390, 2025 WL 451803
    (Fla. Dist. Ct. App. Feb. 11, 2025) ................................................18

*Wipf v. Hutterville Hutterian Brethren, Inc.*, 808 N.W.2d 678 (S.D. 2012) ............34

*Young v. N. Ill. Conf. of United Methodist Church*, 21 F.3d 184
    (7th Cir. 1994)..............................................................................................25

## Statutes and Rules

28 U.S.C. § 1291 ..................................................................................... vi

28 U.S.C. § 1332 ..................................................................................... vi

## Other Authorities

*The Precedential Effects of the Supreme Court's Emergency Stays*,
    44 Harv. J. Law & Pub. Policy 827 (2021) ..................................................29

## JURISDICTIONAL STATEMENT

Defendants contend that the district court correctly concluded that it lacked subject-matter jurisdiction based on the ecclesiastical-abstention doctrine. Subject to that objection to the district court's jurisdiction, Defendants do not dispute Plaintiffs' contention in their jurisdictional statement that the requirements for the exercise of diversity jurisdiction under 28 U.S.C. § 1332 were met. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Whether the district court correctly applied the ecclesiastical-abstention doctrine in dismissing a lawsuit that alleged a conspiracy to oust a church's minister and would have required the trier of fact to determine whether the minister's separation from the church resulted from legitimate religious concerns about his ministry on the part of the church's leadership.

## STATEMENT OF THE CASE

### A.    Nature of the Case

In this appeal, Plaintiffs Charles Stovall Weems, IV ("Weems"), Kerri Weems ("Kerri"), Celebration Global, Inc. ("Celebration Global"), Honey Lake Farms, Inc. ("Honey Lake Farms"), NorthStream Management Group, LLC ("NorthStream"), and Weems Group, LLC ("Weems Group") (collectively "Plaintiffs") challenge the district court's order dismissing their complaint for lack of subject-matter jurisdiction based on the ecclesiastical-abstention doctrine. Doc. 58 at 13–14; App. 376–77. Weems and his wife, Kerri, founded Celebration Church in Jacksonville, Florida. Doc. 49 ¶¶ 23, 93; App. 291, 309. The operative complaint asserts twenty counts for tortious interference and civil conspiracy, all based on an alleged scheme to "oust Pastor Weems from his leadership position" at the church, where he served as senior pastor until an internal investigation of his financial misconduct and

"unbiblical" leadership led to the end of his ministry. Doc. 49 ¶¶ 63, 92–93; App. 300, 309; Doc. 1-1 at 7; App. 22.

As the district court recognized, "the central dispute in this case is whether Celebration Church initiated their investigation into Pastor Weems due to legitimate concerns regarding his fitness for the pastoral ministry, or whether this investigation was a 'sham' orchestrated through the tortious conduct of Defendants." Doc. 58 at 12; App. 375. The district court correctly concluded that "[t]he resolution of these questions [would] necessarily involve matters of church doctrine and polity, which the Court lacks subject matter jurisdiction to address." Doc. 58 at 12–13; App. 375–76.

### B.    Course of Proceedings in the District Court

Plaintiffs filed the original Complaint in this action on July 12, 2023. Doc. 1 at 1; App. 15. In the original Complaint, Plaintiffs asserted two counts—one for tortious interference and one for civil conspiracy—against Defendants Association of Related Churches ("ARC"); Chris Hodges, ARC's co-founder and the senior pastor of Church of the Highlands in Birmingham, Alabama; and Dino Rizzo, ARC's executive director and an associate pastor at Church of the Highlands (collectively "Defendants").[1] Doc. 1 ¶¶ 47, 52, 166–82; Supp. App. 14–15, 42–45. The original

_____

[1] The original Complaint also asserted claims against John Siebeling (whose name is misspelled as "Seibeling"), one of ARC's founding board members. Doc. 1

Complaint alleged a scheme to "oust Pastor Weems from Celebration Church" and replace him with an "ARC-affiliated pastor" purportedly friendlier to Defendants' alleged business interests and vision for the church. Doc. 1 ¶ 66; Supp. App. 18.

On August 28, 2023, Defendants moved to dismiss the Complaint for lack of subject-matter jurisdiction or, alternatively, for a more definite statement. Doc. 28 at 1–2; Supp. App. 47–48. Defendants' motion argued that the ecclesiastical-abstention doctrine barred the district court's exercise of jurisdiction and that the Complaint was a shotgun pleading because its allegations impermissibly lumped all Plaintiffs and Defendants together. Doc. 28 at 2–4; Supp. App. 48–50.

On February 9, 2024, the district court entered an order granting in part and denying in part Defendants' motion. Doc. 39 at 2, 15–16; Supp. App. 60, 73–74. The court struck the Complaint as an impermissible shotgun pleading. Doc. 39 at 4, 13; Supp. App. 62, 71. It also concluded, however, that because of those same pleading deficiencies, it could not determine whether the ecclesiastical-abstention doctrine applied. Doc. 39 at 4, 13; Supp. App. 62, 71.

On March 29, 2024, Plaintiffs filed the First Amended Complaint (the "Amended Complaint"), the operative pleading in this case. Doc. 49 at 1; App. 286. The Amended Complaint asserted twenty counts—fifteen for tortious interference

_____

¶ 53; Supp. App. 12. Plaintiffs later dropped their claims against Siebeling when they filed the First Amended Complaint. *See* Doc. 49 at 1; App. 286.

and five for conspiracy, Doc. 49 ¶¶ 102–205; App. 312–41—each of which incorporated the same substantive allegations, *see* Doc. 49 ¶¶ 102, 107, 112, 117, 121, 125, 129, 134, 139, 144, 149, 154, 159, 163, 167, 171, 178, 185, 192, 199; App. 312, 314–15, 317–20, 322–23, 325–26, 328–29, 331–33, 335–36, 338, 340. The Amended Complaint, like the original Complaint, alleged a scheme to "oust Pastor Weems from his leadership position" at Celebration Church and to "cause Celebration Church to repudiate" Weems's vision for the church. Doc. 49 ¶ 63; App. 300.

On April 22, 2024, Defendants moved to dismiss the Amended Complaint for lack of subject-matter jurisdiction based on the ecclesiastical-abstention doctrine. Doc. 52 at 1; App. 360. Raising a facial attack on the district court's jurisdiction, Defendants argued that Plaintiffs' claims would impermissibly require the court to determine whether the church's investigation and Weems's "ouster" were the result of Defendants' conduct or "sincere concerns about [Weems's] spiritual leadership or vision for the church." Doc. 52 at 3 n.1, 15–16; Supp. App. 78 n.1, 90–91.

Plaintiffs argued in response to the motion to dismiss that their claims "[d]o not implicate church doctrine or polity" and "can be resolved by the application of neutral principles of law." Doc. 56 at 7; Supp. App. 108. Plaintiffs also argued that their claims fell within an exception to the ecclesiastical-abstention doctrine that allows courts to exercise jurisdiction in the presence of "fraud and collusion" or

4

"when church tribunals act in bad faith for secular purposes." Doc. 56 at 16 (quoting *Serbian E. Orthodox Diocese for U.S. of Am. & Can. v. Milivojevich*, 426 U.S. 696, 713 (1976)); Supp. App. 117.

On December 19, 2024, the district court entered an order granting the motion to dismiss. Doc. 58 at 13–14; App. 376–77. The court observed that "each claim in the Amended Complaint depends on the contention that Pastor Weems' ouster as senior pastor was illegitimate because it was based upon a sham investigation orchestrated by Defendants."[2] Doc. 58 at 8–9; App. 371–72. The court reasoned that "while Plaintiffs frame their claims as tortious interference and conspiracy, these claims cannot be decided without resolving whether Celebration Church investigated Pastor Weems for legitimate religious reasons, or because of the tortious conduct of Defendants." Doc. 58 at 10–11; App. 373–74. Making that determination, the court explained, "would result in the Court entangling itself in matters of 'theological controversy, church discipline, [and] ecclesiastical government,' which the ecclesiastical abstention doctrine squarely prohibits." Doc. 58 at 11 (alteration in

---

[2] In their initial brief, Plaintiffs criticize the district court for referring to Weems as "Pastor" even though he "resigned . . . before the action was filed." Initial Br. 21. But Plaintiffs themselves frequently referred to Weems as "Pastor Weems" in the district court, including in both the original Complaint and the Amended Complaint. *See, e.g.*, Doc. 1 ¶¶ 2, 6, 10–11, 27–30; Supp. App. 5–6, 10; Doc. 49 ¶¶ 27, 51, 63–64, 78, 86; App. 292, 297, 300, 304, 306.

original) (quoting *Crowder v. S. Baptist Convention*, 828 F.2d 718, 722 (11th Cir. 1987)); App. 374.

The district court acknowledged that "Celebration Church is not a party to this litigation" and that Plaintiffs and Defendants are not "part of the same church body." Doc. 58 at 11; App. 374. The court concluded, however, that "the resolution of [Plaintiffs'] claims will invariably call for the Court to inquire into Celebration Church's internal decision to investigate Pastor Weems," an inquiry that is "barred by the ecclesiastical abstention doctrine." Doc. 58 at 12; App. 375.

The district court also rejected Plaintiffs' contention that their claims could be resolved "under neutral principles of tort law." Doc. 58 at 12 (quoting Doc. 56 at 15); App. 375. "[T]he central dispute in this case," the court explained, "is whether Celebration Church initiated their investigation into Pastor Weems due to legitimate concerns regarding his fitness for the pastoral ministry, or whether this investigation was a 'sham' orchestrated through the tortious conduct of Defendants." Doc. 58 at 12; App. 375. Resolving that dispute would "necessarily involve matters of church doctrine and polity, which the Court lacks subject matter jurisdiction to address." Doc. 58 at 12–13; App. 375–76.

Finally, the district court rejected Plaintiffs' contention that a "fraud or collusion" exception to the ecclesiastical-abstention doctrine authorized the court to exercise jurisdiction. Doc. 58 at 13 n.8; App. 376 n.8. The court reasoned that the

Amended Complaint "fail[ed] to sufficiently allege that Celebration Church itself had a secular motive for the investigation into Pastor Weems."[3] Doc. 58 at 13 n.8; App. 376 n.8. The district court therefore dismissed the Amended Complaint without prejudice. Doc. 58 at 13; App. 376.

On January 16, 2025, Plaintiffs filed a timely notice of appeal. Doc. 60 at 1–2; App. 379–80.

### C.    Statement of Facts

The following facts are alleged in, and incorporated into every count of, the Amended Complaint.[4] *See* Doc. 49 ¶¶ 102, 107, 112, 117, 121, 125, 129, 134, 139, 144, 149, 154, 159, 163, 167, 171, 178, 185, 192, 199; App. 312, 314–15, 317–20, 322–23, 325–26, 328–29, 331–33, 335–36, 338–40. Weems and Kerri founded Celebration Church in 1998. Doc. 49 ¶ 23; App. 291. Until April 2022, Weems served as Celebration Church's senior pastor. Doc. 49 ¶ 93; App. 309.

ARC is "one of the largest church planting organizations in North America." Doc. 49 ¶ 33; App. 294. It makes initial loans to allow churches to launch and then

---

[3] Plaintiffs do not argue in this appeal that the district court erred in refusing to apply a purported fraud-or-collusion exception to the ecclesiastical-abstention doctrine.

[4] Because the decision under review concerns a facial attack on the district court's jurisdiction, the Amended Complaint's allegations, however far-fetched, must be treated as true. *See, e.g.*, *Kennedy v. Floridian Hotel, Inc.*, 998 F.3d 1221, 1230 (11th Cir. 2021).

receives repayment over time from a percentage of the churches' tithes and offerings. Doc. 49 ¶ 34; App. 294. ARC "has planted more than a thousand churches since 2000." Doc. 49 ¶ 33; App. 294. Historically, Celebration Church has donated about $150,000 to $200,000 per year "to or for the benefit of ARC's church planting operations." Doc. 49 ¶ 36; App. 294.

Hodges is a co-founder of ARC and a founder and senior pastor of the Church of the Highlands in Birmingham, Alabama. Doc. 49 ¶ 39; App. 295. Rizzo is ARC's executive director and an associate pastor at the Church of the Highlands. Doc. 49 ¶ 45; App. 296. Rizzo also served as an "Overseer at Celebration Church until September 2021." Doc. 49 ¶ 46; App. 296.

In 2018, Weems came to reject what the Amended Complaint characterizes as "the modern church growth system," which prioritizes efforts to "grow attendance and generate more and more revenue" for a church. Doc. 49 ¶¶ 25–26; App. 291–92. Weems instead embraced a competing vision in which the goal of increasing church attendance would be subordinated to "helping the poor, missionary work, equality, and simplifying the church by creating alternative revenue streams that would make the church less donation dependent." Doc. 49 ¶ 25; App. 291. Weems conceived what Plaintiffs call the "Missions Plan," which was intended, somehow, to move Celebration Church toward Weems's new vision by creating several new corporate entities to handle various church functions. Doc. 49 ¶¶ 27–28; App. 292–93.

8

To that end, the Weemses formed the four corporate Plaintiffs: Celebration Global, Honey Lake Farms, NorthStream, and Weems Group. Doc. 49 ¶¶ 28–29; App. 292–93. Celebration Global was formed "to operate as the umbrella organization under which [the Weemses'] missionary work would be housed." Doc. 49 ¶ 28; App. 293. Honey Lake Farms was formed "to create, develop, and operate a retreat and outpatient facility for pastoral care." Doc. 49 ¶ 28; App. 292. NorthStream was formed to "provide centralized and shared management services to Celebration Church" and to "help initially operate and develop . . . Honey Lake Farms" and other so-called "Restorative Community Developments." Doc. 49 ¶¶ 27–28; App. 292–93. Weems Group was formed "as a vehicle for [the Weemses] and family members to invest in the Missions Plan." Doc. 49 ¶ 29; App. 293. Another corporation, nonparty AWKNG, Inc., was formed to "serve[] as the hub for the restorative/ministry programing [sic] used at Honey Lake Farms." Doc. 49 ¶ 28; App. 293.

As part of an effort to implement the Missions Plan, the church "agreed to a financial package" for the Weemses that included a "Founding Pastor agreement, retirement package for . . . Weems and [Kerri], a parsonage, and continued and ongoing financial support for their missions through funding Celebration Global, which would in turn help fund the operations of Honey Lake Farm[s], NorthStream,

and AWKNG." Doc. 49 ¶ 53; App. 298. The Amended Complaint refers to these arrangements as the "Founding Pastor Agreements." Doc. 49 ¶ 53; App. 298.

According to the Amended Complaint, Defendants have "business and financial interests" in the church-growth model that Weems had abandoned in favor of his new "missionary-focused" vision. Doc. 49 ¶¶ 27, 51; App. 292, 297. Plaintiffs allege that ARC receives ongoing payments of two percent of tithes from the churches it seeds. Doc. 49 ¶ 34; App. 294. The Amended Complaint also alleges that Hodges "controls" and "benefits financially" from entities that "provid[e] fee-based mentoring, coaching, training, and consulting services and related resources focused on promoting and advancing the modern church growth system to churches and their leadership." Doc. 49 ¶¶ 40–41; App. 295. The nature of Rizzo's purported financial interests in the church-growth model is not described in any detail in the Amended Complaint.

According to the Amended Complaint, Defendants sought to protect these purported financial interests by engineering a "takeover of Celebration Church" to ensure the failure of Weems's missionary-focused vision and the continued dominance of their preferred church-growth model. *E.g.*, Doc. 49 ¶¶ 57, 96; App. 299, 310. To achieve that "takeover," Defendants allegedly "plant[ed] an ARC agent Defendants knew they could control and who would continue to advance their

10

interests, Tim Timberlake . . . , to replace . . . Weems as Senior Pastor of Celebration Church." Doc. 49 ¶¶ 57–58; App. 299.

At the center of the alleged scheme to "oust Pastor Weems" was an internal church investigation purportedly "engineered" by Defendants. Doc. 49 ¶¶ 63, 81; App. 300, 305. According to the Amended Complaint, Defendants, through Celebration Church trustee Kevin Cormier and financial officer Lisa Stewart, "manufacture[d] evidence of supposed financial crimes and mismanagement that could be used to frame . . . Weems and justify his removal from Celebration Church." Doc. 49 ¶ 64; App. 300. The result was a "sham 'investigation'" of Weems's "possible improper financial practices and/or failure to fulfill duties and responsibilities as Senior Pastor." Doc. 49 ¶ 81; App. 305.

The purpose of the investigation was to "frame [the Weemses] for embezzling" from the church, "thereby legitimizing the takeover of Celebration Church, ensuring the failure of the Missions Plan, and simultaneously publicly destroying [the Weemses] so that they no longer posed any threat to Hodge's [sic], Rizzo's . . . , and ARC's personal, business, and financial interests." Doc. 49 ¶ 96; App. 310. Ensuring the failure of the Missions Plan would also "simultaneously destroy[] Celebration Global, Honey Lake Farms and NorthStream," thereby "eliminating them as competition for Hodges['] other businesses." Doc. 49 ¶ 86; App. 306. The investigation was conducted by Celebration Church's attorneys,

supposedly under the direction of Hodges, Rizzo, and John Siebeling, one of ARC's founding board members, "to ensure that the supposed 'investigation' would end in the predetermined outcome necessary to frame and oust . . . Weems for financial and other misconduct and force him to cede control of Celebration Church to ARC controlled agents, including Timberlake and Cormier." Doc. 49 ¶¶ 48, 85; App. 297, 306.

Weems was aware of the church's investigation into his conduct before he resigned; he was informed that while the investigation was ongoing, he was not permitted on church property. Doc. 49 ¶ 83; App. 305–06. Defendants also allegedly "convinc[ed] Celebration Church . . . to amend Celebration Church Bylaws to give its Trustees absolute, unchecked power to unlawfully oust . . . Weems from the church." Doc. 49 ¶ 84; App. 306.

On February 23, 2022, the Weemses filed a lawsuit against Celebration Church in Florida state court, seeking injunctive relief in an effort to "force the resolution of the sham investigation." Doc. 49 ¶ 90; App. 308; *see also* Doc. 28-1 at 2, 16–17; App. 49, 63–64.[5] After the church responded to the complaint in the state court lawsuit, Weems "came to the difficult realization that he could no longer be a

---

[5] "Courts may take judicial notice of publicly filed documents, such as those in state court litigation, at the Rule 12(b)(6) stage." *United States ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 811 n.4 (11th Cir. 2015).

part of Celebration Church." Doc. 49 ¶ 92; App. 309. On April 15, 2022, Weems "tendered his resignation" to the church. Doc. 49 ¶ 93; App. 309.

By that time, the church's investigation of Weems was nearly complete. *See* Doc. 49 ¶ 95; App. 310. The investigation culminated in an April 24, 2022 "Report of Investigation to Celebration Church of Jacksonville, Inc." (the "Report") prepared by the church's attorneys.[6] Doc. 49 ¶ 95; App. 310; Doc. 1-1 at 2; App. 17. The Report—which was the product of "more than 20 interviews with current and former senior leadership team members, staff members, former Trustees, and other advisors and consultants," Doc. 1-1 at 4; App. 19—was made "publicly available" by the church. Doc. 49 ¶ 95; App. 310.

Plaintiffs assert in their initial brief that the Report's findings "involve what courts and litigants commonly understand as 'garden variety' misconduct not tied to any faith or cannon [sic]." Initial Br. 17. That assertion is at best a half-truth. The Report also detailed serious concerns within the church about Weems's failure to adhere to "biblical standards for leadership." Doc. 1-1 at 22; App. 37. And it suggested that Weems's financial misconduct was itself inseparable from religious

---

[6] The district court considered the Report—which was attached to the original Complaint and referenced repeatedly in the Amended Complaint, *see* Doc. 1 ¶ 140; Supp. App. 35; Doc. 1-1 at 2; App. 17; Doc. 49 ¶¶ 95–100; App. 310–12—under the "incorporation-by-reference doctrine." Doc. 58 at 6 n.5 (quoting *Baker v. City of Madison*, 67 F.4th 1268, 1276 (11th Cir. 2023)); App. 369. Plaintiffs do not contend that the district court erred in considering the Report.

conflict within the church, as it grew out of Weems's insistence on ever greater control over the church after he received what he believed was "a secret divine revelation" that "only he had the ability to interpret." Doc. 1-1 at 11; App. 26.

The Report announced that it was "provided to assist [Celebration Church's] Board [of Trustees] in fulfilling its biblical and legal obligations" and was "performed according to biblical principles." Doc. 1-1 at 5, 7; App. 20, 22. In addition to detailing Weems's financial misconduct, Doc. 1-1 at 14–21; App. 29–36, the Report found that the Weemses' leadership had been "inconsistent and unbiblical" and "marked by rampant spiritual . . . abuse," Doc. 1-1 at 7; App. 22. Significantly, at the end of a summary of its findings, the Report concluded that "[e]ach of the above actions"—including both the financial misconduct and the "unbiblical" leadership—"constitutes a separate and independent basis justifying the discipline of [Weems], up to and including ratifying the removal of his leadership position and termination of his employment." Doc. 1-1 at 8; App. 23.

Weems's behavior, the Report went on, reflected "the antithesis of Christ-like personal sacrifice and service to others." Doc. 1-1 at 8–9; App. 23–24. The Report traced the beginning of the trouble with Weems's leadership to what it called "the Encounter":

> The Encounter was a pivotal moment in Celebration's history. At a Seder service on Passover in 2018, Stovall Weems claimed he had a personal encounter with Jesus Christ. . . . At the event, Weems became

14

> transfixed on a piece of bread he was holding. Weems
> stared blankly at the bread for a long time and then
> appeared bewildered, stunned, and speechless as his
> attention turned back to the events on the stage. . . .
>
> Afterward, Weems described that he had seen Jesus
> on the stage and been transported to the Last Supper the
> night before Jesus' crucifixion. Weems claims that he was
> physically with Jesus Christ and that Jesus spoke with him,
> directing his attention to the future and what Christ wanted
> for the Weemses to accomplish on Earth.

Doc. 1-1 at 10; App. 25.

According to the Report, the Encounter was "the catalyst for dramatically changed behaviors and actions by the Weemses in the following years." Doc. 1-1 at 11; App. 26. "The Encounter magnified [Weems's] demand for control and his defiance to authority or accountability." Doc. 1-1 at 11; App. 26. Weems used his claim of "a secret divine revelation" flowing from the Encounter—a claim the Report criticized as "heretical"—to "justify his authority and maintain control of the Church." Doc. 1-1 at 11 & n.2; App. 26. "Anyone—trustees, pastors, senior leaders, employees—who did not serve the needs of the Weemses was replaced. Anyone who challenged Weems' judgment or control of the Church was removed." Doc. 1-1 at 11; App. 26. "[S]taff were not permitted to challenge Weems for fear of being accused of disobeying God's will." Doc. 1-1 at 11; App. 26. Weems even insisted that "the Board reported to [the Weemses], not the other way around." Doc. 1-1 at 11; App. 26.

After the Encounter, "every decision" Weems made "was based on a disjointed understanding of [the Encounter's] meaning." Doc. 1-1 at 11; App. 26. According to the Report, in 2020, Weems hatched a "confusing and poorly-conceived plan"—a reference to what the Amended Complaint calls the "Missions Plan"—to reorganize the church "by spinning off several ministries as stand-alone corporate entities." Doc. 1-1 at 12; App. 27; *see also* Doc. 49 ¶¶ 27–28; App. 292–93. According to the Report, "Weems never fully grasped the complexities involved, continually changed direction, and failed to adequately explain his concepts to the board, senior leaders, and staff." Doc. 1-1 at 12; App. 27. The result was a "highly disorganized and dysfunctional enterprise." Doc. 1-1 at 13; App. 28.

Weems's refusal to accept oversight because of his claim of a "secret divine revelation" eventually manifested in improper and unauthorized financial transactions, which the Report detailed. Doc. 1-1 at 11, 14–21; App. 26, 29–36. During a roughly six-month period from December 2020 to June 2021, Weems did not call a meeting of the board of trustees and "acted without any accountability or oversight by the Board or the Overseers." Doc. 1-1 at 14; App. 29. During that period, Weems also committed various acts of financial misconduct that brought the church "to the brink of insolvency." Doc. 1-1 at 21; App. 36.

In a concluding section, roughly half of which consisted of lengthy quotations from the New Testament, the Report explained that "[t]he biblical standards for

leadership in the church are high, and Stovall and Kerri Weems have demonstrated a longstanding pattern of falling short of this measure." Doc. 1-1 at 22; App. 37. The Report summed up: "Spiritually, the Weemses have acted with arrogance, pride, deception, manipulation, selfishness, dishonesty, greed, entitlement, conceit, and unrepentance. In short, the antithesis of biblical leadership as described in scripture . . . ." Doc. 1-1 at 21; App. 36. The Report recommended immediate acceptance of the Weemses' resignations without further pay or benefits. Doc. 1-1 at 23; App. 38.

As a result of the investigation and alleged "ouster," Celebration Church "repudiate[d] the Founding Pastor Agreements and its commitment to provide millions of dollars in funding to Celebration Global to carry out the Missions Plan." Doc. 49 ¶ 79; App. 304. When Celebration Global's funding from Celebration Church—funding on which the other corporate Plaintiffs depended, *see* Doc. 49 ¶ 53; App. 298—dried up, the effect was to "destroy[]" the other corporate Plaintiffs. Doc. 49 ¶ 86; App. 306. Plaintiffs also allege that the findings from the church's investigation dissuaded potential investors in Honey Lake Farms. Doc. 49 ¶ 98; App. 310.

On October 6, 2023, the Florida state court entered an order dismissing with prejudice Weems's lawsuit against the church based on the ecclesiastical-abstention

17

doctrine.[7] Doc. 37-1 at 3, 6; App. 54, 57. The state court reasoned that adjudicating the Weemses' claims "would require [the court] to impermissibly engage in a doctrinal squabble involving the Church's biblical standards, administration, financial policies, and disciplinary practices." Doc. 37-1 at 4; App. 55. The court concluded that it could not "second-guess the church's decision to remove the Pastors or its reasoning for doing so." Doc. 37-1 at 6; App. 57. On February 11, 2025, a Florida district court of appeal affirmed the order. *Weems v. Wedekind*, No. 5D2023-3390, 2025 WL 451803, at *1 (Fla. Dist. Ct. App. Feb. 11, 2025) (per curiam).

### D.    Standard of Review

An order dismissing a complaint for lack of subject-matter jurisdiction is reviewed de novo. *E.g.*, *Gupta v. McGahey*, 709 F.3d 1062, 1064–65 (11th Cir. 2013) (per curiam).

### SUMMARY OF ARGUMENT

The district court's order dismissing the Amended Complaint for lack of subject-matter jurisdiction should be affirmed. Every count of the Amended Complaint rests on a challenge to the legitimacy of the process undertaken by Celebration Church to investigate Weems and potentially remove him as senior

---

[7] By that time, the Weemses had amended their complaint to assert claims against individual defendants, including Cormier and one of the church's attorneys, in addition to the church. Doc. 28-4 at 2; App. 214.

pastor. The harms Plaintiffs claim to have suffered flowed from that investigation and Weems's alleged "ouster" from his position in the church. Consequently, to prevail on their claims for tortious interference, Plaintiffs will have to prove that the church's investigation of Weems and his "ouster" were caused by Defendants' conduct, not by legitimate religious concerns about his fitness for ministry, such as the concerns about Weems's "unbiblical" leadership detailed in the Report that summarized the findings of the church's investigation. The district court correctly recognized that the ecclesiastical-abstention doctrine forbade it to wade into such a controversy.

Plaintiffs argue that the ecclesiastical-abstention doctrine applies only to "intrachurch" disputes. This case, according to Plaintiffs, is not such a dispute because Celebration Church is not a party and the parties are not all members of the same church. But Plaintiffs cite no case holding that the ecclesiastical-abstention doctrine applies only to disputes between members of the same church or between a church and its members. And at least three circuits have applied the doctrine outside the context of such disputes when resolving the dispute would have required the court to inappropriately entangle itself in a religious controversy. Here, as the district court correctly recognized, it would be impossible to resolve Plaintiffs' claims without becoming so entangled. The fact that Defendants are not members of

Celebration Church therefore is no bar to the application of the ecclesiastical-abstention doctrine.

Finally, Plaintiffs argue that their claims can be decided based on neutral principles because the district court can determine under Florida law whether Weems committed financial misconduct. But determining whether Weems committed financial misconduct would not resolve this dispute. Even if Plaintiffs can prove Weems did not commit financial misconduct, they will also have to prove that the church's investigation and his "ouster" were not the result of legitimate religious concerns about his "unbiblical" leadership—concerns the Report expressly found to constitute a separate and independent basis sufficient to justify Weems's termination as senior pastor.

## ARGUMENT

The district court correctly concluded that the ecclesiastical-abstention doctrine deprived it of jurisdiction. The Amended Complaint seeks relief based on a far-fetched conspiracy theory involving a plot to seize control of Celebration Church and "oust" its senior pastor, Plaintiff Stovall Weems. *See, e.g.*, Doc. 49 ¶¶ 57, 84, 96; App. 299, 306, 310. Every count alleges that Defendants conspired to "legitimiz[e] the takeover of Celebration Church" by a rival faction by engineering a "sham 'investigation'" of Weems by the church's attorneys. Doc. 49 ¶¶ 81, 96; App. 305, 310; *see also* Doc. 49 ¶¶ 102, 107, 112, 117, 121, 125, 129, 134, 139, 144,

149, 154, 159, 163, 167, 171, 178, 185, 192, 199; App. 312, 314–15, 317–20, 322–23, 325–26, 328–29, 331–33, 335–36, 338, 340. The district court was correct to recognize that it could not properly intervene in a controversy about the legitimacy of a church's reasons for investigating or "oust[ing]" its pastor. Doc. 49 ¶ 57; App. 299.

In their initial brief, Plaintiffs offer two arguments to the contrary. First, Plaintiffs assert that the ecclesiastical-abstention doctrine applies only to "intrachurch" disputes and that this case does not present such a dispute because Celebration Church is not a party and because the parties are not members of the same church. Initial Br. 28, 35. But Plaintiffs cite no decision of this Court, or of any other circuit, that so limits the doctrine. And at least three other circuits have applied the doctrine to disputes involving parties who were *not* members of the same church. Whether the parties are members of the same church or not, a civil court may not "enter[] into a religious controversy," as Plaintiffs' claims would require the district court to do. *Crowder v. S. Baptist Convention*, 828 F.2d 718, 721 (11th Cir. 1987).

Second, Plaintiffs contend that their claims can be decided based on neutral principles of law. They argue that "[t]he district court is fully able to determine whether alleged financial improprieties occurred under general Florida law" without intruding into ecclesiastical matters. Initial Br. 35. This argument misconceives the nature of the dispute. It ignores the causation element of the Amended Complaint's

21

tortious-interference claims, which would require Plaintiffs to prove that Defendants' alleged misconduct brought about the church's internal investigation and caused Weems's ministry (and his affiliated business enterprises) to come to an end. Proving that would require Plaintiffs to refute the religious concerns about Weems's "unbiblical" leadership that surfaced during the church's investigation or to prove that those concerns were insincere or played no role in precipitating the investigation or the end of Weems's ministry. Doc. 1-1 at 7; App. 22. The district court was correct to conclude that it lacked jurisdiction to resolve that question.

### A. Resolving Plaintiffs' claims would impermissibly entangle the district court in a religious controversy.

As the Supreme Court has long recognized, "religious controversies are not the proper subject of civil court inquiry." *Serbian E. Orthodox Diocese of U.S. of Am. & Can. v. Milivojevich*, 426 U.S. 696, 713 (1976). "Among the separation of church and state principles required by the establishment and free exercise clauses of the first amendment is that courts may not adjudicate ecclesiastical disputes." *Crowder*, 828 F.2d at 718. This "ecclesiastical abstention doctrine" is a well-established limit on the courts' jurisdiction: "Civil courts lack jurisdiction to entertain disputes involving church doctrine and polity." *Rutland v. Nelson*, 857 F. App'x 627, 628 (11th Cir. 2021) (per curiam); *see also Myhre v. Seventh-Day Adventist Church Reform Movement Am. Union Int'l Missionary Soc'y*, 719 F. App'x 926, 928 (11th Cir. 2018) (per curiam) (same).

22

A "narrow exception to this doctrine" permits judicial review of a church-related dispute if it can be decided based on neutral legal principles—but only if the dispute does not involve religious doctrinal matters, *see Rutland*, 857 F. App'x at 628, or issues of internal church procedures or governance, *see Myhre*, 719 F. App'x at 928–29; *see also Hutchison v. Thomas*, 789 F.2d 392, 396 (6th Cir. 1986) (declining to apply the "neutral principles doctrine" to a dispute involving the plaintiff's "status and employment as a minister of the church"). Courts lack jurisdiction if a claim implicates or is "part and parcel of ecclesiastical concerns." *Eglise Baptiste Bethanie De Ft. Lauderdale, Inc. v. Seminole Tribe of Fla.*, 824 F. App'x 680, 683 (11th Cir. 2020) (per curiam). The core areas courts must avoid include "issues connected to 'theological controversy, church discipline, ecclesiastical government, or conformity of members of the church to the standard of morals required of them.'" *Myhre*, 719 F. App'x at 928 (quoting *Crowder*, 828 F.2d at 722); *see also Eglise Baptiste*, 824 F. App'x at 683.

The ecclesiastical-abstention doctrine is not limited to claims against religious bodies; it is also properly invoked by individuals. *See, e.g.*, *Rutland*, 857 F. App'x at 627 (affirming the dismissal of a complaint against the president of a church); *Eglise Baptiste*, 824 F. App'x at 681 (affirming the dismissal of claims against an individual defendant). Nor is the doctrine limited to disputes involving hierarchical, as opposed to congregational, churches. *See Crowder*, 828 F.2d at 726 n.20 ("The distinction . . .

between the types of congregational and hierarchical church polities [is] relevant only to determining the ecclesiastical body to which the civil court must defer in determining rights to use of property.").

As the former Fifth Circuit recognized, "The relationship between an organized church and its ministers is its lifeblood. . . . Matters touching this relationship must necessarily be recognized as of prime ecclesiastical concern." *McClure v. Salvation Army*, 460 F.2d 553, 558–59 (5th Cir. 1972). Thus, a church's selection or removal of its ministers is a core ecclesiastical matter into which civil courts may not intrude. *See Myhre*, 719 F. App'x at 928 (concluding that the district court lacked jurisdiction over an action challenging "purely ecclesiastical decisions . . . regarding [the plaintiff's] fitness to serve in the clergy or to remain a member of the denomination"); *see also Bell v. Presbyterian Church (U.S.A.)*, 126 F.3d 328, 331 (4th Cir. 1997) ("[T]he decisions of religious entities about the appointment and removal of ministers and persons in other positions of similar theological significance are beyond the ken of civil courts."). Further, courts may not evaluate whether a church's decision-making regarding the selection or removal of its ministers was motivated by legitimate religious reasons. *See Bell*, 126 F.3d at 332 ("While it is possible that the Presbyterian Church may have harbored hostility against Bell personally, it is also possible that [it] may have been acting in good faith to fulfill its discernment of the divine will for its ministry. Resolution of such an

accusation would interpose the judiciary into the Presbyterian Church's decisions . . . relating to how and by whom they spread their message and specifically their decision to select their outreach ministry . . . ."); *see also Young v. N. Ill. Conf. of United Methodist Church*, 21 F.3d 184, 187 (7th Cir. 1994) ("[C]ivil court review of ecclesiastical decisions of church tribunals, particularly those pertaining to the hiring or firing of clergy, are *in themselves* an 'extensive inquiry' into religious law and practice, and hence forbidden by the First Amendment." (emphasis in original)); *Goodman v. Temple Shir Ami, Inc.*, 712 So. 2d 775, 777 (Fla. Dist. Ct. App. 1998) ("Inquiring into the adequacy of the religious reasoning behind the dismissal of a spiritual leader is not a proper task for a civil court.").

Here, the district court correctly concluded that ecclesiastical abstention deprived it of jurisdiction. As Plaintiffs point out, Celebration Church is not a party to this case. Initial Br. 35. Nevertheless, each of Plaintiffs' claims rests on a challenge to the legitimacy of the church's internal investigation of Weems and the end of his role as a pastor in the church. In effect, the Amended Complaint seeks to put the imprimatur of the civil courts "behind a particular religious faction"—the faction of Celebration Church that favors Weems and his vision for the church. *Crowder*, 828 F.2d at 721.

As the district court correctly recognized, Plaintiffs' claims "cannot be decided without resolving whether Celebration Church investigated Pastor Weems

for legitimate religious reasons, or because of the tortious conduct of Defendants." Doc. 58 at 10–11; App. 373–74. Every count of the Amended Complaint incorporates Plaintiffs' allegations that Defendants instigated a sham investigation by the church as part of a scheme to "oust" Weems from his position as senior pastor so that Defendants' vision for the church (the "church growth model") could prevail over Weems's competing vision (the "Missions Plan"). *See, e.g.*, Doc. 49 ¶¶ 26, 38, 57, 63–64, 79; App. 291–92, 295, 299–300, 304; *see also* Doc. 49 ¶¶ 102, 107, 112, 117, 121, 125, 129, 134, 139, 144, 149, 154, 159, 163, 167, 171, 178, 185, 192, 199; App. 312, 314–15, 317–20, 322–23, 325–26, 328–29, 331–33, 335–36, 338, 340. And every purported harm to the Plaintiffs asserted in the Amended Complaint— including the church's repudiation of the Founding Pastor Agreements and withdrawal of the associated financial support for the Weemses and the corporate Plaintiffs, as well as the supposed loss of potential investments in Honey Lake Farms—is alleged to have flowed from the church's investigation and ouster of Weems. *See, e.g.*, Doc. 49 ¶¶ 53–55, 63, 79, 96, 98; App. 298, 300, 304, 310. These matters—a church's investigation of its pastor and its decision-making process regarding his potential removal—are "of prime ecclesiastical concern" and lie outside civil courts' jurisdiction. *McClure*, 460 F.2d at 559.

To prevail on their tortious-interference claims, Plaintiffs would have to prove that these harms resulted from Defendants' alleged misconduct and not from

legitimate religious motivations—for example, the concerns about Weems's "unbiblical" leadership that surfaced during the church's investigation. Doc. 1-1 at 7; App. 22. A tortious-interference claim requires proof that the "defendant's interference caused the cessation of the business relationship." *Realauction.com, LLC v. Grant St. Grp., Inc.*, 82 So. 3d 1056, 1059 (Fla. Dist. Ct. App. 2011). Where a relationship ends because of a third party's "predisposition" to end it, not because of the defendant's interference, the plaintiff cannot establish causation. *Ingenuity, Inc. v. Linshell Innovations Ltd.*, 644 F. App'x 913, 916 (11th Cir. 2016) (per curiam) (quoting *Farah v. Canada*, 740 So. 2d 560, 562 (Fla. Dist. Ct. App. 1999)). And Plaintiffs cannot prevail on their conspiracy claims unless they prevail on the underlying claims for tortious interference. *See SFM Holdings, Ltd. v. Banc of America Sec., LLC*, 764 F.3d 1327, 1339 (11th Cir. 2014) (observing that under Florida law, "an actionable conspiracy requires an actionable underlying tort or wrong" (quoting *Raimi v. Furlong*, 702 So. 2d 1273, 1284 (Fla. Dist. Ct. App. 1997))).

Thus, as the district court observed, it would be impossible to resolve the causation element of Plaintiffs' claims without answering the following questions:

> Was the investigation of Pastor Weems undertaken by Celebration Church in good faith, based on reasonable concerns about his leadership, or solely because of Defendants' machinations? Was Pastor Weems's "ouster" the result of scheming by Defendants, or was it Pastor Weems's failure to live up to "biblical standards for

> leadership in the church" that led to the investigation and
> the end of his ministry? Did Pastor Weems exhibit "the
> antithesis of biblical leadership as described in scripture,"
> or was he just set up?

Doc. 58 at 11 (quoting Doc. 52 at 15–16); App. 374. Attempting to answer those questions would impermissibly entangle the court in matters of "theological controversy, church discipline, ecclesiastical government, or the conformity of the members"—and ministers—"of the church to the standard of morals required of them." *Crowder*, 828 F.2d at 722 (quoting *Watson v. Jones*, 80 U.S. 679, 733 (1871)). The ecclesiastical-abstention doctrine forbids such entanglement. *See, e.g.*, *Myhre*, 719 F. App'x at 928.

**B.     The ecclesiastical-abstention doctrine is not limited to disputes between members of the same church or between churches and their members.**

Plaintiffs' lawsuit, as shown above, would entangle the district court in "religious controversies" that "are not the proper subject of civil court inquiry." *Milivojevich*, 426 U.S. at 713. Plaintiffs nevertheless contend that the ecclesiastical-abstention doctrine does not apply here because it is limited to "intrachurch disputes," a category that Plaintiffs apparently take to include only disputes between members of the same church or between a church and its members. Initial Br. 28, 35. Plaintiffs misinterpret the law.

Plaintiffs cite no decision of this Court, or of any other circuit, holding that the ecclesiastical-abstention doctrine applies only to disputes in which all parties are

members of the same church, or in which the only parties are a church and its members. And as discussed below, at least three circuits—the Fifth, Eighth, and Tenth—have applied the doctrine outside the context of such disputes.

The sole federal authority Plaintiffs cite in support of their position is *General Council on Finance and Administration of the United Methodist Church v. Superior Court of California*, 439 U.S. 1355 (1978) (Rehnquist, J., opinion in chambers), a nearly half-century-old order in which Justice William Rehnquist, as Circuit Justice, denied an application for a stay.[8] Justice Rehnquist's order reveals little about the facts of the underlying dispute. The order arose, however, from a lawsuit in California state court asserting claims for breach of contract, fraud, and violation of state securities laws against the United Methodist Church and a nonprofit that was alleged to be an "alter ego, agency, or instrumentality" of the church. *Id.* at 1369–70. The church sought certiorari review of a state court decision rejecting its challenge to the California courts' personal jurisdiction. *Id.* The church argued that the state court had violated the First and Fourteenth Amendments in concluding that the church "was 'doing business' in the State of California." *Id.* at 1370.

---

[8] As District Judge Trevor McFadden of the District of Columbia has observed, a "decision by a single Justice" on an application for a stay may be persuasive but "cannot have binding precedential effect" because "individual Justices do not have the authority to revise or modify the judgments of the lower courts" and cannot "bind the [Supreme] Court." Trevor N. McFadden & Vetan Kapoor, *The Precedential Effects of the Supreme Court's Emergency Stays*, 44 Harv. J. Law & Pub. Policy 827, 850–51 (2021).

In denying a stay of the state-court proceedings, Justice Rehnquist concluded that the church had failed to show "a reasonable probability that four Justices will consider the issues sufficiently meritorious to vote to grant certiorari." *Id.* at 1372. In reaching that conclusion, Justice Rehnquist suggested that "constitutional limitations on the extent to which a civil court may inquire into and determine matters of ecclesiastical cognizance and polity in adjudicating intrachurch disputes" do not necessarily "apply outside the context of such intraorganization disputes." *Id.* He reasoned that the considerations supporting ecclesiastical abstention "are not applicable to *purely secular* disputes between third parties and a particular defendant, albeit a religious affiliated organization, in which fraud, breach of contract, and statutory violations are alleged." *Id.* at 1373 (emphasis added).

On its face, Justice Rehnquist's reasoning is limited to "purely secular disputes"—a limitation Plaintiffs do not acknowledge. *Id.* That limitation is critical, as the Tenth Circuit's decision in *Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d 648 (10th Cir. 2002), illustrates.

In *Bryce*, two plaintiffs—one of whom was a youth minister and the other of whom was "not associated with" the church involved in the dispute "in any way"—asserted sexual harassment claims against a church and others based on "remarks made about homosexuals and about the plaintiffs' homosexual activities." *Id.* at 651. In the district court, Sara Smith, the plaintiff who was not associated with the church,

relied on Justice Rehnquist's order in *General Council on Finance* in an attempt to avoid the application of the ecclesiastical-abstention doctrine. *Bryce v. Episcopal Church in Diocese of Colo.*, 121 F. Supp. 2d 1327, 1344 (D. Colo. 2000). The district court concluded, however, that *General Council on Finance* did not apply because "[t]he dispute at issue in this case does not involve a purely secular controversy." *Id.* Instead, it "involved a church's selection of its minister and a resolution of a controverted question of faith." *Id.* The district court therefore dismissed both plaintiffs' claims. *Id.*

On appeal, the Tenth Circuit affirmed. *Bryce*, 289 F.3d at 660. Because the court of appeals agreed that the dispute was not "purely secular," it refused to "insert itself into a theological discussion about the church's doctrine and policy towards homosexuals," even though one of the plaintiffs was "not associated with" the church. *Id.* at 651, 658 (quoting *Bell*, 126 F.3d at 331).[9]

This case, like *Bryce*, does not involve a "purely secular dispute," even though the parties are not all members of the same church. *Id.* at 658 (quoting *Bell*, 126 F.3d at 331). *General Council on Finance* is therefore inapposite.

---

[9] In *Bryce*, the Tenth Circuit treated the ecclesiastical-abstention or "church autonomy" doctrine as an affirmative defense, rather than a limitation on the court's jurisdiction. *Id.* at 654. This Court, however, has treated the doctrine as a limitation on the courts' subject-matter jurisdiction. *See Rutland*, 857 F. App'x at 628–29 (affirming a dismissal for lack of subject-matter jurisdiction based on ecclesiastical abstention); *Myhre*, 719 F. App'x at 929 (same).

At least two other circuits have applied the ecclesiastical-abstention doctrine outside the context of what Plaintiffs consider an "intrachurch" dispute. In *Hutterville Hutterian Brethren, Inc. v. Sveen*, 776 F.3d 547 (8th Cir. 2015), the Eighth Circuit applied the doctrine to a dispute that, like this case, involved allegations of a plot by outsiders to engineer a takeover of a religious institution by one of its factions. *Id.* at 550.

*Hutterville* arose from a split between two religious factions—the "Wipf faction" and the "Waldner faction"—each of which claimed the right to control Hutterville Hutterian Brethren, Inc., or "Hutterville," a religious nonprofit corporation that operated a communal farm for a colony of the Hutterite religion. *Id.* at 548–50. The Waldner faction, both as individuals and on behalf of Hutterville, filed a lawsuit against Hutterville's attorneys and their law firm. *Id.* at 548. The Waldner faction asserted a RICO claim, alleging that the attorneys had "conspired with leaders of the other faction to 'manufacture' the apparent religious schism and improperly place the conspiring faction leaders in command of Hutterville." *Id.*

Significantly, the Eighth Circuit's opinion contains no suggestion that the attorneys were members of the Hutterite religion or the colony involved in the dispute. Indeed, the attorneys acknowledged in the district court that "this [is] not a case of one Hutterite faction suing the other." *Hutterville Hutterian Brethren, Inc. v. Sveen*, No. CIV 12-1010, 2013 WL 4679489, at *5 (D.S.D. Aug. 30, 2013).

Nevertheless, the district court concluded that it lacked jurisdiction because the Waldner faction's claims would require determining "which faction truly controls Hutterville," which would "require[] the court to resolve religious and ecclesiastical disputes beyond the province of secular courts." *Hutterville*, 776 F.3d at 552.

On appeal, the Eighth Circuit agreed and affirmed. *Id.* at 557. The court of appeals concluded that "the question of who rightly controls Hutterville [wa]s the unavoidable nub" of the Waldner faction's claims and upheld the district court's conclusion that the First Amendment would not "permit such an inquiry." *Id.* at 555–56.

In reaching that conclusion, the Eighth Circuit relied in part on the doctrine of judicial estoppel. *Id.* at 556–57. As defendants in state-court lawsuits previously filed by the Wipf faction, the Waldner faction had successfully argued that the state courts lacked jurisdiction to "determine church leadership." *Id.* at 556. On that basis, the Eighth Circuit concluded that the Waldner faction was judicially estopped from asserting in the federal litigation that civil courts had jurisdiction to make that determination. *Id.* at 556–57.

But the Eighth Circuit's reliance on judicial estoppel in *Hutterville* does not diminish that decision's persuasive value here. If, as Plaintiffs contend, the ecclesiastical-abstention doctrine applied only to disputes between members of the same church, the doctrine of judicial estoppel would not have applied in *Hutterville*

33

because the Waldner faction's position would have been perfectly consistent with its position in the prior state-court litigation. *See id.* at 557 (explaining that for judicial estoppel to apply, "a party's later position must be clearly inconsistent with its earlier position" (quoting *EEOC v. CRST Van Expedited, Inc.,* 679 F.3d 657, 679 (8th Cir. 2012))). In the prior state-court litigation, only the two factions and Hutterville itself—no outsiders—were parties. *See Wipf v. Hutterville Hutterian Brethren, Inc.*, 808 N.W.2d 678, 680–81 (S.D. 2012); *Hutterville Hutterian Brethren, Inc. v. Waldner*, 791 N.W.2d 169, 171 (S.D. 2010). The federal litigation, on the other hand, presented a dispute between one faction and a group of outsiders. If that distinction were dispositive, as Plaintiffs contend, it would have been wholly consistent to say the ecclesiastical-abstention doctrine applied in the state-court litigation but not in the federal litigation.

The Eighth Circuit concluded, however, that those two positions were irreconcilable. *Hutterville*, 776 F.3d at 556–57. Thus, what mattered to the Eighth Circuit was simply that both the state and federal lawsuits would have required the court to answer the "religious question" of "[w]hich faction's members" were the rightful "governing body" of Hutterville. *Id.* at 555. That was enough to deprive the courts of jurisdiction, regardless of whether the case presented an "intrachurch" dispute or a dispute between one faction and a group of outsiders.

Here, as in *Hutterville*, "the path to [Plaintiffs'] requested relief necessarily leads through the religious dispute," even though some parties are not members of Celebration Church. *Id.* at 555 n.7. The district court was therefore correct to conclude that it lacked jurisdiction.

Most recently, the Fifth Circuit held that the ecclesiastical-abstention doctrine barred claims by an ordained minister and former director of a Southern Baptist organization against a separate Baptist organization because "[a]lthough his claims are facially secular, their resolution would require secular courts to opine on 'matters of faith and doctrine' and intrude on [the defendant organization's] 'internal management decisions that are essential to [its] central mission.'" *McRaney v. N. Am. Bd. of the S. Baptist Convention, Inc.*, No. 23-60494, 2025 WL 2602899, at *14 (5th Cir. Sept. 9, 2025) (to be published) (third alteration in original) (quoting *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020)).

In *McRaney*, the Baptist Convention of Maryland/Delaware ("BCMD") and the North American Mission Board ("NAMB") entered into a "Strategic Partnership Agreement" or "SPA" regarding church planting and evangelism. *Id.* at *1. At the time, Will McRaney was BCMD's executive director and executive missional strategist. *Id.* at *2. After "[a] schism developed between McRaney and NAMB about how best to carry out the SPA," NAMB notified BCMD that it intended to terminate the SPA. *Id.* BCMD then fired McRaney. *Id.* According to BCMD's

president, McRaney was fired because of his "wretched leadership" and lack of "'the humble spirit necessary' for his evangelical mission." *Id.* McRaney, however, evidently blamed NAMB. *See id.* After he "publicly campaigned against NAMB and its president" and posted on Facebook that he was "declaring war" on NAMB, he was disinvited from a conference, and NAMB posted a "no-entry photograph" of him behind the reception desk at its headquarters. *Id.* McRaney then sued NAMB for alleged tortious interference with business relationships, defamation, and intentional infliction of emotional distress. *Id.*

On appeal from a summary judgment and dismissal in NAMB's favor, McRaney argued in part that the ecclesiastical-abstention doctrine did not apply because the case did not "involve an intra-church dispute." *Id.* at *14. In rejecting McRaney's argument, the Fifth Circuit concluded that the ecclesiastical-abstention doctrine "is triggered by the subject matter of the dispute, not the organizational structure of the disputants."[10] *Id.* at *16.

---

[10] In rejecting the contention that the ecclesiastical-abstention doctrine did not apply to a case involving no "intra-church dispute," the Fifth Circuit focused in part on the organizational structure of the Baptist denomination. *See id.* at *14–16. That context, however, does not diminish the significance of *McRaney*'s holding—that "the First Amendment does not allow civil litigation 'to turn on the resolution by civil courts of controversies over religious doctrine and practice.'" *Id.* at *5 (quoting *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969)).

As in *McRaney*, the dispute here involves a pastor formerly affiliated with one organization suing a separate religious organization for alleged torts. And as in *McRaney*, adjudicating the pastor's (and other plaintiffs') claims would require "secular courts to opine on 'matters of faith and doctrine'"—an outcome prohibited by the First Amendment. *Id.* at *14 (quoting *Our Lady of Guadalupe*, 591 U.S. at 746).

Plaintiffs also rely heavily on *Malicki v. Doe*, 814 So. 2d 347 (Fla. 2002), in which the Florida Supreme Court allowed parishioners who had been sexually assaulted by a priest to pursue claims against the church for negligent hiring and supervision. *Id.* at 351–52. Plaintiffs highlight language that could be read to suggest that the ecclesiastical-abstention doctrine does not apply "*outside* the context of . . . intraorganizational disputes." Initial Br. 28 (emphasis and alteration in original) (quoting *Malicki*, 814 So. 2d at 356). In *Malicki*, however, unlike in this case, the dispositive question was purely secular: "whether the Church Defendants had reason to know of the tortious conduct and did nothing to prevent reasonably foreseeable harm from being inflicted upon the plaintiffs." *Malicki*, 814 So. 2d at 364. Here, in contrast, Plaintiffs' claims would require the district court to determine whether the investigation and ouster of Weems were the product of legitimate religious motives.

Significantly, Florida courts have not interpreted *Malicki* to impose Plaintiffs' desired limitation on the ecclesiastical-abstention doctrine. Florida courts after

*Malicki* have not hesitated to apply the doctrine to disputes that were not "intrachurch" in Plaintiffs' sense, as long as the dispute could not be resolved without improperly intruding into religious matters. *See, e.g.*, *Eglise Baptiste Bethanie De Ft. Lauderdale, Inc. v. Bank of Am., N.A.*, 321 So. 3d 245, 246 (Fla. Dist. Ct. App. 2021) (applying the ecclesiastical-abstention doctrine to a dispute between a church and its banks because "the Church's negligence claims necessarily required the trier of fact to resolve the question of which church faction controlled the Church"); *Mammon v. SCI Funeral Servs. of Fla. Inc.*, 193 So. 3d 980, 981 (Fla. Dist. Ct. App. 2016) (applying the ecclesiastical-abstention doctrine to a dispute between a widow and a cemetery that would have required the court to "determine what constituted 'Jewish burial customs and traditions'"). The district court correctly concluded that this case could not be resolved without such an intrusion.

Finally, in a slight variation on their principal theme, Plaintiffs suggest that the ecclesiastical-abstention doctrine does not apply here because "the Report . . . came out after [Weems] resigned." Initial Br. 30. That argument ignores the fact that Defendants' alleged engineering of the "sham" investigation—the primary basis for Plaintiffs' claims—occurred *before* Weems resigned from his position as Celebration Church's senior pastor. *See* Doc. 49 ¶¶ 63, 81, 92–93; App. 300, 305, 309. In any event, as the *Bryce*, *Hutterville*, and *McRaney* cases discussed above illustrate, the parties need not have been members of the same church at *any*

time—much less at *every* relevant time, as Plaintiffs suggest—for the ecclesiastical-abstention doctrine to apply. *See Hutterville*, 776 F.3d at 555–57; *Bryce*, 289 F.3d at 651; *McRaney*, 2025 WL 2602899, at \*16; *see also Kavanagh v. Zwilling*, 997 F. Supp. 2d 241, 250 (S.D.N.Y. 2014) (refusing to exercise jurisdiction over a former priest's lawsuit based on his church's release of an allegedly defamatory press release *after* he was defrocked because resolving the priest's claims would result in "entanglement 'in a matter of ecclesiastical concern'" (quoting *Hartwig v. Albertus Magnus College*, 93 F. Supp. 2d 200, 219 (D. Conn. 2000))), *aff'd*, 578 F. App'x 24 (2d Cir. 2014).

Indeed, Plaintiffs' attempt to attribute the release of the Report after Weems's resignation to tortious meddling by Defendants only makes matters worse. *See* Doc. 49 ¶¶ 94, 97; App. 309–10. Did the church decide to release the Report because of Defendants' alleged scheming? Or was it because of a sense of biblical obligation to "rebuke" those "who persist in sin" "in the presence of all"? Doc. 1-1 at 4 (quoting *1 Timothy* 5:19–20); App. 19. The Amended Complaint invites the district court to settle that controversy.

Here, even though the parties are not all members of Celebration Church, entertaining Plaintiffs' claims would entangle the district court in matters of "theological controversy, church discipline, [and] ecclesiastical government."

*Crowder*, 828 F.2d at 722 (quoting *Watson*, 80 U.S. at 733). The district court correctly concluded that it lacked jurisdiction to enter that morass.

### C.   This case cannot be resolved under neutral principles simply by determining whether Weems committed financial misconduct.

Plaintiffs contend that the ecclesiastical-abstention doctrine does not apply because "[t]he district court is fully able to determine whether alleged financial improprieties occurred under general Florida law." Initial Br. 35. The district court correctly rejected that argument. *See* Doc. 58 at 12; App. 375. Plaintiffs' argument overlooks the "central dispute" presented by the Amended Complaint, which, as the district court aptly observed, "is whether Celebration Church initiated their investigation into Pastor Weems due to legitimate concerns regarding his fitness for the pastoral ministry, or whether this investigation was a 'sham' orchestrated through the tortious conduct of Defendants." Doc. 58 at 12; App. 375. Resolving that dispute would "necessarily involve matters of church doctrine and polity." Doc. 58 at 12; App. 375.[11]

---

[11] Plaintiffs' initial brief occasionally insinuates that their claims relate only to business relationships with third parties unaffiliated with Celebration Church. *See, e.g.*, Initial Br. 9–10, 18–19, 26, 36–37. That suggestion mischaracterizes Plaintiffs' claims. Of the Amended Complaint's fifteen counts for tortious interference, *twelve* allege interference with Plaintiffs' business relationships with Celebration Church, while only three counts *additionally* allege interference with business relationships with others. Plaintiffs' insinuation also misses the point. Regardless of which business relationships are at issue, the foundation of each of Plaintiffs' claims is the alleged scheme to cause Celebration Church to undertake a "sham" investigation of

The causation issue discussed above—an issue Plaintiffs overlook in their initial brief—would necessarily thwart any attempt to resolve this case on neutral principles. Determining whether Weems committed financial misconduct under neutral principles of Florida law would not be sufficient to resolve this case.

Suppose Plaintiffs managed to prove Weems innocent of any financial misconduct. Would it follow that they win? Not at all. If the church had a predisposition to investigate Weems and end his ministry for other reasons—such as the "unbiblical" leadership and "rampant spiritual . . . abuse" that the Report found "constitute[d] a separate and independent basis" for removing Weems, Doc. 1-1 at 7–8; App. 22–23—Plaintiffs would be unable to prove the causation element of their tortious-interference claims. *See Ingenuity, Inc.*, 644 F. App'x at 916. Indeed, Plaintiffs' attempt to frame the investigation as "focus[ed]" on financial improprieties only exposes the unworkability of their position. Initial Br. 37. In the context of a church's investigation finding both financial and spiritual improprieties, how could a court possibly disentangle the secular from the religious motives without weighing the sincerity and gravity of the religious concerns? To prevail, Plaintiffs would have to refute those religious concerns by showing that Weems's leadership was not "unbiblical" or that, contrary to appearances, the church did not

---

Weems that would culminate in his removal. *See, e.g.*, Doc. 49 ¶¶ 57, 63–64, 82, 84–85; App. 299–300, 305–06.

sincerely care whether Weems measured up to "biblical standards for leadership in the church." Doc. 1-1 at 7, 22; App. 22, 37. Those questions, however, are not proper matters for civil courts to decide.

## CONCLUSION

Every count of the Amended Complaint rests on one key contention: that the process undertaken by a church to investigate and potentially remove a pastor was a "sham." *E.g.*, Doc. 49 ¶ 85; App. 306. To prevail on their claims, Plaintiffs would have to refute the concerns that surfaced during that process about that pastor's "unbiblical" leadership and "rampant spiritual . . . abuse." Doc. 1-1 at 7; App. 22. The ecclesiastical-abstention doctrine forbids such an inquiry. The district court's order dismissing the Amended Complaint should be affirmed.

MURPHY & ANDERSON, P.A.

By: s/Niels P. Murphy_____
    Niels P. Murphy
    Florida Bar No. 65552
    nmurphy@murphyandersonlaw.com
    Vanessa Gray
    Florida Bar No. 1025497
    vgray@murphyandersonlaw.com
    1501 San Marco Boulevard
    Jacksonville, Florida  32207
    Telephone: (904) 598-9282
    Facsimile: (904) 598-9283

**Counsel for Association of Related Churches**

ROGERS TOWERS, P.A.

By:  s/Edward McCarthy, III_____
    Edward McCarthy, III
    Florida Bar No. 866873
    emccarthy@rtlaw.com
    Brian G. Kelley
    Florida Bar No. 0106430
    bkelley@rtlaw.com
    1301 Riverplace Boulevard
    Suite 1500
    Jacksonville, Florida 32207
    Telephone: (904) 398-3911
    Facsimile: (904) 396-0663

**Counsel for Appellee Chris Hodges**

BEDELL, DITTMAR, DEVAULT, PILLANS & COXE, P.A.

By: s/Michael E. Lockamy_____
    Henry M. Coxe III
    Florida Bar No. 0155193
    hmc@bedellfirm.com
    Michael E. Lockamy
    Florida Bar No. 69626
    mel@bedellfirm.com
    John G. Woodlee
    Florida Bar No. 0100990
    jgw@bedellfirm.com
    The Bedell Building
    101 East Adams Street
    Jacksonville, Florida 32202
    Telephone: (904) 353-0211
    Facsimile: (904) 353-9307

**Counsel for Dino Rizzo**

43

## CERTIFICATE OF COMPLIANCE

I HEREBY CERTIFY on this 15th day of September, 2025, that this brief complies with the word limit of Florida Rule of Appellate Procedure 32(a)(7)(B)(i), because, excluding the parts of the document exempted by Florida Rule of Appellate Procedure 32(f), this document contains 10,198 words and complies with the typeface requirement of Florida Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Florida Rule of Appellate Procedure 32(a)(6).

_____s/Michael E. Lockamy_____<br>
Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 15th day of September, 2025, a true and correct copy of the foregoing document entitled Answer Brief has been electronically filed with the Clerk of Court by using the U.S. Circuit Court of Appeals, Eleventh Circuit CM/ECF Portal, which will provide a copy to all counsel of record in this case.

s/Michael E. Lockamy
Attorney for Appellee Dino Rizzo