## No. 25-10154

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

CHARLES S. WEEMS, IV, KERRI WEEMS, CELEBRATION GLOBAL, INC., HONEY LAKE FARMS, INC., NORTHSTREAM MANAGEMENT GROUP, LLC, AND WEEMS GROUP, LLC,

*Plaintiffs-Appellants,*

v.

ASSOCIATION OF RELATED CHURCHES, CHRIS HODGES, AND DINO RIZZO,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Middle District of Florida
No. 3:23-cv-00811-MMH-LLL

## APPELLEES' SUPPLEMENTAL APPENDIX

Niels P. Murphy
Vanessa Gray
Murphy & Anderson, P.A.
1501 San Marco Boulevard
Jacksonville, Florida 32207
Telephone: (904) 598-9282
Facsimile: (904) 598-9283

Edward McCarthy, III
Brian G. Kelley
Rogers Towers, P.A.
1301 Riverplace Boulevard
Suite 1500
Jacksonville, Florida 32207
Telephone: (904) 398-3911
Facsimile: (904) 396-0663

Henry M. Coxe III
Michael E. Lockamy
John G. Woodlee
Bedell, Dittmar, DeVault,
Pillans & Coxe, P.A.
The Bedell Building
101 East Adams Street
Jacksonville, Florida 32202
Telephone: 904-353-0211
Facsimile: 904-353-9307

*Attorneys for Appellees Association of Related Churches,*
*Chris Hodges, and Dino Rizzo*

## INDEX TO APPELLEES' SUPPLEMENTAL APPENDIX

**Docket/
Tab No.**

Complaint & Demand for Jury Trial ..........................................................................1

Excerpt from Defendants' Motion to Dismiss for Lack of Jurisdiction or,
Alternatively, Motion for More Definite Statement and
Supporting Memorandum of Law .............................................................................28

Exhibit A to Defendants' Notice of Supplemental Authority ............................. 37-1

Order on Defendants' Motion to Dismiss .................................................................39

Defendants' Motion to Dismiss First Amended Complaint
for Lack of Subject-Matter Jurisdiction or, Alternatively,
for Failure to State a Claim ......................................................................................52

Plaintiffs' Response in Opposition to Defendants' Motion to Dismiss
for Lack of Subject-Matter Jurisdiction or, Alternatively, For Failure
to State a Claim .........................................................................................................56

**DOCKET/TAB 1**

COMPLAINT & DEMAND FOR JURY TRIAL

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CHARLES S. WEEMS, IV, an individual,
KERRI WEEMS, an individual,
and CELEBRATION
GLOBAL, INC., a Florida not for profit           Case No.:
corporation, HONEY LAKE FARMS,
INC., a Florida not for profit corporation,
NORTHSTREAM MANAGEMENT
GROUP, LLC, a Florida limited liability
company, and WEEMS GROUP, LLC,
a Florida limited liability company,

       Plaintiffs,

v.

ASSOCIATION OF RELATED CHURCHES,
a Texas not-for-profit corporation,
CHRIS HODGES, individually,
DINO RIZZO, individually, and
JOHN SEIBELING, individually,

       Defendants.

_____/

## **COMPLAINT & DEMAND FOR JURY TRIAL**

Plaintiffs, Charles Stovall Weems, IV ("Pastor Weems"), Kerri Weems ("K. Weems"), Celebration Global, Inc. ("Celebration Global"), Honey Lake Farms, Inc. ("Honey Lake Farms"), NorthStream Management Group, LLC ("NorthStream"), and Weems Group, LLC ("Weems Group"), sue Defendants, Association of Related Churches ("ARC"), Chris Hodges ("Hodges"), Dino Rizzo ("Rizzo"), and John Seibeling ("Seibeling"), and allege as follows:

## OVERVIEW OF THE CASE

1.      This case arises out of a continuing unlawful conspiracy masterminded by the Defendants to protect and expand their church growth business interests and endeavors and the substantial income they generate by destroying Plaintiffs and eliminating them as perceived threats and competitors, which included engineering a takeover at Celebration Church of Jacksonville, Inc. ("Celebration Church") to allow Defendants to effectively gain control over its operations and substantial assets, cover-up numerous criminal and tortious acts committed in the process, and frame the Weemses's for financial crimes they never committed.

2.      Defendants were consumed by greed and the desire to advance their own financial and business interests when they deliberately targeted Pastor Weems and those closest to him because he rejected their unbridled church growth model and was focused on missionary work and developing supporting businesses that Defendants perceived as a significant threat to their economic interests.

3.      Using ARC's significant influence and power as a vehicle to facilitate and conceal their nefarious scheme, Defendants intentionally caused substantial financial and other irreparable harm to the Plaintiffs through a pattern of unlawful and often criminal acts that included extortion, bribery, psychological abuse, wire fraud, and computer crimes which ultimately caused over $100 million in damages.

4.      This action seeks to hold Defendants accountable for their illegal and tortious misconduct and put a stop to the substantial harm their unlawful actions continue to cause.

2

## PARTIES, JURISDICTION, AND VENUE

5.      This is an action for damages well in excess of $75,000.00, exclusive of interest, costs, and attorneys' fees, as well as equitable relief.

6.      Plaintiff, Pastor Weems, is a resident and citizen of Duval County, Florida.

7.      Plaintiff, K. Weems, is a resident and citizen of Duval County, Florida.

8.      Plaintiff, Celebration Global, is a Florida not for profit corporation with its principal place of business located at 2627 Belfort Road, Jacksonville, Florida 32216.

9.      Plaintiff, Honey Lake Farms, is a Florida not for profit corporation with its principal place of business located at 2627 Belfort Road, Jacksonville, Florida 32216.

10.     Plaintiff, NorthStream, is a Florida limited liability company with its principal place of business located at 2627 Belfort Road, Jacksonville, Florida 32216, whose sole members are Pastor Weems and K. Weems.

11.     Plaintiff, Weems Group, is a Florida limited liability company with its principal place of business located at 2627 Belfort Road, Jacksonville, Florida 32216, whose sole members are Pastor Weems and K. Weems.

12.     Defendant, ARC, is a Texas not-for-profit corporation with its principal place of business located at 1201 Lee Branch Lane, Birmingham, AL 35242.

13.     Defendant, Hodges, is a resident and citizen of Birmingham, Alabama.

14.     Defendant, Rizzo, is a resident and citizen of Birmingham, Alabama.

SUPP APP 6

15.     Defendant, Seibeling, is a resident and citizen of Memphis, Tennessee.

16.     Non-party, Celebration Church, is a Florida not-for-profit corporation with its principal place of business at 9555 R.G. Skinner Parkway, Jacksonville, Florida 32256.

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332 because it involves claims between citizens of different states with an amount in controversy that exceeds the sum of $75,000.00, exclusive of interest and costs.

18.     Pursuant to 28 U.S.C. §1391, venue is proper in this District because a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this District.

19.     Defendants, directly and/or through employees, agents, authorized representatives, co-conspirators, subsidiaries, affiliates, and/or other persons, entities, and/or representatives acting under their management, direction, supervision, and/or control, engaged in numerous contacts in, with, and/or directed at the state of Florida upon which this action is based.

20.     Defendants knowingly and intentionally entered into one or more contracts or agreements, pursuant to which they, directly and/or through employees, agents, authorized representatives, co-conspirators, subsidiaries, affiliates, and/or other persons, entities, and/or representatives acting under their management, direction, supervision, and/or control, committed and engaged in tortious and overt acts within and directed at the state of Florida.

SUPP APP 7

21.     Based on the facts alleged throughout this Complaint, this Court has personal jurisdiction over each Defendant under Section 48.193, *Florida Statutes*, because they each personally, directly, in concert with one another, and/or through an employee, agent, co-conspirator, subsidiary, affiliate, and/or other person or entity acting under their management, supervision, direction, and/or control, engaged in one or more of the following acts:

    a.    committing tortious acts within the state of Florida;

    b.    committing intentional torts expressly aimed at Florida, effects of which were suffered in Florida;

    c.    operating, conducting, engaging in, or carrying on a business or business venture within the state of Florida, or having an office in Florida;

    d.    engaging in substantial and not isolated activity within the state of Florida; and/or

    e.    engaging in a conspiracy to commit tortious acts against Plaintiffs within the state of Florida and engaging in overt acts in furtherance of that conspiracy within or directed at the state of Florida.

22.     Based on the facts alleged throughout this Complaint, sufficient minimum contacts exist between each Defendant and the state of Florida to satisfy Due Process under the United States Constitution because Defendants:  (1) engaged in substantial and not isolated activity within and directed at the state of Florida; (2) conducted business through employees, agents, co-conspirators, and/or authorized representatives located in the state of Florida; and/or (3) committed and conspired to commit intentional torts expressly aimed at Florida, the effects and harms of which were calculated to and did cause injury within the state of Florida.  Accordingly, each

of the Defendants could and should have reasonably anticipated being sued for the claims alleged herein in the state of Florida.

23.    At all times material to this action, Defendants were the agents, licensees, employees, partners, joint-venturers, co-conspirators, masters, and/or employers of one another, and each of them acted within the course and scope of an agency, license, partnership, employment, conspiracy, ownership, joint venture, or contractual relationship with one another.  At all times material to this action, each Defendant's acts, omissions, and misconduct alleged herein were known to, authorized, approved, and/or ratified by the other Defendants; and/or Defendants engaged in such acts, omissions, and misconduct in concert or active participation with one another or to aid or abet one another.

24.    Defendants conspired and agreed with each other and others to engage in unlawful and tortious conduct intended to harm and injure Plaintiffs, in furtherance of which Defendants and their agents and co-conspirators engaged in overt acts within and directed at the state of Florida and could and should have reasonably anticipated that the acts and omissions alleged herein connected them to Florida in a meaningful way.

25.    Defendants' actions and misconduct alleged herein produced and/or substantially contributed to producing the damages, injuries, and harms Plaintiffs suffered, and for which they seek recovery and redress through this action; which injuries and harms occurred in the state of Florida and the greatest effects of which were suffered within the state of Florida.

SUPP APP 9

26.     All conditions precedent to the filing and maintenance of this action have occurred, have been performed, and/or have been waived.

## COMMON FACTUAL ALLEGATIONS TO ALL COUNTS

### Overview of the Plaintiffs

27.     Pastor Weems and K. Weems founded Celebration Church in 1998 and devoted over 23 years of their lives to their church, its congregation, and its missions.

28.     Initially, Celebration Church was comprised of a single site in Jacksonville, Florida, but through years of dedication and sacrifice Pastor Weems and K. Weems grew that single site into a global, multi-site, non-denominational church with nearly 20,000 members.

29.     Pastor Weems served as Celebration Church's Senior Pastor, CEO, and President from its inception until he was forced to resign and separate himself and his family from the church on April 15, 2022.

30.     As Senior Pastor of Celebration Church, Pastor Weems had sole authority to set and shape the vision and direction of Celebration Church, and his responsibilities included: (1) complete plenary authority, control, and responsibility for directing missions and spiritual activities of the church; (2) serving as President and Chief Executive Officer of the church and having authority to direct all of its day-to-day operations, including establishing budgets, raising funds, and directing monies; and (3) acting as Chairman of the Board.

SUPP APP 10

31.     Celebration Church's Board of Trustees were nominated exclusively by the Senior Pastor for one calendar-year terms and responsible for management and oversight of its corporate matters and financial resources.

32.     Celebration Church's "Overseers" were nominated by the Senior Pastor and confirmed by the Board of Trustees, provided apostolic oversight to the Senior Pastor, and were charged with protecting the Church through counsel, prayer, and if required, the investigation and discipline of the Senior Pastor.

### The Weemses's Anti-Growth Vision and Missionary Work

33.     In 2018, Pastor Weems came to the realization that Celebration Church had become too "corporate" and focused on generating attendance and revenue and needed to concentrate on helping the poor, missionary work, equality, and simplifying the church by creating alternative revenue streams that would make the church less donation dependent.

34.     Pastor Weems also came to recognize that the modern church growth system and its constant pressure to grow attendance and generate more and more revenue to keep the corporate "machine" running was having significant negative psychological and health impacts on pastors, who needed counseling, guidance, and treatment to recover from the adverse effects of the growth model that Defendants are at the forefront of promoting.

35.     To execute his new vision, Pastor Weems and K. Weems developed a plan that included establishing several corporate entities that collectively would house and fund Celebration Church's significant administrative and personnel operations,

SUPP APP 11

quickly reduce expenses and Celebration Church's debt, and operate and fund the missionary work on which Pastor Weems wanted to focus.

36. The plan for this vision included the following:

A. a retreat and outpatient facility for pastoral care—Honey Lake Farms—and an adjoining medical clinic—Honey Lake Clinic, Inc.—that would provide Christian mental health treatment services, the revenue from which would be used to build out and support Honey Lake Farms' mission;

B. a for profit corporation—NorthStream—designed to provide centralized and shared management services to Celebration Church and numerous other churches that enabled church leadership to focus their attention on ministry and missions rather than operational aspects of their churches; that would also develop Restorative Community Developments (RCD's[1]), the first of which was Honey Lake Farms; and

C. a separate entity—AWKNG, Inc.—which would act as a hub for the restorative/ministry programing used at Honey Lake Farms, a theology school, missionary partnerships, media operations, and other similar endeavors.

37. Celebration Global was designed to be the umbrella organization under which Pastor Weemses's missionary work would be housed.

38. As they began implementing their anti-growth, missionary focused vision, Pastor Weems and K. Weems contributed their own personal money and invested in Weems Group for a combined total of approximately $1.2 million that was used to fund the operations of Honey Lake Farms, NorthStream, and AWKNG.

---

[1] Restorative Community Developments are self-contained investment portfolios ideal for venture philanthropists and impact investors, combining profitability with socially and environmentally conscious that directly impact human flourishing in both rural and urban areas.

SUPP APP 12

## Overview of Defendants

39.    ARC is a cooperative of independent churches from different denominations, networks, and backgrounds, the members of which consist of (a) churches "planted" or launched through ARC and (b) churches that invest in the mission of ARC financially.

40.    Although ARC started as a loosely connected group of people who wanted to help smaller churches, it eventually (under the leadership of Hodges) shifted its focus to generating large attendance growth and church "planting" to vastly expand Defendants' influence and revenue streams.

41.    ARC has become one of the largest church planting organizations in North America and has planted more than a thousand churches since 2000.

42.    ARC-planted churches enter into contractual agreements with ARC that, among other things, provide for initial loans to launch the church and require the church to pay 10% of tithes and offerings to ARC until this loan is repaid; following which the church is required to send ARC an ongoing amount of 2% of its monthly tithes/offerings.

43.    Celebration Church is not an ARC-planted church, and at all times material to this action had no legal, contractual, or financial obligations to ARC or any of the other Defendants.

44.    Historically, Celebration Church gratuitously donated approximately $150,000 to $200,000 per year to or for the benefit of ARC's church planting operations.   However, Defendants were constantly pressuring Pastor Weems to

10

commit to donating 2% of Celebration Church's income to ARC for church planting purposes.

45.    ARC is not a denomination and claims that it does not issue directives on what its member churches should promote doctrinally, philosophically, ministerially, or politically; and further claims that all of its member churches are completely and totally autonomous—operationally, financially, and governmentally.[2]

46.    ARC has attained a significant amount of power and influence through its church growth model and church-planting operations, and is able to maintain and expand such power and influence through affiliated entities and "partners" that it heavily encourages its members to use.

47.    Hodges is one of the co-founders of ARC and Founder and Senior Pastor of Church of the Highlands ("Highlands"), one of the largest churches in the United States with over 60,000 members and 23 campuses.

48.    Hodges fully embraces the modern church growth model and has vocally expressed his goal to help 1,000 churches break the 1,000-attendance barrier.

49.    Hodges founded and operates several entities closely affiliated with ARC and Highlands that are heavily promoted as ARC "partners," including GrowLeader, LLC ("GrowLeader") and Highlands College.

50.    GrowLeader is a for-profit company that is closely affiliated with and heavily promoted through ARC that generates significant revenue and resulting

---

[2] https://www.arcchurches.com/about/our-structure/

SUPP APP 14

financial benefits to Defendants by providing fee-based mentoring, coaching, training, and consulting services and related resources focused on promoting and advancing the modern church growth system to churches and their leadership.

51.    Hodges derives significant power and financial benefits from the promotion and advancement of GrowLeader and Highlands through ARC.

52.    Rizzo is the Executive Director of ARC and an Associate Pastor at Church of the Highlands[3] who also served as an Overseer at Celebration Church until September 2021.

53.    Seibeling is a Founder and Senior Pastor of The Life Church and founding board member of ARC who also served as an Overseer at Celebration Church until September 2021.

54.    Promoting the use of ARC attorneys by churches is one means through which Defendants furtively maintain control and oversight over ARC members.

55.    Attorneys David Middlebrook and Steven Goodspeed ("Middlebrook Goodspeed") specialize in the areas of church formation, governance, operations, and taxes.  At all times material to this action, Middlebrook Goodspeed were law partners whose firm was promoted as an ARC "partner," and they contemporaneously represented ARC and Celebration Church, as well as numerous other ARC member churches.

---

[3] https://jamesriver.church/author/drizzo

SUPP APP 15

56.     Middlebrook's current law firm, The Church Lawyers Group, is a featured ARC "partner" that provides special resources for ARC members.

57.     Middlebrook Goodspeed prepared Celebration Church's governing Bylaws installed in 2015.

58.     Attorneys Lee Wedekind ("Wedekind") and Kristin Ahr ("Ahr") work for the Nelson Mullins Riley & Scarborough LLP law firm ("Nelson Mullins") and have served as litigation counsel for ARC and Rizzo.  At all times material to this action, Wedekind and Ahr, through Nelson Mullins, represented ARC; including when they purportedly represented Celebration Church during the events described below.

59.     At all times material to this action, Defendants acted as the principals of and directed and controlled the acts and conduct of Middlebrook Goodspeed and Wedekind and Ahr upon which the claims set forth herein are based; during the performance of which Middlebrook Goodspeed and Wedekind and Ahr were acting in the capacity as Defendants' undisclosed agents carrying out Defendants' directives under Defendants' control.

**The Implementation of Weemses's New Vision & Direction for Celebration**

60.     In 2019, Pastor Weems and K. Weems began working toward implementing Pastor Weems's new vision and direction for Celebration Church and transitioning Pastor Weems from Celebration Church's Senior Pastor to a Founding Pastor role in which he would be able to spend much more of his time and energy on

SUPP APP 16

missions and less on the church's day-to-day operations, while also continuing to have an ongoing relationship with the congregation he founded and pastored.

61.     Pastor Weemses's vision to shift Celebration Church's focus away from growth and toward missionary work is antithetical to Defendants' church growth business and operational model and financial interests.

62.     As Pastor Weems began to implement his new shift in focus, he informed Defendants that Celebration Church would only be willing to donate funds to ARC if they were earmarked for missionary work and helping pastors get the counseling, guidance, and treatment they needed to shift their focus to ministry and missions, rather than church growth; while also expressing his concerns over the ARC system and its focus on planting churches to help expand ARC and GrowLeader and Defendants' own personal interests, causing stress and psychological harm for pastors.

63.     Middlebrook Goodspeed consulted Pastor Weems and Celebration Church on his transition to the Founding Pastor role and the memorialization of agreed upon terms and conditions of a Founding Pastor agreement, retirement package for Pastor Weems and K. Weems, parsonage, and continued and ongoing financial support for the missions in which Pastor Weems was involved.

64.     Celebration Church's Board of Trustees and Overseers were fully aware of, approved, and agreed on behalf of Celebration Church to the terms, conditions, and agreements associated with Pastor Weemses's transition to Founding Pastor, the Weemses's' retirement package, their parsonage, and the commitment to provide financial support for the missions with which Pastor Weems would be involved.

SUPP APP 17

65.     Attendant to his transition to Founding Pastor, Pastor Weems was also working on identifying someone as a potential eventual successor to the Celebration Church Senior Pastor position.

66.     Defendants were aware of this and seized on it as an opportunity to oust Pastor Weems from Celebration Church and plant an ARC-affiliated pastor they knew they could control and who would continue to advance Defendants' church growth model.

67.     Defendants identified ARC agent Tim Timberlake ("Timberlake") as the perfect candidate to fill this role, and Rizzo subsequently vouched for Timberlake to Pastor Weems.

68.     At all times material to this action, Defendants acted as the principals of, directed, and controlled acts and conduct of Timberlake upon which the claims set forth herein are based; during the performance of which Timberlake acted in the capacity as Defendants' undisclosed agent carrying out Defendants' directives under Defendants' control.

69.     Unaware of the clandestine agency relationship between Defendants and Timberlake and Defendants' planting of Timberlake to advance their conspiracy against Plaintiffs, Pastor Weems moved forward with the Founding Pastor transition plan, pursuant to which Timberlake initially would serve as lead pastor at Celebration Church's Jacksonville campus while Pastor Weems retained legal control and authority as the Senior Pastor, President, CEO, and Chairman of the Board.  Pastor Weems would coach Timberlake through his development plan while observing his

SUPP APP 18

performance and simultaneously working to memorialize the agreed upon terms of his transition to Founding Pastor.

70.     In December 2019, Celebration Church's Compensation Committee (including Seibeling and Rizzo) approved a compensation package that included (among other things) Celebration Church's acquisition of a parsonage for the Weemses's and the payment of $100,000 per year to Pastor Weems until age 65; the terms of which were memorialized in a *Compensation Resolution* fully executed and approved by the Board of Trustees.

71.     On December 20, 2019, Celebration Church entered into a *Parsonage Use License Agreement* with Pastor Weems and K. Weems, effective as of January 10, 2020.

72.     Based on the agreements memorialized in the *Compensation Resolution* and the rights that accrued to Pastor Weems and K. Weems by virtue of the benefits Celebration Church agreed to provide, the Weemses's sold their home and moved into a temporary parsonage.

73.     During the same time period, Timberlake abruptly moved to Jacksonville without prior notice to Pastor Weems, 11 months ahead of the agreed upon schedule, and immediately began exerting pressure on Pastor Weems to hand over control of Celebration Church.

74.     In early 2020, as a result of the COVID pandemic and lockdowns, Celebration Church was limited to video services until September 2020. During this difficult time, Pastor Weems and K. Weems were instrumental in helping the church navigate through the financial difficulties caused by COVID and lockdowns and other

SUPP APP 19

operational problems created by certain executive leadership under the control of Lisa Stewart ("Stewart"), Celebration Church's CFO at that time.

75. When in-person services finally resumed, Timberlake started leading Sunday morning services at Celebration Church's Jacksonville campus and Pastor Weems focused on mission work, reaching more of the church's members across the country and world through video, refining the organization of the church and its missions and related organizations, and working with Middlebrook Goodspeed to memorialize Celebration Church's agreements concerning Pastor Weems's transition to Founding Pastor.

76. One of Pastor Weems's and K. Weems's primary focuses during this time was Honey Lake Farms.

77. In her role as CFO of Celebration Church at that time, Stewart also served as CFO of Honey Lake Farms and Honey Lake Clinic.

78. Around this time, Celebration Church and Kevin Cormier ("Cormier") entered into a collaboration whereby construction-type entities owned by Cormier were hired by Celebration Church to perform land and housing improvements and management services at Honey Lake Farms. Not long thereafter, Cormier promised to donate $1 million of in-kind construction-type services at Honey Lake Farms.

79. Throughout 2020, construction work and land management services were performed at Honey Lake Farms by Cormier's companies, which Pastor Weems was led to believe was part of Cormier's $1 million pledge. Pastor Weems expected

SUPP APP 20

that Stewart was properly accounting for this donation and responsibly managing the church's finances in accordance with her fiduciary duties.

80.     In December of 2020, the Honey Lake Farms Lodge opened and started offering retreats and its outpatient facility for pastoral care.

81.     Honey Lake Clinic also began generating revenue providing Christian mental health treatment services.

82.     Pastor Weems soon appointed Cormier as a Celebration Church Trustee and Stewart left her position as Celebration Church CFO and transitioned to work solely for Honey Lake Clinic as its CEO.

83.     During her time working as CFO for Celebration Church and Honey Lake Clinic, Stewart gave false financial reports to Pastor Weems, which misrepresented balances in the church's accounts, and engaged in additional fraudulent misconduct.

84.     For example, in 2020 Stewart refused to separate the AWKNG mission organization as a separate 501(c)(3) entity distinct from the church and concealed her insubordination to Pastor Weemses's and the Board of Trustees' directives to separate the funds designated for the AWKNG organization into a separate account from that of the church.  By doing this, she was able to hide her financial and operational mismanagement and retain control of funds to create inaccurate and misleading reports in which Stewart materially misrepresented the church's unrestricted cash as $2.2 million more than it actually was.  This and other fraudulent acts were documented in Celebration Church's 2020 audit.

SUPP APP 21

85.     Stewart also provided Cormier with unrestricted access to Honey Lake Farms' bank accounts and failed to supervise his activities.  Pastor Weems had no access to view these accounts, which Cormier used to reimburse his companies for expenses without any oversight or accountability.

86.     Pastor Weems eventually discovered and verified that Cormier had embezzled church funds, engaged in a fraudulent billing scheme, and attempted to commit usury.

87.     Stewart knew that Cormier had not donated any of the $1 million in work that he pledged and that the work for which he was billing the church was actually supposed to be "donated" (*i.e.*, free), but allowed payments to be issued to Cormier's entities knowing that no agreements were in place to support them and that no authorization or approvals were obtained for the work allegedly performed.  Cormier also stopped submitting any substantiation for his invoices but continued to get payments.

88.     In April of 2021, Pastor Weems confronted Cormier about his above-described misconduct and Cormier admitted that he reneged on his pledge to donate $1 million of in-kind services and sought to remedy the situation by "donating" the work he claimed to have performed but for which he had not yet been paid, along with a house that the church had been renting from him.

89.     Meanwhile, Pastor Weems and K. Weems continued working tirelessly to bring stability, structure, consistency, and clarity to Celebration Church's staff, congregation, and organization, and to greatly improve the church's financial position.

SUPP APP 22

They believed everything was moving forward as planned with the transition to Pastor Weemses's role as Founding Pastor and the church's related agreements concerning the Weemses's' retirement packages, funding for Celebration Global, and the parsonage.

90.    In May of 2021, the Weemses's and Celebration Church agreed on the property that would be the Weemses's' permanent parsonage and it was sold to the Church for that purpose—following which Celebration Church agreed to and did treat that property as the Weemses's' parsonage under the *Parsonage Use License Agreement*.

91.    The Board of Trustees also represented that they were working with Middlebrook Goodspeed on finalizing written documents (such as a *Founding Pastor Emeritus Operating Agreement*) memorializing the terms that Celebration Church already verbally agreed upon and approved concerning Pastor Weems's transition to Founding Pastor, the Weemses's' retirement compensation, the parsonage, and the funding of the missions with which Pastor Weems is involved.

92.    Defendants all were aware of the agreements Celebration Church made and approved concerning Pastor Weems's transition to Founding Pastor, the Weemses's' retirement compensation, the parsonage, and the funding to be provided to Celebration Global for the missions with which Pastor Weems is involved.

93.    However, unbeknownst to Pastor Weems, Defendants and their agents were already working behind the scenes for quite some time on a plan to oust Pastor Weems from his leadership position and interfere with Plaintiffs' agreements with Celebration Church.

SUPP APP 23

94.     Among other things, this included: the planting of Timberlake and direction and approval of his subversive acts described below; enlisting Timberlake and Cormier to help oust Pastor Weems; enlisting Stewart to manufacture evidence of supposed financial crimes and mismanagement to use against the Weemses's; and enlisting Gaby Sullivan (K. Weems's assistant and an employee of NorthStream) to illegally access and download K. Weemses's private data, emails, medical information, and therapy sessions and provide them to Defendants to use against the Weemses's. Sullivan told multiple Celebration Church staff members that she was "protected" and that Celebration Church was going to be taken over.

95.     In September 2021, Hodge's Highlands church announced that it was spending $4.5 million to build its own "Lodge Retreat Center"—a center for pastoral counseling reported as being "the vision of" Hodges and Rizzo[4] that was virtually identical to the Honey Lake Farms' Lodge that had been up and running since December 2020. Around the same time, Rizzo and Seibeling stepped down as Celebration Church Overseers.

96.     Honey Lake Farms' Lodge and The Lodge Retreat Center (once completed) would have been competitors. However, Defendants knew Honey Lake Farms' Lodge had a significant advantage because it was already operational and had numerous retreats, counseling and restorative programs led by professional therapists

---

[4]      https://ministrywatch.com/church-of-the-highlands-quietly-advances-controversial-pastoral-retreat-center/

and able to provide outpatient clinical care through its association with Honey Lake Clinic, which  Defendants' "Lodge" was unable to provide.

97.    Defendants also perceived Honey Lake Farms as a threat because it was providing counseling services that included programs designed to improve pastoral mental health by moving away from the church growth model.

98.    During this same time period, Pastor Weems uncovered more evidence of Cormier embezzling money from Celebration Church.

99.    On September 22, 2021, Pastor Weems informed Rizzo and Seibeling about Cormier's embezzlement and fraud and resulting need to dismiss him from the Celebration Church board.  To Pastor Weems's surprise, they revealed that Cormier called them back in April of 2021 (10-days after Pastor Weems first confronted Cormier about his financial misconduct) and asked them to initiate an investigation against Pastor Weems.

100.    In October of 2021, the Weemses's continued to move forward with their transition plan and missionary work, meeting and developing an advantageous business relationship with Historical Concepts, a highly respected architecture and development firm in Atlanta, and commissioned (at a cost over $14,000) the rendering of a master site plan for Honey Lake Farms so that they could begin recruiting investors for the RCD portion of the project.

101.    The Weemses's immediately drove from their meeting with Historical Concepts to the 2021 ARC conference at Seacoast Church in South Carolina to

SUPP APP 25

demonstrate their goodwill toward their friends at ARC and put forth the idea of working together around missions.

102.    As a result, Pastor Weems and Greg Surratt agreed to partner to expand the availability of pastoral health retreats by hosting them at Honey Lake Farms and Surratt's lodge, which would have generated an estimated $1.5 million in income for Honey Lake Farms and AWKNG over the next 24 months.

103.    Not long thereafter, AWKNG and Honey Lake Farms held a fundraiser to raise money for scholarships for pastors and ministers to attend wellness retreats, which raised approximately $250,000 and connected Plaintiffs with Willie Robertson (well known for the "Duck Dynasty" reality show).  Robertson  expressed interest in partnering with Honey Lake Farms and even shot some episodes of his series, "Buck Commander," at the farm.  During the fundraising event, discussions were had with Robertson around potential future filming and other types of partnerships around youth programs and community evangelism at Honey Lake Farms.

104.    In addition to Robertson, Honey Lake Farms was poised to partner with Wildwood Ranch, Hand of Hope, and Convoy of Hope on very profitable and beneficial endeavors for Honey Lake farm's mission.

105.    NorthStream had also secured an advantageous business relationship with the city of Greenville, FL related to its first RCD and was launching its first RCD in Africa through Project Africa in Zimbabwe.

SUPP APP 26

106.     Plaintiffs had also developed an advantageous business relationship with David Maura through which they were poised to secure significant investments in their operations at Honey Lake Farms and NorthStream.

### The Implementation of the Plan to Destroy Plaintiffs and Frame Pastor Weems and K. Weems for Financial Crimes

107.     In November of 2021, Pastor Weems approached the Honey Lake Clinic board about releasing disbursements to Honey Lake Farms in compliance with the clinic's bylaws. Although strongly opposed by Stewart and Honey Lake Clinic CFO, Devan Schandig, the board voted unanimously in favor of the disbursement.

108.     Soon thereafter, Defendants began to execute the final phase of their plan to destroy Plaintiffs.

109.     Unbeknownst to Pastor Weems, Rizzo and Timberlake contacted Surratt and informed him that Pastor Weems was about to be put under investigation by Cormier, Powell, and Rowe and that Surratt should cut all ties with Pastor Weems and Honey Lake Farms, which led to Surratt to immediately call Pastor Weems and cancel the projects they had planned to partner in together.

110.     Heading into a December 2021 Celebration Church Board of Trustees meeting, the Weemses's were completely in the dark about the plot against them and believed the Board of Trustees was set to give final approval the written documents memorializing the existing agreements with Celebration Church.

111.     Instead, acting under the influence and control of Defendants and their agents, the Trustees abruptly changed course at the December 8, 2021 meeting;

SUPP APP 27

producing a draft *Founding Pastor Emeritus Agreement* with substantially different terms than those that had already been agreed upon by Celebration Church (most notably, termination provisions that would allow the Trustees to deny the Weemses's the rights and benefits Celebration Church had already agreed to provide), and slashing the already agreed upon funding promised by Celebration Church to Celebration Global by fifty percent (approximately $24 million over 15 years).

112.   This drastic reduction in missions funding combined with the campaign targeting Plaintiffs' strategic partnerships all but assured the failure of the mission organizations and operations in which the Weemses's had already personally invested.

113.   Defendants continued to secure Timberlake's allegiance to their cause, curate his image, and promote him as a capable leader for Celebration Church by orchestrating hundreds of thousands of dollars in monetary payments to him directly and indirectly through his ministry for book sales and promotion, in exchange for which and at Defendants' direction, Timberlake relentlessly contacted pastors, missional partners, strategic partners, leaders of church networks, and donors; telling them that Pastor Weems was about to be investigated for financial misconduct and would be removed as Senior Pastor, leaving Timberlake in control of the church, and that they should deal solely with him since Pastor Weems would be ousted with no possibility of return.  Timberlake even directed Celebration Church youth pastors to begin telling the youth that Pastor Weems was under investigation for financial

SUPP APP 28

misconduct—leading several of them, some as young as 12, to be confused and talk to their parents about this.

114.    Timberlake also made it clear that he would take Pastor Weems's place at ARC and return Celebration Church's vision and direction to ARC's and GrowLeader's church growth model.

115.    Defendants also committed to ruining the Plaintiffs' reputations, specifically in the ministry world, so they could never be in ministry or make a living and have no possible way of ever being part of Celebration Church again.

116.    Pastor Weems was planning on dismissing Cormier at the end of the year and had enlisted the help of Trustees Rowe and Wiseman to attend the meeting with Cormier, during which he would be confronted, permanently removed from the board and the church, and the authorities would be notified, if necessary, pending the financial audit Pastor Weems had already ordered.  On December 31, 2021, Pastor Weems emailed Cormier to inform him that his one-year term as a Trustee had concluded and that a new Trustee would be appointed to fill his vacated position, which would lead to this planned meeting.

117.    On January 4, 2022, Cormier responded by providing "notice" that he and two other trustees, Powell and Rowe, were "bringing a full investigation" on unspecified allegations and "will be asking our board to review the possibility of asking Stovall Weems to step down as our current Chairman and Senior Pastor role." Cormier further claimed that "[b]ased on our bylaws the removal of board members during this investigation must be put on hold…"

SUPP APP 29

118.   Pastor Weems responded later that evening, informing Cormier that he could not initiate such an investigation under Celebration Church's Bylaws and advising him of the proper procedures to follow.   Pastor Weems also dismissed Cormier from the Board of Trustees and advised that he would ask the Board of Trustees to investigate Cormier's actions over the past year, listing the instances of fraud for which Cormier would be investigated.

119.   On January 7, 2022, now aware of Rowe's involvement in the plot to remove him for unspecified reasons, Pastor Weems sent an email dismissing Rowe as a Trustee based on Cormier's statements about Rowe's involvement and an admission made by Timberlake about which Trustees were involved.

120.    On January 7, 2022, almost immediately after dismissing Rowe, Pastor Weems received a letter (dated January 6) from Rowe and Powell claiming that he was under discipline, was not in good standing, and was suspended as the church's Senior Pastor as a result of "possible improper financial practices and/or failure to fulfill duties and responsibilities as Senior Pastor."

121.   As these events unfolded, Defendants ensured that they would maintain ultimate oversight and control over the Weemses's ouster from Celebration Church through Middlebrook Goodspeed and the enlistment of ARC attorneys Wedekind and Ahr to lead the supposed "investigation" of Pastor Weems and K. Weems.

122.   On January 8, 2022, Wedekind and Ahr informed Pastor Weems that he was banned from Celebration Church while he supposedly was "investigated," barred

27

him from church property under threat of criminal prosecution, and instructed him to cease all contact with everyone associated with Celebration Church.

123.    These acts were wholly improper and violative of multiple Celebration Church Bylaws.

124.    Aware of this, Defendants used Middlebrook Goodspeed and Wedekind and Ahr to amend the Celebration Church Bylaws to give the Trustees the absolute, unchecked power they needed to unlawfully oust Pastor Weems from the church.

125.    Wedekind and Ahr also proceeded with conducting the sham "investigation" of Pastor Weems; during which Defendants and Middlebrook Goodspeed worked closely with Wedekind and Ahr to ensure that the supposed "investigation" would end in the predetermined outcome Defendants wanted.

126.    Well-before the supposed "investigation" commenced, Defendants knew Cormier and Stewart were involved in embezzling money from Celebration Church and that the "investigation" could be used to frame Pastor Weems for the embezzlement and justify ousting him from Celebration Church and thereafter install leadership Defendants could control (Cormier and Timberlake), avoid paying Plaintiffs the benefits Celebration Church had already agreed to provide, and use Pastor Weems as the scapegoat for Cormier and Stewart's illegal activities while simultaneously eliminating Honey Lake Farms as competition for Highlands' Lodge and stomping-out Pastor Weemses's anti-church growth message.

127.    All the while, Defendants believed that their nefarious plot would never be exposed because it would be protected by the secrecy of ecclesiastical abstention.

SUPP APP 31

128.   During the sham "investigation," the Weemses's were essentially made pariahs, unable to defend themselves and isolated from the church, friends, church members, and professional colleagues and contacts, most of whom they were prohibited from contacting and had been told the Weemses's were suspended and "under investigation" for unspecified reasons.

129.   At the same time, Defendants knew the actions they orchestrated had placed Plaintiffs in significant financial distress.

130.   Then, on January 17, 2022, Defendants sent an extortionate email to Pastor Weems through their agent, Larry Stockstill, an Overseer and Apostolic Elder of Highlands and Hodges' personal pastor.

131.   In this January 17, 2022 email, Stockstill acting at Defendants' direction openly acknowledged Cormier's embezzlement but insisted that he remain on Celebration Church's Board of Trustees:

> Several notable leaders have challenged the idea you had that the trustees are leading a "coup d'etat." They have said they are good, solid men who love both of you but are trying to save the church. I am aware of your concern about the embezzlement you caught one of the Trustees in but that must be dealt with separately from their actions as a body right now and not the source of their corporate actions. Their actions have centered around your leadership and actions in the recent time.

132.   In this January 17, 2022 email, Stockstill acting at Defendants' direction also openly challenged Pastor Weemses's "new direction in ministry" before summarizing that Pastor Weems was "under investigation financially…banned from

SUPP APP 32

the church and it's property… and no longer [has] a 'founder's seat' and that will probably not happen," before laying out in detail the actions Pastor Weems had to take to "CLEAR [his] NAME," which included repenting to ARC, Rizzo, and Seibeling in particular:

> 1. Express to the trustees your repentance and sorrow for the erratic leadership  What began, perhaps, with a desire to please the Lord and enter revival has developed into something that is not a part of the solid, stable foundation and values of Celebration Church.  Your financial dealings must be totally simplified so that the most unassuming member can understand.
>
> 2. Return to a broken, repentant, reconciling relationship to the Board of ARC (of which you have continued to be a part). Repent to them concerning not walking under their covering, blessing, and oversight. Repent specifically to John and Dino for ignoring their advice and counsel as overseers.
>
> 3. Pull back from following the directions and advice of other outside leaders who have reshaped Celebration church since your vision.
>
> 4. Restore your relationship to Tim Timberlake. He is not seeking to take your church and dishonor you. He could easily return to North Carolina. Whether you feel you erred in appointing him or not, it is an irreversible action you have publicly taken and you must return to the role of an encouraging father in his life (something he no longer has with his wonderful father already in heaven).
>
> 5. When all of the above is done, the last piece to clear your reputation is the financial investigation. If it comes back with nothing significant, there should be, in my opinion, no barrier to the Trustees giving you a severance package as the Founder. In my opinion, there will be no "Founder's seat" because of the confusion that has ensued around your leadership. I believe the Trustees will help you begin your worldwide missions ministry as completely separate from Celebration. You have huge potential as a leader, a preacher of righteousness, and a voice to this generation worldwide…IF YOU CLEAR YOUR NAME.

133.   At the time of this January 17, 2022 email, Pastor Weems and Celebration Church had no formal relationship with ARC, and ARC had no legal control over Pastor Weems or Celebration Church.  There was no legitimate reason for ARC or any of the Defendants to be making any demands on Pastor Weems.

SUPP APP 33

134.   At the time of this January 17, 2022 email, Middlebrook Goodspeed were also, at Defendants' direction, refusing to do anything to assist Pastor Weems in preventing the coup unfolding at Celebration Church and instead insisted that Pastor Weems "not get an attorney or go to the court."

135.   As time dragged on with no imminent resolution of this incredibly damaging situation in sight, the Weemses's decided to take action and filed suit on February 23, 2022 to try to obtain temporary injunctive relief to protect their rights and force the resolution of the sham investigation.

136.   On March 3, 2022, Wedekind filed a Motion to Dismiss in that lawsuit which lobbed unsubstantiated, unnecessary personal attacks against the Weemses's that were completely irrelevant to the legal arguments it raised and further explained how Celebration Church's Bylaws were amended on January 13, 2022, to make its Board "the highest ecclesiastical authority in the church…"

137.   Upon reading this, Pastor Weems came to the difficult realization that he could no longer be a part of Celebration Church and needed to try to protect his family from any further attacks by resigning and completely separating from Celebration Church.

138.   Thus, on April 15, 2022, Pastor Weems tendered his resignation as Senior Pastor, President, Chief Executive Officer, Chairman and member of the Board of Trustees, and registered agent.

139.   However, Defendants were not satisfied with Pastor Weemses's resignation, were upset over the lawsuit and the publicity it drew, and were likely

SUPP APP 34

fearful that members of Celebration Church's congregation would follow Pastor Weems once he began ministering elsewhere and working with other churches. Accordingly, Defendants continued to work closely behind the scenes with their attorneys, Wedekind and Ahr, to create and publicly disseminate a false and defamatory narrative and statements about Pastor Weems and K. Weems, along with private and confidential information about K. Weems they had unlawfully gathered, to try to destroy their reputations, humiliate them, and prevent Plaintiffs from continuing their ministry and missions.

140.    This culminated in an April 24, 2022, "Report of Investigation to Celebration Church of Jacksonville, Inc.", a copy of which is attached hereto as **Exhibit A** (the "Report"), which Defendants ensured was leaked to the press so that it would be publicly available before ARC's Conference in South Carolina on April 25-27, 2022—at which Hodges was planning to discuss the progress of the Highlands Lodge and plans for GrowLeader.

141.    The ultimate purpose of the public dissemination of the Report was to frame Pastor Weems and K. Weems for embezzling the money Defendants' knew Cormier and Stewart had taken and covered up, which could be used to legitimize the takeover of Celebration Church and ensure the failure of Plaintiffs' anti-growth vision and missionary work while simultaneously using Pastor Weems to publicly demonstrate what would happen to others if they entertained the idea of opposing Defendants' modern church growth philosophy.

SUPP APP 35

142. Notably, the Report falsely tried to blame Pastor Weems for (among other things) embezzlement based on a *supposed* $3 million cash shortfall between October and December 2020:

> Thomas learned that Weems had a poor understanding of the Church's organizational structure and financial position, including its revenues and expenses. As things progressed, Thomas became increasingly concerned about the Church's cash burn rate and how it was depleting the Church's cash balance. The Church's financial statements reflect that its cash balance dropped from $9 million in October 2020 to $6 million in December 2020, then to $2 million in March/April 2021. Weems never had a grasp of where the money went and would oscillate between negligent attention to financial details and aggressive demands for voluminous information. He could never keep all of the parts straight in his head, and he blamed this confusion on the providers of the information (Stewart, Thomas, Cormier).

143. However, Celebration Church's own financial statements (prepared by Stewart) demonstrate that it had a $6 million cash balance in October 2020, not $9 million:

## CELEBRATION CHURCH, INC.
### STATEMENT OF FINANCIAL POSITION
#### FOR THE PERIOD ENDED SEPTEMBER 30, 2020 (unaudited)

| | | |
|---|---|---|
| **ASSETS** | | |
| CURRENT ASSETS | | |
| CASH AND CASH EQUIVALENTS | $ | 6,335,876 |
| ACCOUNTS RECEIVABLE | | 2,357,758 |
| INVENTORY | | 29,481 |
| OTHER CURRENT ASSETS | | 275,816 |
| TOTAL CURRENT ASSETS | | 8,998,931 |
| PROPERTY AND EQUIPMENT, NET | | 38,538,400 |
| OTHER ASSETS | | 684,340 |
| TOTAL ASSETS | $ | 48,221,671 |

SUPP APP 36

144.    Cormier and Stewart were in fact the ones responsible for over $3 million embezzled from Celebration Church, which Timberlake knew about and, at Defendants' direction, helped cover up to frame Pastor Weems and help support his installation as Pastor Weems's replacement at Celebration Church.

145.    Defendants' knew the Report, which was engineered to make it falsely appear as if it was the product of a legitimate investigation conducted by a reputable law firm, could be used to sway the opinions of Celebration Church's members, the public, and people and businesses affiliated with Plaintiffs to convince them that Pastor Weems and K. Weems were criminals—even though the reality was that Defendants were intimately involved in preparing the Report and its conclusions and the lawyers who authored the Report it were in fact working for and loyal to Defendants.

146.    Although Defendants knew the embezzlement and other criminal accusations the Report leveled against Pastor Weems were demonstrably false, they continued to ensure that these accusations were advanced publicly and disseminated to ensure Defendants' ultimate objective of destroying Plaintiffs was achieved.

147.    Thus, on April 27, 2022, acting at Defendants' direction, Wedekind prepared and transmitted a letter via email to TurnCoin, Ltd.'s chief legal officer, Arno Visser, (the "TurnCoin Letter"), which falsely asserted that Pastor Weems "embezzled and fraudulently transferred [Celebration Church] funds that were used to purchase TurnCoin" and engaged in "money laundering…in violation of 18 U.S.C. §§ 1956(a) and 1957":

SUPP APP 37



**NELSON MULLINS**

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AND COUNSELORS AT LAW

50 N. Laura Street, 41st Floor
Jacksonville, FL 32202
T 904.665.3600  F 904.665.3699
nelsonmullins.com

Lee D. Wedekind, III
T: 904.665.3652
lee.wedekind@nelsonmullins.com

April 27, 2022

**By email**

Arno Visser
Chief Legal Officer
TurnCoin, Ltd.
Madison Building Midtown
Queensway
GX11 1AA
arno@turncoin.com

Re:   Demand to freeze TurnCoin purchased with embezzled and fraudulently
       transferred assets

Mr. Visser:

       We represent Celebration Church of Jacksonville, Inc. Celebration's former pastor,
Stovall Weems, embezzled and fraudulently transferred church funds that were used to
purchase TurnCoin on behalf of the following: Charles S. ("Stovall") Weems IV, AWKNG,
Inc., Honey Lake Farms, Inc., and Benny Perez Ministries. The purchase of TurnCoin
under these circumstances may constitute money laundering by Weems in violation of 18
U.S.C. §§ 1956(a) and 1957.

       On April 24, we released a report of our investigation into Weems's illegal
activities. A copy of the report can be viewed at www.celebration.org/weemsinvestigation.
Following the release of our report, we have been advised that Weems is planning to
liquidate all or part of these TurnCoin holdings.

       This letter is to notify TurnCoin of these potentially criminal actions and to request
TurnCoin's assistance by freezing the holdings of Charles S. Weems IV, AWKNG, Inc.,
Honey Lake Farms, Inc., and Benny Perez Ministries until the dispute between these
parties has been resolved. We would be pleased to provide you with additional
information or to discuss this matter further at your earliest convenience.

       Thank you for your cooperation.

                                          Very truly yours,

                                          Lee D. Wedekind, III

LDW/aa

35

148.    The TurnCoin Letter specifically directed TurnCoin to view the Report to read about "Weemses's illegal activities" and included a hyperlink to the Report for that purpose.

149.    This TurnCoin Letter used the Report and false criminal accusations about Pastor Weems to try to convince TurnCoin to freeze Pastor Weemses's investments in hopes of further financially crippling Plaintiffs.

150.    Despite knowledge of the actual perpetrators of the embezzlement and the efforts to conceal it, Defendants ensured that Pastor Weems would be publicly blamed for it, which not only protected Cormier for his criminal acts but also rewarded him by ensuring that he would be placed in charge of Celebration Church's Board of Trustees.

151.    Defendants also further rewarded Timberlake for his role in advancing Defendants' conspiracy by partnering with Servolution to promote and generate sales of Timberlake's book (*The Power of 1440*), while simultaneously using the book to encourage church planting and growth.

152.    Based on the agreements and promises made by Celebration Church as outlined above, the Weemses's not only stopped drawing a salary from the church but also invested and gave hundreds of thousands of dollars (almost to the point of insolvency) to fund the missions Celebration Church had already agreed to fund; all of which they lost as a result of Defendants' actions.

36

153.   Defendants' actions also caused losses of committed funding and agreements to Celebration Global totaling approximately $30 million dollars over a 15-year period.

154.   Honey Lake Farms was far down the road to being self-sustaining when Defendants' actions caused its committed investors and partners to back out, resulting in millions of dollars of additional losses.

## The Unlawful Means Defendants Used to Tortiously Interfere

155.   By engaging in the above-alleged conduct, Defendants conducted, engaged in, and/or participated in a pattern of unlawful and criminal activity deliberately intended to harm Plaintiffs and carry out defendants' conspiracy against them.

156.   Defendants' conduct alleged in paragraphs 126-134, above, constitutes racketeering and extortion in violation of 18 U.S.C. § 1961(1)(A) and § 836.05, *Fla. Stat.*

157.   Defendants' conduct alleged in paragraph 94, above, constitutes racketeering and an offense against users of computer systems, networks, and electronic devices in violation of 18 U.S.C. § 1961(1)(A) and § 815.06, *Fla. Stat.*,

158.   Defendants' conduct alleged in paragraphs 55-59, 63, 65-68, 92, 94, 113, 121, 126, and 150-151, above, constitutes racketeering and bribery in violation of 18 U.S.C. § 1961(1)(A) and § 838.16, *Fla. Stat.*.

SUPP APP 40

159.    Defendants' conduct alleged in paragraphs 139-140, above, constitutes the communication of libelous matter to newspapers in violation of violated § 836.09, *Fla. Stat*.

160.    Defendants' conduct alleged in paragraphs 139-149, above, constitutes racketeering and wire fraud in violation of 18 U.S.C. § 1961(1)(B) and 18 U.S.C. §1343.

161.    Defendants' overall course of conduct and conspiracy alleged above also constitutes a scheme to defraud in violation of the Florida Communications Fraud Act, § 817.034, *Fla. Stat*.

162.    Defendants aided, abetted, counseled, hired, or otherwise procured others to commit the criminal acts described above and are therefore principals in the first degree under § 777.011, *Florida Statutes*.

163.    Defendants soliciting others to commit the criminal acts described above, and in the course of such solicitation commanded, encouraged, hired, or requested another person to engage in specific conduct which would constitute such offense or an attempt to commit such an offense, thereby constituting criminal solicitation in violation of § 777.04(2), *Florida Statutes*.

164.    Defendants agreed, conspired, combined and/or confederated with another person or persons to commit the criminal acts described above, thereby committing criminal conspiracy in violation of § 777.04(3), *Florida Statutes*.

165.    Defendants also explicitly or tacitly agreed to participate in a common scheme and unlawful ongoing conspiracy, in furtherance of which they recommended,

SUPP APP 41

agreed to, and participated in committing the criminal acts described above, which caused significant harm and damages to Plaintiffs as a result.

## COUNT I
### (TORTIOUS INTERFERENCE)

166.    Plaintiffs re-allege and incorporate Paragraphs 1 through 165, as if fully stated herein.

167.    As more specifically alleged in paragraphs 62-64, 70-71, 89-91, and 100-106, above, Plaintiffs had advantageous contractual and business relationships of which Defendants were aware.

168.    Defendants intentionally and unjustifiably interfered with Plaintiffs' advantageous contractual and business relationships.

169.    As a direct and proximate result of Defendants' unlawful and tortious interference with Plaintiffs' advantageous contractual and business relationships, Plaintiffs suffered substantial economic damages in amounts to be proven at trial.

170.    Defendants' actions alleged herein were unjustified, unlawful and committed maliciously and deliberately with an intent to injure Plaintiffs and cause them substantial harm; were committed with actual knowledge of the wrongfulness of the conduct and the high probability that injury and damage to Plaintiffs would result, and despite that knowledge, Defendants intentionally pursued their course of conduct, resulting in injury and damages to Plaintiffs; and/or were committed in conscious disregard of the Plaintiffs' rights.

SUPP APP 42

171.    As a direct and proximate result of Defendants' tortious conduct, and in addition to the quantifiable monetary damages Defendants' conduct caused, Plaintiffs also suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law if Defendants are not enjoined from engaging in such conduct in the future.

172.    Based on the facts alleged herein and to be established at trial, Plaintiffs have the clear legal right to the entry of an injunction prohibiting Defendants' tortious misconduct.

173.    The public interest would be served by the entry of an injunction prohibiting Defendants' unlawful and tortious misconduct.

WHEREFORE, Plaintiffs demand judgment against Defendants awarding:

a.    Compensatory damages in appropriate amounts to be established at trial;

b.    Punitive damages in appropriate amounts to be established at trial;

c.    Injunctive relief prohibiting Defendants from engaging in the tortious and unlawful misconduct alleged herein;

d.    Costs associated with this action; and

e.    Such other and further relief as the Court deems just and appropriate to protect Plaintiffs' rights and interests.

## COUNT II
## (CONSPIRACY)

174.    Plaintiffs re-allege and incorporate Paragraphs 1 through 173, as if fully stated herein.

SUPP APP 43

175.    Defendants agreed and conspired with one another to tortiously interfere with Counter-Plaintiffs' advantageous contractual and business relationships.

176.    In doing so, Defendants agreed and conspired to do an unlawful act or a lawful act by unlawful means.

177.    Defendants each committed overt acts in pursuance and furtherance of their conspiracy.

178.    As a direct and proximate result, Plaintiffs suffered damages in amounts to be proven at trial.

179.    Defendants' actions alleged herein were unjustified, unlawful and committed maliciously and deliberately with an intent to injure Plaintiffs and cause them substantial harm; were committed with actual knowledge of the wrongfulness of the conduct and the high probability that injury and damage to Plaintiffs would result, and despite that knowledge, Defendants intentionally pursued their course of conduct, resulting in injury and damages to Plaintiffs; and/or were committed in conscious disregard of the Plaintiffs' rights.

180.    As a direct and proximate result of Defendants' tortious conduct, and in addition to the quantifiable monetary damages Defendants' conduct caused, Plaintiffs also suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law if Defendants are not enjoined from engaging in such conduct in the future.

SUPP APP 44

181.   Based on the facts alleged herein and to be established at trial, Plaintiffs have the clear legal right to the entry of an injunction prohibiting Defendants' tortious misconduct.

182.   The public interest would be served by the entry of an injunction prohibiting Defendants' unlawful and tortious misconduct.

WHEREFORE, Plaintiffs demand judgment against Defendants, awarding:

a.   Compensatory damages in appropriate amounts to be established at trial;

b.   Punitive damages in appropriate amounts to be established at trial;

c.   Injunctive relief prohibiting Defendants from engaging in the tortious and unlawful misconduct alleged herein;

d.   Costs associated with this action; and

e.   Such other and further relief as the Court deems just and appropriate to protect Plaintiffs' rights and interests.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted,

*/s/ Shane B. Vogt*
Shane B. Vogt – FBN 257620
E-mail:  svogt@tcb-law.com
David A. Hayes - FBN 096657
E-mail:  dhayes@tcb-law.com
TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Tel:  (813) 834-9191
Fax: (813) 443-2193
*Attorneys for Plaintiffs*

SUPP APP 45

**DOCKET/TAB 28**

EXCERPT FROM DEFENDANTS' MOTION TO DISMISS FOR LACK OF
JURISDICTION OR, ALTERNATIVELY, MOTION FOR MORE DEFINITE
STATEMENT AND SUPPORTING MEMORANDUM OF LAW

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

CHARLES S. WEEMS, IV, an
individual, KERRI WEEMS, an
individual, and CELEBRATION
GLOBAL, INC., a Florida not for
profit corporation, HONEY LAKE
FARMS, INC., a Florida not for profit
corporation, NORTHSTREAM
MANAGEMENT GROUP, LLC, a
Florida limited liability company, and
WEEMS GROUP, LLC, a Florida
limited liability company,

       Plaintiffs,

v.

ASSOCIATION OF RELATED
CHURCHES, a Texas not-for-profit
corporation, CHRIS HODGES,
individually, DINO RIZZO,
individually, and JOHN SEIBELING,
individually,

       Defendants.

_____/

Case: 3:23-cv-00811-MMH-LLL

**DEFENDANTS' MOTION TO DISMISS FOR LACK OF JURISDICTION**
**OR, ALTERNATIVELY, MOTION FOR MORE DEFINITE STATEMENT**
**AND SUPPORTING MEMORANDUM OF LAW**

Pursuant to Local Rule 3.01 and Federal Rule of Civil Procedure 12,

Defendants Association of Related Churches ("ARC"), Chris Hodges ("Pastor

Hodges"), Dino Rizzo ("Pastor Rizzo"), and John Seibeling ("Pastor Seibeling")

(collectively "Defendants") move to dismiss Plaintiffs' Complaint & Demand for

Jury Trial (Doc. 1; "Complaint" or "Compl.") for lack of subject matter

jurisdiction based on the ecclesiastical abstention doctrine or, alternatively, for a

more definite statement because Plaintiffs filed an impermissible shotgun pleading.

## I.   __INTRODUCTION__

At the outset, Defendants strongly disagree with the allegations and claims in Plaintiffs' Complaint, most of which are neither factually nor legally supported. But for purposes of this motion, the Court need not decide the merits of any of Plaintiffs' positions. Instead, even accepting what has been written, two inescapable conclusions result: (i) the Court lacks jurisdiction over this dispute, and (ii) Plaintiffs have inadequately pled their allegations and claims in a shotgun complaint.

As to the first conclusion, the Complaint asks the Court to impermissibly take sides in a church dispute over which it has no jurisdiction. Plaintiff Stovall Weems is the founder and former Senior Pastor of the Celebration Church ("Celebration Church" or "the Church") based in Jacksonville, Florida. Compl., ¶¶ 27-29. This lawsuit arises from what the Complaint portrays as a dispute between two rival factions, each with a different vision of the Church's future. According to the Complaint, one faction favors "unbridled church growth." *Id.*, ¶ 2. The other faction, represented by Pastor Weems and his wife, Plaintiff Kerri Weems, purportedly favors an "anti-growth, missionary focused vision." *Id.*, ¶ 38; *see also id.*, ¶ 61.

According to the Complaint, Defendants—alleged proponents of the growth-focused vision—hatched "a plan to oust Pastor Weems from his leadership position" so their vision could prevail. *Id.*, ¶ 93. The centerpiece of the alleged plan

SUPP APP 48

was what Pastor Weems characterizes as a "sham 'investigation'" of his misconduct as Senior Pastor. *Id.*, ¶ 125. That investigation, conducted by respected attorneys hired by the Church's board of trustees, culminated in a report finding that Pastor Weems had exhibited "the antithesis of biblical leadership" in his role at the Church, including alleged financial improprieties and misconduct. Compl., Ex. A. at 20. Ultimately, with his leadership in doubt, Pastor Weems resigned. *Id.*, ¶ 138.

Did Pastor Weems actually exhibit "the antithesis of biblical leadership"? *Id.*, Ex. A. at 20. Or was the investigation a pretext "to legitimize the takeover of Celebration Church and ensure the failure of Plaintiffs' anti-growth vision and missionary work"? *Id.*, ¶ 141. Did the wrong faction prevail in the struggle for control of the Church? These are among the disagreements in which the Complaint impermissibly seeks to entangle this Court.

Both the United States and Florida Constitutions forbid the Court from deciding such matters. Under the ecclesiastical abstention doctrine, civil courts may not "enter[] into a religious controversy and put[] the enforcement power of the state behind a particular religious faction." *Crowder v. S. Baptist Convention*, 828 F.2d 718, 721 (11th Cir. 1987); *see also Napolitano v. St. Joseph Cath. Church*, 308 So. 3d 274, 275, 277 (Fla. 5th DCA 2020). Because civil courts "may not adjudicate ecclesiastical disputes," the Court lacks subject matter jurisdiction to decide this case and must dismiss the Complaint. *Crowder*, 828 F.2d at 718.

As to the second conclusion, Plaintiffs have not adequately pled the claims

brought by each named plaintiff against each named defendant. Plaintiffs have, instead, impermissibly filed a shotgun complaint, grouping all named parties on each side of the case into two over-generalized groups described as "Plaintiffs" and "Defendants," incorporating all allegations by and against these groups into a single first count, and then incorporating that first count into a second. It is thus impossible to understand the specific facts and actions at issue as to each of the 10 parties in this case. Thus, if the Court exercises jurisdiction over this matter, it should order a more definite statement and require Plaintiffs to replead the Complaint.

## II.   MOTION TO DISMISS FOR LACK OF JURISDICTION

### A.   Applicable Law

"Among the separation of church and state principles required by the establishment and free exercise clauses of the first amendment is that courts may not adjudicate ecclesiastical disputes." *Crowder*, 828 F.2d at 718. This "limitation on secular judicial power" to interfere with "religious affairs" is similarly embedded in Florida's Constitution. *Napolitano*, 308 So. 3d at 275, 277.

The "ecclesiastical abstention doctrine" is well-established: "Civil courts lack jurisdiction to entertain disputes involving church doctrine and polity." *Rutland v. Nelson*, 857 F. App'x 627, 628 (11th Cir. 2021); *Myhre v. Seventh-Day Adventist Church Reform Movement Am. Union Int'l Missionary Soc'y*, 719 F. App'x

SUPP APP 50

**DOCKET/TAB 37-1**

EXHIBIT A TO DEFENDANTS' NOTICE OF SUPPLEMENTAL AUTHORITY

# Exhibit A

IN THE CIRCUIT COURT, FOURTH
JUDICIAL CIRCUIT, IN AND FOR
DUVAL COUNTY, FLORIDA

CASE NOS.:          16-2022-CA-1047

DIVISION:          CV-F

CHARLES STOVALL WEEMS, IV and
KERRI WEEMS,

     Plaintiffs,

v.

CELEBRATION CHURCH OF
JACKSONVILLE, INC., KEVIN
CORMIER, MARCUS ROWE,
ANGELA CANNON, JACOB WILLIAM,
and LEE WEDEKIND, III,

     Defendants.

_____/

## ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

This matter comes before the Court on "Motion of Defendant Lee Wedekind, III, to Dismiss for Lack of Subject-Matter Jurisdiction," and "Celebration Church of Jacksonville Inc., Kevin Cormier, Marcus Rowe, Angela Cannon, and Jacob William's Motion to Dismiss Third Amended Complaint for Lack of Subject-Matter Jurisdiction," both filed on November 17, 2022. On December 16, 2022, Plaintiffs filed their response in opposition to the motions to dismiss. On August 3, 2023, this Court held a hearing on the motions to dismiss.

On September 28, 2022, this Court issued an Order dismissing without prejudice Plaintiffs' Second Amended Complaint for lack of subject matter jurisdiction and granting Plaintiffs leave to file an amended complaint raising causes of action that could be decided solely on neutral principles of secular law without impermissibly wading into ecclesiastical waters. On October 18,

2022, Plaintiffs filed their Third Amended Complaint. This Court must again dismiss Plaintiffs' complaint for lack of subject matter jurisdiction—this time with prejudice.

*Overview of the Dispute*

This dispute revolves around a report (the "Report") commissioned by Celebration Church of Jacksonville, Inc. (the "Church") through its co-defendant trustees and drafted in-part by co-defendant Lee Wedekind, III to investigate Plaintiffs' possible misconduct in their pastoral roles. While the investigation was on-going, Charles Stovall Weems, IV ("Pastor Stovall Weems") resigned from the Church. The Church published the completed Report on its website, finding Pastor Stovall Weems had breached his fiduciary duties to the Church through fraud and self-dealing and that the Pastors failed generally to fulfill the biblical standards for church leadership.

Plaintiffs sued, asserting causes of action for defamation, conspiracy to defame, invasion of privacy, public disclosure of private facts, intentional infliction of emotional distress, and conspiracy to invade privacy. Defendants contend this Court lacks subject matter jurisdiction under the ecclesiastical abstention doctrine, despite Plaintiffs efforts to amend, because adjudication of the present dispute would require adjudication of a religious quarrel. This Court agrees.

*The Ecclesiastical Abstention Doctrine*

The ecclesiastical abstention doctrine is rooted in the free exercise and establishment clauses of the Constitution and provides a categorical institutional barrier against secular courts officiating religious controversies. *See Napolitano v. St. Joseph Catholic Church*, 308 So. 3d 274, 277 (Fla. 5th DCA 2020). This jurisdictional bar adheres to disputes over church polity and administration. *Id.* at 278. "[T]he doctrine precludes secular courts from exercising jurisdiction over ecclesiastical disputes, those about 'discipline, faith, internal organization, or ecclesiastical rule, custom, or law,' as distinguished from 'purely secular disputes between third parties and a

2

particular defendant, albeit a religiously affiliated organization.'" *Id.* (quoting *Malichi v. Doe*, 814 So. 2d 347, 357 (Fla. 2002)). A court has jurisdiction to decide secular disputes involving a religious entity using neutral legal principles only if "'no issue of doctrinal controversy is involved.'" *Napolitano*, 308 So. 3d at 278 (quoting *Jones v. Wolf*, 443 U.S. 595, 605 (1979)).

### *Application of the Ecclesiastical Abstention Doctrine to the Present Dispute*

This Court finds judicial resolution of Plaintiffs' causes of action would require it to impermissibly engage in a doctrinal squabble involving the Church's biblical standards, administration, financial policies, and disciplinary practices, and decide whether the Pastors' personal, spiritual, and administrative conduct fulfilled those standards.

The third amended complaint omits mention of large sections[1] of the Report related to the underlying power struggle between the Pastors and Board, as well as the Pastors alleged failure to abide by biblical leadership standards. These omissions are necessitated by the ecclesiastical abstention doctrine's prohibition on "intrud[ing] on a church's autonomous management of its own internal affairs," *Flynn v. Estevez*, 221 So. 3d 1241, 1246 (Fla. 1st DCA 2017), such as "'inquiring into the adequacy of the religious reasoning behind the dismissal of a spiritual leader.'" *Diocese of Palm Bch., Inc. v. Gallagher*, 249 So. 3d 657, 663 (Fla. 4th DCA 2018) (quoting *Goodman v. Temple Shir Ami, Inc.*, 712 So. 2d 775, 777 (Fla. 3d DCA 1998)).

Instead, the most recent complaint hones in on a few specific segments of the Report. It first focuses on the allegations of financial improprieties. Plaintiffs posit that "[t]he falsity of [the alleged financial improprieties] can be determined by comparing those [allegations] to documents and events and applying secular law to decide whether Plaintiffs did in fact embezzle, misuse, or

---

[1] The Report is attached to the Third Amended Complaint and must therefore be considered—in its entirety—as a part of the complaint for all purposes. *Springhill Missionary Baptist Church, Inc. v. Mobley*, 251 So. 3d 281, 283 (Fla. 1st DCA 2018) (citing Fla. R. Crim. P. 1.130(b)).

3

SUPP APP 55

misappropriate church funds for personal gain or engage in other acts that result[ed] in financial losses to the church." Indeed, it is likely possible for this Court to determine whether the Pastors made any material representations about, or personally benefitted from, any of these financial transactions without delving into questions involving biblical dogma or church polity.

But this Court cannot pass on the myriad other questions invariably arising in this dispute. First, this Court is not permitted to determine the proper scope of the Pastors' spending powers (including whether these transactions required board approval) or whether the riskiness of certain investments aligned with the Church's missions or fiduciary duties to its tithing members. Those questions can only be answered by church leadership—not this Court. Second, this litigation will require adjudication of Defendants' qualified privilege to publish the Report based on their senior leadership roles within the church. *See Lundquist v. Alewine*, 397 So. 2d 1148, 1149 (Fla. 5th DCA 1981) ("The elements essential to the finding of a conditionally privileged publication are (1) good faith, (2) an interest to be upheld, (3) a statement limited in its scope to this purpose, (4) a proper occasion, (5) publication in a proper manner."). Put simply, this Court lacks authority to judge the legitimacy of a religious interest or whether efforts to uphold that religious interest were appropriate. Third, the Report must be analyzed under the substantial truth doctrine, requiring it to be considered in the full context of its publication. *Kieffer v. Atheists of Fla., Inc.*, 269 So. 3d 656, 659 (Fla. 2d DCA 2019). Plainly, the Report cannot be assessed in its full context without consideration of the large swaths that were carefully excised from the third amended complaint.

This Court is likewise barred from adjudicating the propriety of the Report discussing Pastor Kerri Weems's depression and suicidal ideation. The Report's mention of Pastor Kerri Weems's mental health struggles must be considered within the context in which they were raised—namely, in response to her husband's alleged encounter with Jesus Christ. This theophanic

4

encounter was mentioned in the Report because it seemingly precipitated, and provided some explanation for, many of the leadership issues occasioning the Pastors' ouster. But, again, consideration of the entire Report would require this Court to second-guess the church's decision to remove the Pastors or its reasoning for doing so.

At bottom, resolution of this dispute would require this Court enmesh itself into the decision of who should lead the Church—this is something it cannot do:

> When it comes to the expression and inculcation of religious doctrine, there can be no doubt that the messenger matters. . . . [T]he content and credibility of a religion's message depend vitally on the character and conduct of its teachers. A religion cannot depend on someone to be an effective advocate for its religious vision if that person's conduct fails to live up to the religious precepts that he or she espouses. For this reason, a religious body's right to self-governance must include the ability to select, and to be selective about, those who will serve as the very "embodiment of its message" and "its voice to the faithful."

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 201 (2012) (J. Alito, concurring) (quoting *Petruska v. Gannon Univ.*, 462 F.2d 294, 306 (3d Cir. 2006)). Therefore, the ecclesiastical abstention doctrine deprives this Court of subject matter jurisdiction over the present dispute, and no amendment can circumvent this constitutional prohibition. *See Grove Isle Ass'n, Inc. v. Grove Isle Assocs., LLLP*, 137 So. 3d 1081, 1090 (Fla. 3d DCA 2014).

Accordingly, it is **ORDERED** that Plaintiffs' "Third Amended Complaint," filed on October 18, 2022, is **DISMISSED WITH PREJUDICE**.

**DONE AND ORDERED** in Jacksonville, Duval County, Florida on October 6, 2023.

*Marianne Lloyd Aho*
**MARIANNE L. AHO**
**Circuit Judge**

Copies furnished to all counsel of record.

/tbc

5

**DOCKET/TAB 39**

ORDER ON DEFENDANTS' MOTION TO DISMISS

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

CHARLES S. WEEMS, IV , an
individual, KERRI WEEMS, an
individual, CELEBRATION
GLOBAL, INC., a Florida not for
profit corporation, HONEY LAKE
FARMS, INC., a Florida not for
profit corporation, NORTHSTREAM
MANAGEMENT GROUP, LLC, a
Florida limited liability company,
and WEEMS GROUP, LLC, a
Florida limited liability company,

      Plaintiffs,

v.                                                          Case No. 3:23-cv-811-MMH-LLL

ASSOCIATION OF RELATED
CHURCHES, a Texas not-for-profit
corporation, CHRIS HODGES,
individually, DINO RIZZO,
individually, and JOHN
SEIBELING, individually,

      Defendants.

_____

# <u>O R D E R</u>

**THIS CAUSE** is before the Court on Defendants' Motion to Dismiss for

Lack of Jurisdiction or, Alternatively, Motion for More Definite Statement and

Supporting Memorandum of Law (Doc. 28; Motion) filed on August 28, 2023.

In the Motion, Defendants seek dismissal of Plaintiffs' Complaint & Demand

for Jury Trial (Doc. 1; Complaint) based on the ecclesiastical abstention doctrine.  Motion at 1.  In the alternative, Defendants ask the Court to "order a more definite statement and require that Plaintiffs replead the Complaint." Id. at 24.  Plaintiffs have filed a response in opposition to the Motion.  See Plaintiffs' Response in Opposition to Defendants' Motion to Dismiss or for More Definite Statement (Doc. 35; Response), filed September 25, 2023.[1]  Accordingly, this matter is ripe for review.  For the reasons that follow, the Court finds that the Motion is due to be granted to the extent that the Court will strike the Complaint as a shotgun pleading and direct Plaintiffs to file an amended complaint.

## I.    Background[2]

Plaintiffs Charles Stovall Weems ("Pastor Weems") and Kerri Weems are co-founders of Celebration Church.  Complaint at 1, 7.  Before he resigned from his position with the Church in April 2022, Pastor Weems had been Celebration Church's Senior Pastor and CEO since its founding in 1998.  See id. ¶¶ 27–29.  Plaintiffs Celebration Global, Inc., Honey Lake Farms, Inc.,

_____

[1] Plaintiffs requested and received an extension of time to file their Response.  See Endorsed Order (Doc. 34), entered September 14, 2023.  Accordingly, Plaintiffs' Response was timely filed.

[2] In considering the Motion, in which Defendants assert a facial challenge to the Court's jurisdiction, see Motion at 6 n.4, the Court must accept all factual allegations in the Complaint as true.  Lawrence v. Dunbar, 919 F.2d 1525, 1529 (11th Cir. 1990).  As such, the facts recited here are drawn from the Complaint and its exhibit and may well differ from those that ultimately can be proved.

SUPP APP 60

NorthStream Management Group, LLC, and Weems Group, LLC., are business entities Pastor Weems and Kerri Weems created to "house and fund Celebration Church's significant administrative and personnel operations" and to support Pastor Weems's missionary work.  See id. ¶¶ 35–38.  Defendants are the Association of Related Churches ("ARC"), which is a "cooperative of independent churches from different denominations," id. ¶ 39, ARC's co-founder Chris Hodges, id. ¶ 47, ARC's Executive Director Dino Rizzo, id. ¶ 52, and ARC's "founding board member" John Seibeling, id. ¶ 53.  Rizzo and Seibeling also served as "Overseer[s] at Celebration Church until September 2021."  Id. ¶¶ 52–53.

In the Complaint, Plaintiffs assert that Defendants engaged in an "unlawful conspiracy" to "protect and expand their church growth business interests and endeavors and the substantial income they generate by destroying Plaintiffs and eliminating them as perceived threats and competitors," including by "engineering a takeover at Celebration Church of Jacksonville, Inc."  Id. ¶ 1.  Among other allegations, Plaintiffs assert that Defendants orchestrated a "sham 'investigation'" within Celebration Church to frame Pastor Weems for embezzlement.  See id. ¶ 125.  According to Plaintiffs, this caused Celebration Church to "avoid paying Plaintiffs the benefits [it] had already agreed to provide," allowed Defendants to "install leadership [they] could control" within Celebration Church, and eliminated "Honey Lake Farms

as competition" for a similar entity developed by Hodges and Rizzo.[3]   Id. ¶¶ 95, 126.   Plaintiffs plead two counts in their 182-paragraph Complaint.   In Count I, Plaintiffs assert a claim for tortious interference with "Plaintiffs' advantageous contractual and business relationships."   See id. ¶¶ 166–173. In Count II, Plaintiffs assert a claim for conspiracy based on all the same facts. See id. ¶¶ 174–182.   Defendants seek dismissal of both Counts.   See generally Motion.

## II.    Discussion

In the Motion, Defendants first argue that the ecclesiastical abstention doctrine prevents the Court from adjudicating Plaintiffs' claims.   See id. at 13– 21.   In the alternative, Defendants assert that the Complaint is an impermissible shotgun pleading.   See id. at 21–23.   As explained below, Defendants' first argument fails for the same reason their second one succeeds: because the Complaint is a shotgun pleading, the Court lacks sufficient information to determine the applicability of the ecclesiastical abstention doctrine to any of Plaintiffs' claims.

In general, pursuant to the ecclesiastical abstention doctrine, "[c]ivil courts lack jurisdiction to entertain disputes involving church doctrine and

---

[3] Plaintiffs explain that Honey Lake Farms is "a retreat and outpatient facility for pastoral care" which provides "Christian mental health treatment services."   Id. ¶ 36. Plaintiffs further assert that Hodges and Rizzo were involved in creating the Lodge Retreat Center, a "virtually identical" program announced nine months after Honey Lake Farms opened.   See id. ¶ 95.

SUPP APP 62

polity" unless the dispute can be resolved "under neutral principles" of law without "consideration of religious doctrinal matters."   See Rutland v. Nelson, 857 F. App'x 627, 628 (11th Cir. 2021) (citing Crowder v. S. Baptist Convention, 828 F.2d 718, 727 (11th Cir. 1987) and Jones v. Wolf, 443 U.S. 595, 602–03 (1979)).[4]   Defendants assert that resolving Plaintiffs' claims would require "excessive judicial entanglement" with Celebration Church's internal governance and would require the Court to answer several "manifestly ecclesiastical questions."   Motion at 14–20.   For this reason, Defendants contend that the Court cannot evaluate the "causation and damages elements of Plaintiffs' claims" without violating the First Amendment.   See id. at 18.   In response, Plaintiffs assert that Defendants fail to analyze the "relationships amongst these parties and nature of the claims at issue" in this case, as opposed to those in related state-court litigation against Celebration Church itself.[5]

---

[4] The Court does not rely on unpublished opinions as binding precedent, but they may be cited in this Order when the Court finds them persuasive on a particular point.   See McNamara v. GEICO, 30 F.4th 1055, 1060–61 (11th Cir. 2022); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

[5] In state court, Pastor Weems and Kerri Weems previously filed a lawsuit against Celebration Church "to try to obtain temporary injunctive relief" while an investigation of Pastor Weems was ongoing.   See Complaint ¶ 135.   Pastor Weems and Kerri Weems are also parties to "a separate pending eviction matter."   See Motion at 11 n.3.   Plaintiffs assert that Defendants' arguments in the instant case "bootstrap[ ] themselves to abstention arguments" that Celebration Church and its principals raised in the related litigation, and maintain that the "related state court actions are irrelevant to this Court's subject matter jurisdiction in this case."   Response at 3 & n.1.   Plaintiffs' contention in this regard may have some merit, but the problem with the argument is that Plaintiffs' vague pleading that itself lumps all Plaintiffs and Defendants together forecloses the ability to distinguish the relationships amongst the parties from those addressed in the state-court actions.

See Response at 3.   Accordingly, Plaintiffs argue that Defendants "fail to meet th[eir] burden" of showing that the dispute cannot be decided based on neutral principles of secular law.[6]   See id. at 8.

For some events and business relationships Plaintiffs describe in the Complaint, Defendants' arguments likely are well-taken.[7]   But Plaintiffs describe (or allude to) many business relationships in the Complaint, see, e.g., Complaint   ¶¶ 102–106, and the Court is unable to determine which relationships, acts, or omissions form the basis of their tortious interference

---

[6] Plaintiffs also assert that if the Motion is truly a facial attack on subject matter jurisdiction, it should be denied because they have properly alleged diversity jurisdiction.   See Response at 4.   But the presence of diversity jurisdiction does not mean that ecclesiastical abstention does not apply.   Abstention is not the absence of a statutory basis for subject matter jurisdiction, but a doctrine "under which a District Court may decline to exercise" jurisdiction which would otherwise be proper.   See Allegheny Cnty. v. Frank Mashuda Co., 360 U.S. 185, 188 (1959) (emphasis added).   And although it has not done so in a published decision, the Eleventh Circuit has treated ecclesiastical abstention as an issue which is properly addressed under Rule 12(b)(1).   See Myhre v. Seventh-Day Adventist Church Reform Movement Am. Union Int'l Missionary Soc'y, 719 F. App'x 926, 928 (11th Cir. 2018) ("The district court correctly dismissed Myhre's complaint for lack of subject matter jurisdiction."); see also Kawimbe v. African Methodist Episcopal Church, No. 1:20-cv-04711-SDG, 2022 WL 3362050, at *1–2 (N.D. Ga. Aug. 15, 2022) (denying motion for reconsideration because "the Eleventh Circuit continues to treat the ecclesiastical abstention doctrine as a jurisdictional concern" (collecting cases)).

[7] Plaintiffs appear to argue that ecclesiastical abstention is categorically inapplicable because the parties "are not even members of the same church or religious institution."   See Response at 8–9.   In doing so, Plaintiffs attempt to distinguish Mammon v. SCI Funeral Servs. of Fla., Inc., 193 So. 3d 980 (Fla. 4th DCA 2016), where abstention was warranted in a dispute between an individual and a non-religious institution, because, in this action, Plaintiffs are "suing Defendants for committing torts in violation of secular law."   See id.   But this was precisely the issue that Mammon addressed: even though the plaintiff there framed her complaint "in counts alleging deceptive and fraudulent misrepresentations" in violation of secular law, the court could not apply that secular law "without first determining, as a matter of fact, 'what constitutes Jewish burial customs and traditions.'"   Mammon, 193 So. 3d at 985.   At least at this stage of the proceedings, the Court does not foreclose any future argument that a claim "require[s] an examination of doctrinal beliefs and internal church procedures."   See Myhre, 719 F. App'x at 929.

SUPP APP 64

claims.[8]  Without allegations that identify which actions by which Defendants harmed which Plaintiff and which of that Plaintiff's relationships with which entities, the Court cannot determine whether resolution of each Plaintiffs' claims requires consideration of religious doctrinal matters as opposed to a straightforward application of secular law.  For example, it is unclear which claims would require the Court to determine how Celebration Church began its investigation into Pastor Weems, interpret the church's financial policies and bylaws, or weigh the effect of the investigation report "on [Celebration Church's] board members as compared to the effects of" other religious disagreements.[9]  See Motion at 14, 18.  Accordingly, the Court is unable to determine whether

---

[8] Although Plaintiffs incorporate specific paragraphs into Count I to illustrate their "advantageous contractual and business relationships," see id. ¶ 167, it does not appear that Plaintiffs intended this to be an exhaustive list of relationships.  Indeed, these incorporated paragraphs lack any reference to Plaintiff Weems Group, LLC.  And for many of the incorporated relationships, there are no allegations to suggest that the relationship was damaged, let alone how it was damaged.  Accordingly, the incorporation of these allegations in Count I does not clarify Plaintiffs' claims.

[9] Because Siebeling and Rizzo are former Overseers of Celebration Church, Defendants also argue that the Court will need to examine whether they acted within "the scope of their responsibilities as Overseers" to address the claims against these Defendants.  See Motion at 19–20.  According to Defendants, since the Overseer role involved providing "'apostolic oversight'" and "'prayer,'" the Court would have to answer ecclesiastical questions in the process.  See id. (quoting Complaint ¶ 31).  But the Complaint also alleges that these Defendants stepped down as Overseers in September 2021, and it does not suggest that they remained agents of Celebration Church in another capacity.  See Complaint ¶¶ 52–53, 95.  And some allegations suggest that Plaintiffs may be seeking to hold Rizzo accountable for conduct which occurred after he stepped down as an Overseer.  See id. ¶¶ 107–111 (appearing to assert that Rizzo told an investor that he "should cut all ties with Pastor Weems and Honey Lake Farms" in November or December of 2021).  Based on the pleading, the Court cannot determine whether all of Plaintiffs' claims against Siebeling and Rizzo require analysis of conduct which occurred while they were Overseers at Celebration Church.

SUPP APP 65

and to what extent the claims in this case require the inquiries which Defendants argue would be impermissible.

The root of this uncertainty, of course, is the conclusory, overly generalized, and imprecise way that Plaintiffs have set forth the claims in the Complaint.  Notably, despite its length, the Court is skeptical that in the Complaint, Plaintiffs include sufficient information for some (if not all) Plaintiffs to state plausible claims for relief.[10]  The manner in which Plaintiffs have drafted the Complaint deprives the Court of the ability to conclusively determine whether ecclesiastical abstention is appropriate as to all of Plaintiffs' claims against each Defendant, but it also supports Defendants' contention that the Complaint is an impermissible shotgun pleading.  Id. at 21–23.  In Weiland, the Eleventh Circuit "identified four rough types or categories of shotgun pleadings."  See Barmapov v. Amuial, 986 F.3d 1321, 1324–25 (11th

---

[10] For example, Plaintiff Weems Group, LLC, is mentioned only once in the substantive allegations.  What claims is this Plaintiff pursuing?  Moreover, claims for tortious interference "generally require[ ] 'a business relationship evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered.'"  Sarkis v. Pafford Oil Co., Inc., 697 So. 2d 524, 526 (Fla. 1st DCA 1997) (quoting Ethan Allen, Inc. v. Georgetown Manor, Inc., 647 So. 2d 812, 814 (Fla. 1994)); see also Dunn v. Air Line Pilots Ass'n, 193 F.3d 1185, 1191 (11th Cir. 1999) (concluding that, to establish a "business relationship," the plaintiff must show "a relationship with a particular party, and not just a relationship with the general business community").  Plaintiffs do not appear to include such allegations as to many of the business relationships described, and it is unclear whether many of the business relationships described in the Complaint were even damaged.  See, e.g., Complaint ¶ 106 (asserting that "Plaintiffs" had "developed an advantageous business relationship with David Maura," a person who is mentioned nowhere else in the Complaint).

SUPP APP 66

Cir. 2021) (quoting <u>Weiland v. Palm Beach Cnty. Sheriff's Off.</u>, 792 F.3d 1313,

1321 (11th Cir. 2015)).   As the <u>Barmapov</u> court explained,

> The first [category] is "a complaint containing multiple counts
> where each count adopts the allegations of all preceding counts,
> causing each successive count to carry all that came before and the
> last count to be a combination of the entire complaint."   The second
> is a complaint "replete with conclusory, vague, and immaterial facts
> not obviously connected to any particular cause of action."   The
> third is a complaint that does not separate "each cause of action or
> claim for relief" into a different count.   And the final type of
> shotgun pleading is a complaint that "assert[s] multiple claims
> against multiple defendants without specifying which of the
> defendants are responsible for which acts or omissions, or which of
> the defendants the claim is brought against."

<u>Barmapov</u>, 986 F.3d at 1324–25 (quoting <u>Weiland</u>, 792 F.3d at 1321–23).

Defendants contend that the Complaint falls into each of these four categories.

Motion at 22.   At least regarding the second, third, and fourth categories,

Defendants are correct.[11]

   As to the second category, the Complaint is replete with conclusory, vague

allegations.[12]   <u>See, e.g.</u>, Complaint ¶ 24 ("Defendants conspired and agreed

---

[11] Defendants contend that the Complaint falls into the first category because
"Count II incorporates all of Count I."   <u>Id.</u> at 22 (quoting <u>Moore v. Jasper City Bd. of Educ.</u>,
No. 22-13943, 2023 WL 3719151, at *2 (11th Cir. May 30, 2023)).   The Court is not persuaded
that this is a fatal defect in this case.   The Complaint contains only two Counts, and as
Plaintiffs correctly observe, <u>see</u> Response at 13, the conspiracy claims in Count II derive from
the tortious interference claims in Count I.   <u>See</u> <u>Ford v. Rowland</u>, 562 So. 2d 731, 735 n.2
(Fla. 5th DCA 1990) ("Conspiracy is not a separate or independent tort but is a vehicle for
imputing the tortious acts of one coconspirator to another to establish joint and several
liability.").   Unlike other defects Defendants identify, the Court is not convinced that this
reincorporation "materially increase[es] the burden of understanding the factual allegations
underlying each count."   <u>See</u> <u>Weiland</u>, 792 F.3d at 1324–26.

[12] Plaintiffs' only argument to the contrary is that Defendants cite "no examples" to
show that the Complaint falls into this category, "presumably because it is simply untrue."

SUPP APP 67

with each other and others to engage in unlawful and tortious conduct intended to harm and injure Plaintiffs . . . ."); id. ¶¶ 58–59 (asserting that "Defendants acted as the principals of and directed and controlled the acts and conduct" of two attorneys who "purportedly represented Celebration Church"); id. ¶ 68 (asserting that "Defendants acted as the principals of, directed, and controlled acts and conduct of" Celebration Church's lead pastor); id. ¶ 94 (asserting that Defendants enlisted an individual "to manufacture evidence of supposed financial crimes and mismanagement").   The rest of the allegations in the Complaint do little to clarify these allegations.   Plaintiffs are two individuals and four separate business entities.   In the Complaint, they describe several business relationships and allegedly tortious acts but do not specifically state which of these relationships or acts form the basis of which individual Plaintiff's claims.   For one Plaintiff—Weems Group, LLC—there are no allegations about it having <u>any</u> business relationships.   Plaintiffs' vague and conclusory pleading is simply insufficient to put Defendants on notice of the claims against them and the grounds on which each claim rests.[13]   See <u>Weiland</u>, 792 F.3d at 1323

---

Response at 13.   But this is incorrect: Defendants cite many examples of conclusory allegations from throughout the Complaint.   See Motion at 22 (citing Complaint ¶¶ 1–4, 19–20, 23–24, 59, 68, 93–94, 115, 124–130, 139, 155–65).

[13] This is especially true because for any Plaintiff to prevail on a claim that Defendants tortiously interfered with a business relationship under Florida law, that Plaintiff "must plead and prove that" the Defendant had "knowledge of the relationship" <u>and</u> "manifested a specific intent to interfere with" it.   See <u>Chicago Title Ins. Co. v. Alday-Donalson Title Co. of Fla., Inc.</u>, 832 So. 2d 810, 814 (Fla. 2d DCA 2002).   That Plaintiff must also establish that it incurred actual losses from the damage to the identified relationship.   See <u>Worldwide Primates, Inc. v. McGreal</u>, 26 F.3d 1089, 1091–92 (11th Cir. 1994) (imposing Rule 11 sanctions

SUPP APP 68

(describing this deficiency as the "unifying characteristic of all types of shotgun pleadings"); see also Barmapov, 986 F.3d at 1325–26 (describing excessively conclusory allegations that defendants "'sabotage[d]' [the plaintiff's] efforts to apply for financing" (first alteration in original)).

As for the third and fourth types of shotgun pleadings, in Count I of the Complaint Plaintiffs appear to combine claims for tortious interference based on multiple theories and occurrences, and Plaintiffs routinely fail to specify which Plaintiff or Plaintiffs bring the claim, and which Defendant or Defendants the Plaintiff asserts would be responsible for which acts or omissions.   The Eleventh Circuit has repeatedly explained that in a case with multiple parties, and in particular multiple defendants, the complaint should contain specific allegations with respect to each defendant; it is insufficient to assert "multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against."   See Weiland, 792 F.3d at 1323 & n.14 (collecting cases).   This is true even more so here, where multiple Plaintiffs raise claims based on a series of different events against multiple Defendants, all in the same two Counts of the Complaint.[14]

---

on a plaintiff who brought a tortious interference claim under Florida law despite knowing "from the beginning" that the attempted interference caused no actual damage to the relationship at issue).

[14] Some Plaintiffs do not appear to be able to base any claim on some of the acts alleged in the Complaint.   For example, why would the business entity Plaintiffs have claims for acts

SUPP APP 69

In their Response, Plaintiffs assert without elaboration that Defendants "ignore the legal implications of Defendants' conspiracy making each of them liable for each other's acts." <u>See</u> Response at 14. It is true that a properly pleaded conspiracy can make co-conspirators liable for each other's actions. <u>See</u> <u>Ford</u>, 562 So. 2d at 735 n.2. But this does not relieve each Plaintiff of the obligation to provide each Defendant with adequate notice of which claims are brought against that Defendant and by which Plaintiff. <u>See</u> <u>Automotive Alignment & Body Serv., Inc. v. State Farm Mut. Auto. Ins. Co.</u>, 953 F.3d 707, 732 (11th Cir. 2020) (determining that a district court properly dismissed a claim for tortious interference as a shotgun pleading because it was based on "group allegations");[15] <u>see also</u> <u>Weiland</u>, 792 F.3d at 1320 (explaining that the federal pleading rules exist to ensure that a plaintiff's "'adversary can discern

_____

directed solely at Pastor Weems and Kerri Weems? <u>See</u> Complaint ¶ 94 (describing acts intended "to help oust Pastor Weems" from Celebration Church and to "illegally access and download [Kerri Weems's] private data, emails, medical information, and therapy sessions" for "Defendants to use against the Weemses [sic]").

[15] The Court notes that group allegations are not necessarily fatal if the complaint "can be fairly read to aver that all defendants are responsible for the alleged conduct." <u>See</u> <u>Kyle K. v. Chapman</u>, 208 F.3d 940, 944 (11th Cir. 2000) (concluding that a complaint was not deficient where it "collectively accuse[d] all the defendants of all the acts" because the complaint alleged physical abuse of a patient in a mental hospital by "defendants who were personally involved" in his care). But in many allegations it is unclear whether Plaintiffs believe that each Defendant engaged in the same conduct or each is merely liable as a co-conspirator. For example, it is not apparent that Plaintiffs believe each Defendant—ARC, Hodges, Rizzo, and Seibeling—individually directed Wedekind to email TurnCoin. <u>See</u> Complaint ¶ 147 (asserting that Wedekind sent this email "at Defendants' direction"). It is likewise unclear whether Plaintiffs believe that each Defendant individually "rewarded Timberlake for his role in advancing" the conspiracy by "partnering with Servolution to promote and generate sales of Timberlake's book." <u>See</u> <u>id.</u> ¶ 151. Accordingly, many allegations cannot be read to assert that all the Defendants engaged in all the conduct alleged.

SUPP APP 70

what he is claiming and frame a responsive pleading, the court can determine which facts support which claims and whether the plaintiff has stated any claims upon which relief can be granted, and, at trial, the court can determine that evidence which is relevant and that which is not'" (quoting T.D.S. Inc. v. Shelby Mut. Ins. Co., 760 F.2d 1520, 1544 n.14 (11th Cir. 1985) (Tjoflat, J., dissenting))).   Indeed, "[i]n conspiracy cases, a defendant must be informed of the nature of the conspiracy which is alleged," and it is "not enough to simply aver in the complaint that a conspiracy existed."   Fullman v. Graddick, 739 F.2d 553, 557 (11th Cir. 1984); see also World Class Yachts, Inc. v. Murphy, 731 So. 2d 798, 799 (Fla. 4th DCA 1999) ("[g]eneral allegations of conspiracy are inadequate" to state a claim under Florida law).   Here Plaintiffs' Complaint simply fails to provide sufficient notice of the basis for Plaintiffs' claims. Accordingly, Plaintiffs' arguments to the contrary are unavailing.

### III.   Conclusion

For the reasons described above, the Complaint is an impermissible shotgun pleading which fails to put Defendants on sufficient notice of the claims brought against them, and also prevents the Court from resolving Defendants' contention that the ecclesiastical abstention doctrine warrants dismissal.   For this reason, the Court will strike the Complaint and direct Plaintiffs to file a proper amended complaint.

SUPP APP 71

## IV.   Future Proceedings

Having resolved the Motion, the Court turns its attention to the procedural posture of this action.    The case has been pending since July of 2023 but has not yet progressed beyond the pleading stage.    Moreover, in light of the fact that Defendants had raised a non-frivolous challenge to the Court's exercise of jurisdiction over these claims, on November 3, 2023, the Court stayed discovery pending resolution of the instant Motion.   See Order (Doc. 38).   The Court has now resolved the Motion, but has not resolved Defendants' contention that application of the ecclesiastical abstention doctrine warrants dismissal of Plaintiffs' claims.    Thus the stay of discovery would be due to remain in place. The Court is of the view, however, that rather than simply stay discovery, the better course of action is to stay and administratively close the case pending resolution of the jurisdictional challenge.    Despite the age of the case, given the absence of a viable complaint the Court cannot yet determine whether the exercise of jurisdiction to resolve Plaintiffs' claims is proper.    Until Plaintiffs have filed a proper complaint, and the Court has resolved the jurisdictional challenge, the prudent course of action is to stay the case to preserve the resources of the parties and also assure that, if abstention is appropriate, premature litigation of the claims raised by Plaintiffs will not improperly invade matters protected by the First Amendment.    As such the Court will direct the Clerk of the Court to stay and administratively close this case

SUPP APP 72

pending a determination by the Court that Plaintiffs have filed a viable amended complaint that plausibly states a claim (or claims) over which the Court can properly exercise subject matter jurisdiction.

Accordingly, it is

**ORDERED:**

1.   Defendants' Motion to Dismiss for Lack of Jurisdiction or, Alternatively, Motion for More Definite Statement and Supporting Memorandum of Law (Doc. 28) is **GRANTED** to the extent that the Complaint & Demand for Jury Trial (Doc. 1) is **STRICKEN**.

2.   The Motion is otherwise **DENIED without prejudice**.

3.   Plaintiffs may file an amended complaint on or before **March 1, 2024**.   Failure to do so may result in a dismissal of this action.

4.   Defendants shall respond to the amended complaint in accordance with the requirements of Rule 15 of the Federal Rules of Civil Procedure.

5.   The Clerk of the Court is **DIRECTED** to stay and administratively close this case.

6. The parties are relieved of the obligation to file a Joint Uniform Case Management Report within twenty-one days of this Order as the Court previously directed.[16]

**DONE AND ORDERED** in Jacksonville, Florida on February 9, 2024.

**MARCIA MORALES HOWARD**
United States District Judge

lc31

Copies to:

Counsel of Record

---

[16] <u>See</u> Order (Doc. 38) entered November 6, 2023.

SUPP APP 74

**DOCKET/TAB 52**

DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT
FOR LACK OF SUBJECT-MATTER JURISDICTION OR,
ALTERNATIVELY, FOR FAILURE TO STATE A CLAIM

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CHARLES S. WEEMS, IV, an
individual, KERRI WEEMS, an
individual, and CELEBRATION
GLOBAL, INC., a Florida not for profit
corporation, HONEY LAKE FARMS,
INC., a Florida not for profit corporation,
NORTHSTREAM MANAGEMENT
GROUP, LLC, a Florida limited liability
company, and WEEMS GROUP, LLC, a
Florida limited liability company,

      Plaintiffs,

v.                           Case No.: 3:23-cv-00811-MMH-LLL

ASSOCIATION OF RELATED
CHURCHES, a Texas not-for-profit
corporation, CHRIS HODGES,
individually, and DINO RIZZO,
individually,

      Defendants.

_____/

**DEFENDANTS' MOTION TO DISMISS FIRST AMENDED
COMPLAINT FOR LACK OF SUBJECT-MATTER JURISDICTION
OR, ALTERNATIVELY, FOR FAILURE TO STATE A CLAIM**

Defendants Association of Related Churches ("ARC"), Chris Hodges ("Pastor

Hodges"), and Dino Rizzo ("Pastor Rizzo") move under Federal Rule of Civil

Procedure 12(b)(1) to dismiss Plaintiffs' First Amended Complaint & Demand for Jury

Trial (ECF No. 49) for lack of subject-matter jurisdiction because the ecclesiastical

abstention doctrine bars this lawsuit. Alternatively, Defendants move under Federal

Rule of Civil Procedure 12(b)(6) to dismiss Counts X through XV and Counts XIX

and XX for failure to state a claim.

## INTRODUCTION

The ecclesiastical abstention doctrine bars civil courts from considering this dispute. At the center of each of the First Amended Complaint's twenty counts is a farfetched—and fictional—conspiracy theory involving an elaborate plot to seize control of Celebration Church and oust Pastor Stovall Weems. *See, e.g.*, 1st Am. Compl. ¶¶ 57, 84, 96. According to Plaintiffs' allegations—which are baseless—Defendants conspired to "legitimiz[e] the takeover of Celebration Church" by a rival faction by engineering a "sham 'investigation'" of Pastor Weems on behalf of the church. *Id.* ¶¶ 81, 96. Though Celebration Church is not a party to this lawsuit, each of Plaintiffs' claims rests on a challenge to the legitimacy of the church's internal investigation of Pastor Weems and the end of his role as a pastor in the church.

In its order striking the original Complaint as a shotgun pleading, the Court observed that "[f]or some events and business relationships" alleged in the Complaint, Defendants' ecclesiastical abstention arguments "likely are well-taken." ECF No. 39 at 6. But because that Complaint lumped together claims involving six Plaintiffs and four Defendants, the Court was "unable to determine which relationships, acts, or omissions form[ed] the basis of" each claim. *Id.*

The First Amended Complaint removes any doubt. Plaintiffs' amended pleading breaks their claims down into twenty separate counts, each of which expressly incorporates and, critically, depends on Plaintiffs' allegations regarding the church's "sham 'investigation'" and the end of Pastor Weems's ministry. *See* 1st Am.

SUPP APP 77

Case 3:23-cv-00811-MMH-LLL   Document 52   Filed 04/22/24   Page 3 of 25 PageID 672
USCA11 Case: 25-10154   Document: 44   Date Filed: 09/15/2025   Page: 78 of 122

Compl. ¶¶ 102, 107, 112, 117, 121, 125, 129, 134, 139, 144, 149, 154, 159, 163, 167, 171, 178, 185, 192, 199; *see also* ¶¶ 57-58, 63-65, 81-87, 91, 95-96. Each claim thus demands an impermissible intrusion into core ecclesiastical matters.

Both the United States and Florida Constitutions forbid such an intrusion. Under the ecclesiastical abstention doctrine, civil courts may not "enter[] into a religious controversy and put[] the enforcement power of the state behind a particular religious faction." *Crowder v. S. Baptist Convention*, 828 F.2d 718, 721 (11th Cir. 1987). Because civil courts "may not adjudicate ecclesiastical disputes," the First Amended Complaint should be dismissed for lack of subject-matter jurisdiction. *Id.* at 718.

Alternatively, the counts asserted by NorthStream Management Group, LLC ("NorthStream") and Weems Group, LLC ("Weems Group") fail to allege well-pleaded facts sufficient to support claims for tortious interference or conspiracy. Those counts should be dismissed for failure to state a claim.

## BACKGROUND

### A.    Allegations of the First Amended Complaint

Plaintiffs' allegations, though false in all but the most mundane details, will be treated as true for the purposes of this motion.[1] The substantive allegations are presented under the heading "COMMON FACTUAL ALLEGATIONS TO ALL COUNTS" and are incorporated into each count. *See* 1st Am. Compl. ¶¶ 23-101; *see also id.* ¶¶ 102, 107, 112, 117, 121, 125, 129, 134, 139, 144, 149, 154, 159, 163, 167,

---

[1]     This motion presents a facial, rather than factual, attack on the Court's jurisdiction. *See Kennedy v. Floridian Hotel, Inc.*, 998 F.3d 1221, 1230 (11th Cir. 2021).

3

SUPP APP 78

171, 178, 185, 192, 199.

According to those allegations, Plaintiffs Stovall Weems and Kerri Weems founded Celebration Church in 1998. *Id.* ¶ 23. Until April 2022, Pastor Weems served as Celebration Church's Senior Pastor. *Id.* ¶ 93.

Defendant ARC is "one of the largest church planting organizations in North America and has planted more than a thousand churches since 2000." *Id.* ¶ 33. Pastor Hodges is a co-founder of ARC and a founder and Senior Pastor of the Church of the Highlands in Birmingham, Alabama. *Id.* ¶ 39. Pastor Rizzo is "the Executive Director of ARC and an Associate Pastor at Church of the Highlands." *Id.* ¶ 45. Pastor Rizzo also served as an "Overseer at Celebration Church until September 2021." *Id.* ¶ 46.

In 2018, Pastor Weems rejected what the First Amended Complaint characterizes as "the modern church growth system," which prioritizes efforts to "grow attendance and generate more and more revenue" for a church. *Id.* ¶¶ 25-26. Pastor Weems instead embraced a competing vision in which the goal of increasing church attendance would be subordinated to "helping the poor, missionary work, equality, and simplifying the church by creating alternative revenue streams that would make the church less donation dependent." *Id.* ¶ 25. Pastor Weems conceived what Plaintiffs call the "Missions Plan," which was intended, somehow, to move Celebration Church toward Pastor Weems's new vision by creating several new corporate entities to handle various church functions. *Id.* ¶¶ 27-28.

To that end, the Weemses formed the four corporate Plaintiffs: Celebration Global, Inc. ("Celebration Global"), Honey Lake Farms, Inc. ("Honey Lake Farms"),

NorthStream, and Weems Group. *Id.* ¶¶ 28-29. Celebration Global was formed "to operate as the umbrella organization under which [the Weemses'] missionary work would be housed." *Id.* ¶ 28. Honey Lake Farms was formed "to create, develop, and operate a retreat and outpatient facility for pastoral care." *Id.* NorthStream was formed to "provide centralized and shared management services to Celebration Church" and to "help initially operate and develop . . . Honey Lake Farms" and other so-called "Restorative Community Developments." *Id.* ¶¶ 27-28. Weems Group was formed "as a vehicle for [the Weemses] and family members to invest in the Missions Plan." *Id.* ¶ 29. Another corporation, nonparty AWKNG, Inc., was formed to "serve[] as the hub for the restorative/ministry programing [sic] used at Honey Lake Farms." *Id.* ¶ 28.

According to Plaintiffs, Weems Group invested $450,000 in NorthStream. *Id.* ¶ 29. Although the First Amended Complaint does not describe the nature of that investment, it says the money "was used to help fund and start the operations of Honey Lake Farms and AWKNG." *Id.* The First Amended Complaint also alleges that the Weemses "invested $350,000 of their own money in Honey Lake Farms." *Id.*

According to Plaintiffs, Defendants have "business and financial interests" in the church growth model that Pastor Weems had come to reject in 2018. *Id.* ¶ 51. Plaintiffs allege that ARC receives ongoing payments of 2 percent of tithes from the churches it seeds. *Id.* ¶ 34. It also alleges that Pastor Hodges "controls" and "benefits financially" from entities that "provid[e] fee-based mentoring, coaching, training, and consulting services and related resources focused on promoting and advancing the

modern church growth system to churches and their leadership." *Id.* ¶¶ 40-41. The nature of Pastor Rizzo's purported financial interests is not described in any detail.

According to the First Amended Complaint, Defendants sought to protect these financial interests by engineering a "takeover of Celebration Church" to ensure the failure of Pastor Weems's missionary-focused vision and the continued dominance of their preferred church growth model. *E.g.*, *id.* ¶¶ 57, 96. To achieve that "takeover," Defendants allegedly "plant[ed] an ARC agent Defendants knew they could control and who would continue to advance their interests, Tim Timberlake . . . , to replace S. Weems as Senior Pastor of Celebration Church." *Id.* ¶¶ 57-58.

At the center of the alleged scheme to "oust Pastor Weems" was an internal church investigation purportedly "engineered" by Defendants. *Id.* ¶¶ 63, 81. According to the First Amended Complaint, Defendants, through Celebration Church trustee Kevin Cormier and financial officer Lisa Stewart, "manufacture[d] evidence of supposed financial crimes and mismanagement that could be used to frame S. Weems and justify his removal from Celebration Church." *Id.* ¶ 64. The result was a "sham 'investigation'" of Pastor Weems's "possible improper financial practices and/or failure to fulfill duties and responsibilities as Senior Pastor." *Id.* ¶ 81. The purpose of the investigation was to "frame S. Weems and K. Weems for embezzling" from Celebration Church, "thereby legitimizing the takeover of Celebration Church, ensuring the failure of the Missions Plan, and simultaneously publicly destroying S. Weems and K. Weems so that they no longer posed any threat to Hodge's [sic], Rizzo's . . . , and ARC's personal, business, and financial interests." *Id.* ¶ 96.

SUPP APP 81

While the church's internal investigation was ongoing, Defendants, according to the First Amended Complaint, "convinc[ed] Celebration Church . . . to amend Celebration Church Bylaws to give its Trustees absolute, unchecked power to unlawfully oust S. Weems from the church." *Id.* ¶ 84; *see also id.* ¶ 91.

The church's investigation of Pastor Weems ultimately resulted in an April 24, 2022 "Report of Investigation to Celebration Church of Jacksonville, Inc." (the "Report") prepared by the church's attorneys. *Id.* ¶ 95; ECF No. 1-1.[2] The Report announced that it was "provided to assist [Celebration Church's] Board [of Trustees] in fulfilling its biblical and legal obligations" and was "performed according to biblical principles." ECF No. 1-1 at 4, 6. In addition to detailing Pastor Weems's financial misconduct, *id.* at 13-20, the Report found that the Weemses' discipline and removal were independently justified by "unbiblical" leadership of the church, including "spiritual" abuse. *Id.* at 6-7. Pastor Weems's behavior, the Report found, reflected "the antithesis of Christ-like personal sacrifice and service to others." *Id.* at 7-8. And after extensively quoting scripture, the Report found the Weemses had shown "the antithesis of biblical leadership." *Id.* at 20. It recommended immediate acceptance of their resignations without further pay or benefits. *Id.* at 22.

---

[2]     The Report was attached to the original Complaint as an exhibit and is explicitly referenced in the First Amended Complaint. 1st Am. Compl. ¶ 95 (citing ECF No. 1-1). The investigation and the Report are relied on extensively throughout the First Amended Complaint. *See id.* ¶¶ 78, 81-83, 85-87, 95-100. A document may be treated as incorporated by reference into a complaint if "(1) 'the plaintiff refers to certain documents in the complaint,' (2) those documents are 'central to the plaintiff's claim,' and (3) the documents' contents are undisputed." *Baker v. City of Madison*, 67 F.4th 1268, 1276 (11th Cir. 2023) (quoting *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (per curiam)). All three elements are met with respect to the Report.

7

On April 15, 2022, Pastor Weems "tendered his resignation." *Id.* ¶ 93. Thus, Defendants, according to the First Amended Complaint, "successfully completed their plan to take over control of Celebration Church." *Id.* ¶ 91. Based on that purported "takeover" of the church, Plaintiffs assert claims for tortious interference and conspiracy in twenty counts. *See id.* ¶¶ 102-205.

## B.   Related State-Court Litigation

This is not the Weemses' first lawsuit challenging the church's investigation and their resulting "ouster." On February 23, 2022, the Weemses filed suit in the Circuit Court for the Fourth Judicial Circuit, in and for Duval County, Florida (*Weems v. Celebration Church of Jacksonville, Inc. et al.*, Case No. 2022-CA-001047).[3] The original complaint in that lawsuit sought injunctive relief against Celebration Church. ECF No. 28-1 ¶ 100. It requested, among other things, an order "[r]estoring Pastor Stovall and Kerri to their pre-suspension positions at the Church" and "[d]etermining that the purported January 2022 amendment to the Bylaws is invalid." *Id.*

Subsequent complaints in that state-court lawsuit also asserted claims for damages against individual defendants, including Celebration Church trustees and one of the church's attorneys. ECF No. 28-2; ECF No. 28-4. Those claims are based on the same internal investigation of the Weemses' "possible misconduct in their pastoral

---

[3]      The Court may take judicial notice of filings in related state-court proceedings. *See Sporea v. Regions Bank, N.A.*, No. 20-11812, 2021 WL 2935365, at *2 (11th Cir. July 13, 2021) (per curiam) ("[T]he district court did not abuse its discretion by taking judicial notice of documents related to Sporea's state court action."); *U.S. ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 811 n.4 (11th Cir. 2015) ("Courts may take judicial notice of publicly filed documents, such as those in state court litigation, at the Rule 12(b)(6) stage.").

SUPP APP 83

roles" that Plaintiffs rely on here. *See* ECF No. 37-1 at 2.

On October 6, 2023, the state court entered an order dismissing that lawsuit with prejudice. *Id.* at 5. The court concluded that adjudicating the Weemses' claims "would require [the court] to impermissibly engage in a doctrinal squabble involving the Church's biblical standards, administration, financial policies, and disciplinary practices." *Id.* at 3. The state court reasoned that it could not lawfully "determine the proper scope of the Pastors' spending powers (including whether these transactions required board approval)." *Id.* at 4. More fundamentally, the court could not "second-guess the church's decision to remove the Pastors or its reasoning for doing so." *Id.* at 5.

## ARGUMENT

### I.     This lawsuit is barred by the ecclesiastical abstention doctrine.

#### A.     The Ecclesiastical Abstention Doctrine

"Among the separation of church and state principles required by the establishment and free exercise clauses of the first amendment is that courts may not adjudicate ecclesiastical disputes." *Crowder*, 828 F.2d at 718. This "limitation on secular judicial power" to interfere with "religious affairs" is similarly embedded in Florida's Constitution. *Napolitano v. St. Joseph Cath. Church*, 308 So. 3d 274, 275, 277 (Fla. 5th DCA 2020). This "ecclesiastical abstention doctrine" is well-established: "Civil courts lack jurisdiction to entertain disputes involving church doctrine and polity." *Rutland v. Nelson*, 857 F. App'x 627, 628 (11th Cir. 2021) (per curiam); *Myhre v. Seventh-Day Adventist Church Reform Movement Am. Union Int'l Missionary Soc'y*, 719

9

F. App'x 926, 928 (11th Cir. 2018) (per curiam) (same); *see also Napolitano*, 308 So. 3d at 277. Nor may a court "enter[] into a religious controversy and put[] the enforcement power of the state behind a particular religious faction." *Crowder*, 828 F.2d at 721.

A "narrow exception to this doctrine" permits judicial review of a church-related dispute if it can be decided based on neutral legal principles—but only if the dispute does not involve religious doctrinal matters, *see Rutland*, 857 F. App'x at 628, or issues of internal church procedures or governance, *see Myhre*, 719 F. App'x at 928-29; *see also Hutchison v. Thomas*, 789 F.2d 392, 396 (6th Cir. 1986) (declining to apply the "'neutral principles' doctrine" to a dispute involving the plaintiff's "status and employment as a minister of the church"). Courts lack jurisdiction if a claim implicates or is "part and parcel of ecclesiastical concerns." *Eglise Baptiste Bethanie De Ft. Lauderdale, Inc. v. Seminole Tribe of Fla.*, 824 F. App'x 680, 683 (11th Cir. 2020) (per curiam). The core areas courts must avoid include "issues connected to 'theological controversy, church discipline, ecclesiastical government, or conformity of members of the church to the standard of morals required of them.'" *Myhre*, 719 F. App'x at 928 (quoting *Crowder*, 828 F.2d at 722); *see also Eglise Baptiste*, 824 F. App'x at 683.

Further, the ecclesiastical abstention doctrine is not limited to claims against religious bodies; it is also properly invoked by individuals. *See, e.g., Rutland*, 857 F. App'x at 627 (affirming the dismissal of a complaint against the president of a church); *Eglise Baptiste*, 824 F. App'x at 681 (affirming the dismissal of claims against an individual defendant). And as the Court observed in its order striking the original

Complaint, the doctrine may apply even where the parties are not members of the same church or religious institution. *See* ECF No. 39 at 6 n.7; *see also Mammon v. SCI Funeral Servs. of Fla. Inc.*, 193 So. 3d 980, 985 (Fla. 4th DCA 2016).

Nor is the doctrine limited to disputes involving hierarchical, as opposed to congregational, churches. *See Crowder*, 828 F.2d at 726 n.20. Instead, as the Eleventh Circuit has recognized, "[t]he distinction . . . between the types of congregational and hierarchical church polities [is] relevant only to determining the ecclesiastical body to which the civil court must defer in determining rights to use of property." *Id.*

"The relationship between an organized church and its ministers is its lifeblood." *McClure v. Salvation Army*, 460 F.2d 553, 558 (5th Cir. 1972). "Matters touching this relationship must necessarily be recognized as of prime ecclesiastical concern." *Id.* at 559. Consequently, a church's selecting or removing its ministers is a core ecclesiastical matter into which civil courts may not intrude. *See Myhre*, 719 F. App'x at 928 (concluding that the district court lacked jurisdiction over an action challenging "purely ecclesiastical decisions . . . regarding [the plaintiff's] fitness to serve in the clergy or to remain a member of the denomination"); *see also Bell v. Presbyterian Church*, 126 F.3d 328, 331 (4th Cir. 1997) ("[T]he decisions of religious entities about the appointment and removal of ministers and persons in other positions of similar theological significance are beyond the ken of civil courts."); *Se. Conf. Ass'n of Seventh-Day Adventists, Inc. v. Dennis*, 862 So. 2d 842, 843-44 (Fla. 4th DCA 2003) (holding that the court lacked jurisdiction over a pastor's claims that a church

11

negligently suspended him and failed to follow its internal procedures in dealing with allegations against him because "[w]hether an individual is qualified to be a clergy member of a particular faith is a matter to be determined by the procedures and dictates of that particular faith"; "[t]he interaction between a church and its pastor is an essential part of church government"; and "civil courts must abstain from deciding ministerial employment disputes").

Nor can a plaintiff overcome the autonomy that protects such decisions merely by alleging that such a decision flowed from illegitimate or nonreligious motives. A civil court "lacks jurisdiction over an action if the inquiry it would have to undertake to resolve the issues before it requires analysis of the religious organization's decision making process or excessive entanglement in the organization's religious affairs." *Farley v. Wis. Evangelical Lutheran Synod*, 821 F. Supp. 1286, 1289 (D. Minn. 1993). Thus, evaluating the motives behind a church's selection or removal of its ministers is an improper intrusion into ecclesiastical matters. *See Bell*, 126 F.3d at 332 ("While it is possible that the Presbyterian Church may have harbored hostility against Bell personally, it is also possible that [it] may have been acting in good faith to fulfill its discernment of the divine will for its ministry. Resolution of such an accusation would interpose the judiciary into the Presbyterian Church's decisions . . . relating to how and by whom they spread their message and specifically their decision to select their outreach ministry . . . ."); *Goodman v. Temple Shir Ami, Inc.*, 712 So. 2d 775, 777 (Fla. 3d DCA 1998) ("Inquiring into the adequacy of the religious reasoning behind the dismissal of a spiritual leader is not a proper task for a civil court."); *see also Young v.*

*N. Ill. Conf. of United Methodist Church*, 21 F.3d 184, 187 (7th Cir. 1994) ("[C]ivil court review of ecclesiastical decisions of church tribunals, particularly those pertaining to the hiring or firing of clergy, are *in themselves* an 'extensive inquiry' into religious law and practice, and hence forbidden by the First Amendment." (emphasis in original)).

> **B.   This lawsuit presents an ecclesiastical dispute that civil courts may not lawfully adjudicate.**

Here, the First Amended Complaint presents "manifestly ecclesiastical" questions that "would require [the Court] to inquire into church rules, policies, and decision-making and questions of church governance" and excessively entangle it "'in questions of ecclesiastical doctrine or belief'—the very types of questions [courts] are commanded to avoid." *Eglise Baptiste*, 824 F. App'x at 683 (quoting *Crowder*, 828 F.2d at 722). Like the lawsuit dismissed by the state court, Plaintiffs' claims in this action would require the Court to "second-guess the church's decision to remove [Pastor Weems] or its reasoning for doing so." ECF No. 37-1 at 5. The Court, therefore, lacks jurisdiction.

All of Plaintiffs' claims depend on the contention that Celebration Church's investigation and "ouster" of the Weemses were illegitimate. 1st Am. Compl. ¶ 82. If Pastor Weems's ministry ended for legitimate religious reasons—for example, because of doubts among the church's trustees about his spiritual leadership or sincere disagreement with his vision for the church—then Plaintiffs cannot show that Defendants caused their alleged damages. Plaintiffs' allegations regarding the investigation and the supposed takeover plot are incorporated into—and are

SUPP APP 88

indispensable to—every count of the First Amended Complaint. *See, e.g.*, *id.* ¶¶ 57-58, 63-65, 81-87, 91, 95-96; *see also id.* ¶¶ 102, 107, 112, 117, 121, 125, 129, 134, 139, 144, 149, 154, 159, 163, 167, 171, 178, 185, 192, 199. Thus, although the church itself is not a defendant in this action, this lawsuit is nevertheless another improper attempt by the Weemses to challenge Celebration Church's "decisions . . . about the appointment and removal of ministers." *Bell*, 126 F.3d at 331.

The Weemses' essential complaint "s that Defendants instigated a sham internal church investigation as part of a scheme to "oust" Pastor Weems from Celebration Church so that Defendants' vision for the church could prevail, with various negative financial consequences for the Weemses, including the loss of a financial package. *See, e.g.*, 1st Am. Compl. ¶¶ 57, 63-64, 79, 104, 109, 114. The Weemses also complain about "the public dissemination of the Report" resulting from the investigation, which was purportedly intended to "legitimiz[e] the takeover of Celebration Church." *Id.* ¶ 96. These matters—a church's investigation of its pastor and its decision-making process regarding his removal—are "of prime ecclesiastical concern" and lie outside civil courts' legitimate sphere of concern. *McClure*, 460 F.2d at 559.

Further, any alleged harm to the corporate Plaintiffs—which the Weemses formed to carry out Pastor Weems's vision for Celebration Church, *see* 1st Am. Compl. ¶¶ 28-29—flowed from the church's investigation and alleged ouster of Pastor Weems. The First Amended Complaint alleges that the Weemses and Celebration Church agreed on a "financial package" (the "Founding Pastor Agreements") that included, among other things, "continued and ongoing financial support for [the Weemses']

14

missions through funding Celebration Global, which would in turn help fund the operations of Honey Lake Farm[s], NorthStream, and AWKNG." *Id.* ¶ 53.

After its investigation, Celebration Church "repudiate[d] the Founding Pastor Agreements and its commitment to provide millions of dollars in funding to Celebration Global to carry out the Missions Plan." *Id.* ¶ 79. In turn, when Celebration Global's funding from Celebration Church—on which all the other corporate Plaintiffs depended—dried up, the effect was to "destroy[]" the other corporate Plaintiffs. *Id.* ¶ 86. Plaintiffs also allege that the findings from the church's investigation dissuaded potential investors in Honey Lake Farms. *Id.* ¶ 98. Those are the only harms alleged to support each count of the First Amended Complaint. *See id.* ¶¶ 102, 107, 112, 117, 121, 125, 129, 134, 139, 144, 149, 154, 159, 163, 167, 171, 178, 185, 192, 199.

To prevail on the causation and damages elements of their claims, Plaintiffs must prove that Defendants caused those harms. *See, e.g.*, *Realauction.com, LLC v. Grant Street Grp., Inc.*, 82 So. 3d 1056, 1059 (Fla. 4th DCA 2011) (observing that a tortious interference claim requires proof that "defendant's interference caused the cessation of the business relationship"). In other words, Plaintiffs must prove that it was Defendants' conduct—not Pastor Weems's own conduct or, for that matter, sincere concerns about his spiritual leadership or vision for the church—that brought about the church's investigation and Weems's departure.

The causation and damages elements of Plaintiffs' claims thus cannot be resolved without answering the following questions, among others equally inappropriate for a civil court: Was the investigation of Pastor Weems undertaken by

SUPP APP 90

Celebration Church in good faith, based on reasonable concerns about his leadership, or solely because of Defendants' machinations? Was Pastor Weems's "ouster" the result of scheming by Defendants, or was it Pastor Weems's failure to live up to "biblical standards for leadership in the church" that led to the investigation and the end of his ministry? ECF No. 1-1 at 21. Did Pastor Weems exhibit "the antithesis of biblical leadership as described in scripture," or was he just set up? *Id.* at 20.

Resolving the causation and damages issues would require the Court not only to determine how and why Celebration Church began its investigation of Pastor Weems but also to weigh *the degree to which* the Report affected the church trustees' decision-making as opposed to the influence of other religious disagreements or conflicting visions for the church that may have contributed to the end of Pastor Weems's ministry. In other words, even if Plaintiffs could somehow show that the church's investigation was initiated because of a conspiracy by Defendants—and they cannot—the Court would still have to determine whether the rupture between Pastor Weems and the church was ultimately caused by Defendants' alleged scheming or, instead, sincere religious disagreement, or a disagreement about whether Pastor Weems's conduct complied with the church's policies. And it would still be necessary to evaluate any dispute about doctrinal matters and to examine the church's financial policies and bylaws to determine whether the financial misconduct alleged in the Report was genuinely improper.

Judicial entanglement in such religious matters is impermissible. *See, e.g.*, *Myhre*, 719 F. App'x at 928; *see also Rutland v. Nelson*, No. 3:20-CV-1272-J-32JRK, 2021 WL

SUPP APP 91

118984, at *1 (M.D. Fla. Jan. 13, 2021) ("[T]he First Amendment prevents this Court from ruling on any matters of internal governance of churches, including the [church's] decision to disfellow [the plaintiff], and any subsequent action relating to his role in the Church. No amendment of the Complaint can cure this problem."), *aff'd*, 857 F. App'x 627 (11th Cir. 2021); *Goodman*, 712 So. 2d at 777 ("In order for the trial court to have resolved these disputes, it would have had to immerse itself in religious doctrines and concepts and 'determine' whether the religious disagreements were a 'valid' basis for the termination of [a rabbi's] services. The allegedly defamatory report and tortious interference occurred as part of this religious dispute and would require the trial court to weigh their effect on the board members as compared to the effects of the other considerations which clearly are religious disagreements. Inquiring into the adequacy of the religious reasoning behind the dismissal of a spiritual leader is not a proper task for a civil court."). But such entanglement is unavoidable if this action is allowed to proceed.

The problem is not that Plaintiffs' position on the merits of these issues is wrong (although it is). What matters is that the Court cannot even inquire into, much less resolve, Plaintiffs' claims without impermissibly intervening in these sorts of ecclesiastical matters. *See Young*, 21 F.3d at 187 ("[C]ivil court review of ecclesiastical decisions of church tribunals, particularly those pertaining to the hiring or firing of clergy, are *in themselves* an 'extensive inquiry' into religious law and practice, and hence forbidden by the First Amendment." (emphasis in original)); *Diocese of Palm Beach, Inc. v. Gallagher*, 249 So. 3d 657, 663 (Fla. 4th DCA 2018) (holding that abstention was

required with respect to claims that would have required determining whether the "reasons for not making [the plaintiff] a pastor, and reassigning him to another church, were valid religious reasons concerning [his] fitness for the job"); *Goodman*, 712 So. 2d at 777 ("Inquiring into the adequacy of the religious reasoning behind the dismissal of a spiritual leader is not a proper task for a civil court."). Accordingly, the First Amended Complaint should be dismissed for lack of subject-matter jurisdiction.

## II.    Counts X through XV and Counts XIX and XX fail to state a claim.

Alternatively, the counts that purport to assert tortious interference and conspiracy claims on behalf of NorthStream (Counts X, XI, XII, and XIX) and Weems Group (Counts XIII, XIV, XV, and XX) should be dismissed for failure to state a claim.

To state a claim for tortious interference, a complaint must allege "(1) the existence of a business relationship . . . [;] (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship." *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994) (first alteration in original) (quoting *Tamiami Trail Tours, Inc. v. Cotton*, 463 So. 2d 1126, 1127 (Fla. 1985) (per curiam)).

Further, although "[a] protected business relationship need not be evidenced by an enforceable contract," "'the alleged business relationship must afford the plaintiff existing or prospective legal or contractual rights.'" *Id.* (quoting *Register v. Pierce*, 530 So. 2d 990, 993 (Fla. 1st DCA 1988)). "As a general rule, an action for tortious

SUPP APP 93

interference with a business relationship requires a business relationship evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered." *Gossard v. Adia Servs., Inc.*, 723 So. 2d 182, 184 (Fla. 1998) (per curiam) (quoting *Ethan Allen, Inc.*, 647 So. 2d at 815).

To state a conspiracy claim, a complaint must allege:

> (1) an agreement between two or more parties; (2) to do an unlawful act or to do a lawful act by unlawful means; (3) the doing of some overt act in pursuance of the conspiracy; and (4) damage to plaintiff as a result of the acts done under the conspiracy.

*Philip Morris USA, Inc. v. Russo*, 175 So. 3d 681, 686 n.9 (Fla. 2015).

Significantly, "[t]he gist of a civil action for conspiracy is not the conspiracy itself, but the civil wrong which is done pursuant to the conspiracy and which results in damage to the plaintiff." *Marriott Int'l, Inc. v. Am. Bridge Bahamas, Ltd.*, 193 So. 3d 902, 909 (Fla. 3d DCA 2015) (quoting *Blatt v. Green, Rose, Kahn & Piotrkowski*, 456 So. 2d 949, 950 (Fla. 3d DCA 1984)). A conspiracy claim, therefore, requires an underlying tort. *See id.* ("The independent civil wrong on which the civil conspiracy is dependent must be alleged in the complaint. If a particular wrong is not pled as the underlying basis for the conspiracy, then the complainant must be 'precluded from recovery' on the basis of any conspiracy to commit that wrong." (citation omitted)); *see also CEMEX Constr. Materials Fla., LLC v. Armstrong World Indus., Inc.*, No. 3:16-cv-186-J-34JRK, 2018 WL 905752, at *13 (M.D. Fla. Feb. 15, 2018) ("[A] claim for civil conspiracy will not lie unless the plaintiff alleges an underlying civil wrong, done

pursuant to the conspiracy, which results in damage to the plaintiff.").

**A.    The First Amended Complaint fails to state a claim on behalf of NorthStream.**

**1.    The First Amended Complaint fails to allege advantageous contractual or business relationships enjoyed by NorthStream.**

NorthStream asserts that Defendants interfered with its "advantageous contractual and business relationships with Celebration Church and Honey Lake Farms, Honey Lake Clinic, and AWKNG." 1st Am. Compl. ¶¶ 147, 152, 157. But the First Amended Complaint alleges no such relationships.

On the contrary, there was no direct business or contractual relationship between NorthStream and Celebration Church. Instead, NorthStream hoped to benefit indirectly from another entity's alleged relationship with Celebration Church. According to the First Amended Complaint, Celebration Church agreed to provide "financial support for [the Weemses'] missions through funding Celebration Global, which would in turn help fund the operations of Honey Lake Farm[s], NorthStream, and AWKNG." *Id.* ¶ 53. NorthStream's hope for an indirect benefit does not amount to "an actual and identifiable understanding or agreement" with Celebration Church, "which in all probability would have been completed if the defendant[s] had not interfered." *Gossard*, 723 So. 2d at 184.

Nor does the First Amended Complaint allege a sufficient contractual or business relationship between NorthStream and Honey Lake Farms, Honey Lake Clinic, or AWKNG. NorthStream, Honey Lake Farms, and AWKNG have in common that the Weemses formed them. 1st Am. Compl. ¶ 28. But nothing in the

First Amended Complaint suggests NorthStream had an "actual and identifiable understanding or agreement" with any of them "which in all probability would have been completed if the defendant[s] had not interfered." *Gossard*, 723 So. 2d at 184.

Plaintiffs speculate that if Defendants had not interfered with the Weemses' plans, anticipated investments in Honey Lake Farms by nonparties "would have benefitted NorthStream through management services agreements with Honey Lake Farms, Honey Lake Clinic, and AWKNG, pursuant to which NorthStream would have been paid management fees to provide management services for the operations at Honey Lake Farms and management services associated with launching [restorative community developments]." 1st Am. Compl. ¶ 76. But Plaintiffs do not allege that such "management services agreements" had actually been executed. Nor do they describe the anticipated contracts in any detail or allege well-pleaded facts supporting the conjecture that they would have been executed but for Defendants' conduct.

> **2.    The First Amended Complaint fails to allege interference with, or damages resulting from a breach of, any business relationship purportedly enjoyed by NorthStream.**

The First Amended Complaint also fails to allege any intentional interference with, or damages resulting from a breach of, NorthStream's purported relationships with Celebration Church, Honey Lake Farms, Honey Lake Clinic, or AWKNG. For example, the First Amended Complaint does not suggest that Defendants induced Celebration Church, Honey Lake Farms, Honey Lake Clinic, or AWKNG to breach management services agreements with NorthStream. Indeed, such a breach would be surprising, if not impossible, given the Weemses' control over at least three of those

entities. *See* 1st Am. Compl. ¶¶ 6, 28. It is hard to imagine how Defendants could have in effect interfered with Pastor Weems's relationship with himself. The First Amended Complaint thus fails to state claims for tortious interference on behalf of NorthStream. *See Ethan Allen, Inc.*, 647 So. 2d at 814; *see also Gerber v. Keyes Co.*, 443 So. 2d 199, 201 (Fla. 3d DCA 1983) ("There is no cause of action for tortious interference with a business relationship in the absence of a breach.").

Further, because the First Amended Complaint fails to allege an underlying tort against NorthStream, Count XIX fails to state a conspiracy claim. *See Marriott Int'l, Inc.*, 193 So. 3d at 909. Counts X, XI, XII, and XIX should therefore be dismissed.

### B. The First Amended Complaint fails to state a claim on behalf of Weems Group.

In Counts XIII, XIV, and XV, Weems Group asserts tortious-interference claims against ARC, Pastor Hodges, and Pastor Rizzo, respectively. The First Amended Complaint fails, however, to allege the existence of a business relationship or interference with that relationship and resulting damage to Weems Group.

Each of Weems Group's claims rests on the assertion that Defendants interfered with Weems Group's relationship with NorthStream—an entity that, like Weems Group, is wholly owned by the Weemses. 1st Am. Compl. ¶¶ 6-7, 160-61, 164-65, 168-69. Apart from introductory paragraphs that reveal the two companies' common ownership, only a single sentence of the First Amended Complaint is devoted to characterizing their relationship: "Weems Group invested approximately $450,000 in NorthStream, which was used to help fund and start the operations of Honey Lake

22

Farms and AWKNG . . . ." *Id.* ¶¶ 6-7, 29.

The nature of that "invest[ment]" is left to the imagination. It appears not to have been an equity investment since NorthStream's "sole members" are Stovall and Kerri Weems, not Weems Group. *Id.* ¶ 6. But if the $450,000 investment was a loan, the First Amended Complaint does not say so. Nor does it say whether Weems Group and NorthStream entered into a contract. To support a tortious-interference claim, again, a relationship "must afford the plaintiff existing or prospective legal or contractual rights." *Ethan Allen, Inc.*, 647 So. 2d at 814 (quoting *Register*, 530 So. 2d at 993). No such rights can be discerned from the First Amended Complaint.

Whatever the nature of the purported relationship, the First Amended Complaint does not allege well-pleaded facts showing that Defendants interfered with it. It is puzzling, to say the least, how any Defendant could possibly have interfered with a relationship between two entities wholly owned by the same married couple. The First Amended Complaint does nothing to dispel that puzzlement; for all it says, any relationship between Weems Group and NorthStream is still wholly intact, just as their common ownership would lead one to expect. For these reasons, Counts XIII, XIV, and XV fail to state claims for tortious interference with that relationship. *See Gerber*, 443 So. 2d at 201 ("There is no cause of action for tortious interference with a business relationship in the absence of a breach.").

Although Counts XIII and IV refer only to NorthStream, Count XV, perhaps inadvertently, asserts that Pastor Rizzo interfered with Weems Group's relationship with Celebration Church as well. 1st Am. Compl. ¶ 169. The First Amended

23

Complaint does not assert, however, that Pastor Rizzo knew of any such relationship. *See* 1st Am. Compl. ¶ 168. Nor does it allege any well-pleaded facts showing that such a relationship existed, much less that Pastor Rizzo, or any other Defendant, interfered with it and thereby harmed Weems Group. Count XV, therefore, falls along with Counts XIII and XIV.

Finally, without an underlying tort, Weems Group's conspiracy claim—Count XX—must also be dismissed. *See Marriott Int'l, Inc.*, 193 So. 3d at 909.

## CONCLUSION

The ecclesiastical abstention doctrine prevents the Court from exercising jurisdiction over this dispute. Therefore, the First Amended Complaint should be dismissed for lack of subject-matter jurisdiction. Alternatively, all counts asserted by NorthStream or Weems Group should be dismissed for failure to state a claim.

## LOCAL RULE 3.01(g) CERTIFICATION

Under Local Rule 3.01(g), the undersigned certifies that counsel for Defendants have conferred by email with counsel for Plaintiffs in good faith regarding the subject matter of this Motion. Plaintiffs oppose the requested relief.

SUPP APP 99

Respectfully submitted this 22nd day of April 2024.

MURPHY & ANDERSON, P.A.

s/Sarah Jeck Hulsberg
Niels P. Murphy
Florida Bar No. 0065552
Sarah Jeck Hulsberg
Florida Bar No. 0106027
1501 San Marco Blvd
Jacksonville, Florida 32207
904-598-9282 (Telephone)
nmurphy@murphyandersonlaw.com
shulsberg@murphyandersonlaw.com
*Attorneys for Defendant Association of Related Churches*

BEDELL, DITTMAR, DeVAULT, PILLANS & COXE, P.A.

s/Michael E. Lockamy
Michael E. Lockamy
Florida Bar No. 69626
John G. Woodlee
Florida Bar No. 0100990
The Bedell Building
101 East Adams Street
Jacksonville, Florida 32202
904-353-0211 (Telephone)
904-353-9307 (Facsimile)
mel@bedellfirm.com
jgw@bedellfirm.com
*Attorneys for Defendant Dino Rizzo*

THE LILES FIRM, P.A.

s/Robert B. George
Robert B. George
Florida Bar No. 108995
John A. Carlisle
Florida Bar No. 626716
50 North Laura Street, Suite 1200
Jacksonville, Florida 32202
904-634-1100 (Telephone)
904-634-1234 (Facsimile)
rgeorge@thelilesfirm.com
jcarlisle@thelilesfirm.com
*Attorneys for Defendant Chris Hodges*

SUPP APP 100

**DOCKET/TAB 56**

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION OR,
ALTERNATIVELY, FOR FAILURE TO STATE A CLAIM

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CHARLES S. WEEMS, IV, an individual,
KERRI WEEMS, an individual,
and CELEBRATION
GLOBAL, INC., a Florida not for profit
corporation, HONEY LAKE FARMS,
INC., a Florida not for profit corporation,
NORTHSTREAM MANAGEMENT
GROUP, LLC, a Florida limited liability
company, and WEEMS GROUP, LLC,
a Florida limited liability company,

Case No.:  3:23-cv-00811-MMH-LLL

      Plaintiffs,

v.

ASSOCIATION OF RELATED
CHURCHES, a Texas not-for-profit
corporation, CHRIS HODGES, and
individually, DINO RIZZO,

      Defendants.

_____/

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION
OR, ALTERNATIVELY, FOR FAILURE TO STATE A CLAIM**

    Plaintiffs, Charles S. Weems, IV, Kerry Weems, Celebration Global, Inc.,

Honey Lake Farms, Inc., Northstream Management Group, LLC and Weems Group,

LLC (collectively, "Plaintiffs"), by counsel and pursuant to Local Rule 3.01, respond

in opposition to the Motion to Dismiss for Lack of Subject Matter Jurisdiction or,

Alternatively, for Failure to State a Cause of Action [Doc. 52] ("Motion") filed by

Defendants, Association of Related Churches ("ARC"), Chris Hodges ("Hodges"), and Dino Rizzo ("Rizzo"), (collectively, "Defendants"), as follows:

## **INTRODUCTION**

Ecclesiastical abstention does not bar subject matter jurisdiction over this case, particularly at the pleadings stage.  Plaintiffs' claims are **not** based on any questions of religious doctrine and they are **not** against parties who are part of the same church or religious institution.  Defendants are trying to use religion as a sword, not a shield, to immunize themselves from tort liability and deprive Plaintiffs of their fundamental constitutional rights to freedom of religion and petition for the redress io grievances. Defendants' alternative contention that Weems Group and NorthStream fail to state actionable causes of action for tortious interference and conspiracy is equally flawed. Weems Group and NorthStream adequately and plausibly alleges facts establishing each of the required elements of their claims.

Defendants' Motion prematurely and without sufficient factual or legal support seeks to permanently deprive Plaintiffs of their only means of redress for the wrongs Defendants committed against them.  It should be denied.

## **DEFENDANTS' "FACIAL"** **SUBJECT MATTER JURISDICTION CHALLENGE**

Defendants' Motion raises a "facial" challenge to subject matter jurisdiction based on ecclesiastical abstention (*see* Motion at p.3, n.1).  The burden is on the party invoking ecclesiastical abstention to establish that it applies:  *Flynn v. Estevez*, 221 So.3d 1241, 1247 (Fla. 1st DCA 2017) (a "church or religious organization seeking to avoid

application of a neutral state law must first show why application of the law requires adjudication of an ecclesiastical matter." (*citing Malichi v. Archdiocese of Miami*, 945 So.2d 526, 529 (Fla. 1st DCA 2006) and *Malicki v. Doe*, 814 So.2d 347,360 (Fla. 2002)).

This Court has already determined that ecclesiastical abstention can be raised under Rule 12(b)(1). *See* Doc. 39 at p. 6 n.6. But having chosen this procedural mechanism to contest jurisdiction, Defendants are necessarily subject to its constraints.

***First***, Defendants necessarily admitted the truth of **all** of Plaintiffs' factual allegations. *Kennedy v. Floridian Hotel, Inc.*, 998 F.3d 1221, 1230 (11th Cir. 2021) (quoting *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990)). They cannot refute any facts nor ignore facts that defeat the application of the abstention doctrine.

Defendants acknowledge that this case involves non-religious tort claims between religiously unaffiliated parties that happened to occur within the context of a church to which Defendants did not belong (Motion at pp. 3-9). They also acknowledge their commercial interests, economic motives ,desire to eliminate Plaintiffs as competitors and perceived threats to Defendants' business model. and the non-religious object of their conspiracy (Motion at pp. 3-9), but omit some key details and allegations, such as Defendants' lack of "doctrinal" or "ministerial" control over Celebration Church (Doc. 49 ¶¶ 5-6).

Nevertheless, Defendants to try to transform this case into an "ecclesiastical" dispute by bootstrapping themselves to abstention arguments raised by Plaintiffs' former church and its principals in related litigation (Motion at pp. 8-9) and to

Celebration Church's investigation and certain "biblical" findings in the resulting Report (Id. at pp. 6-7). However, Defendants omit that this false and defamatory Report was published publicly outside the church after Plaintiffs were no longer members and to coincide with ARCS's national conference (Doc. 49 ¶¶ 91-98), and used in support of the false and defamatory letter to TurnCoin (Doc. 49 ¶¶ 99-100).

*Second*, Defendants cannot ask this Court to make impermissible factual determinations about the elements of Plaintiffs' claims and merits of this case; such as their argument that abstention is necessary based on causation and damages issues (*see* Motion at pp. 14-17), which necessarily requires the Court to make factual determinations. *Grosharev v. Wilson's Limited, Inc.*, 2010 WL 11507086, *1 at n. 3 (M.D. Fla. Jan. 15, 2010) ("the district court should only rely on Rule 12(b)(1) [i]f the facts necessary to sustain jurisdiction do not implicate the merits of plaintiff's cause of action."); *Minker v. Baltimore Annual Conf. of United Methodist Church*, 894 F.2d 1354, 1360-1361 (D.C. Cir. 1990) (arguments seeking dismissal based on abstention involving causation and damages issues are factual in nature and not appropriate for the dismissal stage).

## <u>ARGUMENT</u>

As a preliminary matter, it is important at the outset to recognize that religious freedom is not the only fundamental constitutional right at issue in this case. The First Amendment right to petition the government for a redress of grievances includes a right of access to the courts and is "[o]ne of the most precious of the liberties safeguarded by the Bill of Rights" and "high in the hierarchy of First Amendment

values." *Bank of Jackson Cty. v. Cherry*, 980 F.2d 1362, 1370 (11th Cir. 1993); *Lozman v. City of Riviera Beach, Fla.*, 138 S. Ct. 1945, 1954-1955 (2018). This right is so fundamental that it is "implied by the very idea of a government, republican in form." *BK & E Const. Co. v. NLRB*, 536 U.S. 516, 524-525 (2002). Defendants' Motion seeks to deprive Plaintiffs of this fundamental right and, if granted, would leave Plaintiffs without any recourse against Defendants for their tortious misconduct.

Conversely, as the Supreme Court recognized in *Cantwell v. State of Connecticut*, 310 U.S. 296, 303-304 (1940), freedom of religion is not synonymous with the freedom to act:

> The constitutional inhibition of legislation on the subject of religion has a double aspect. On the one hand, it forestalls compulsion by law of the acceptance of any creed or the practice of any form of worship. Freedom of conscience and freedom to adhere to such religious organization or form of worship as the individual may choose cannot be restricted by law. On the other hand, it safeguards the free exercise of the chosen form of religion. Thus, the Amendment embraces two concepts—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society.

As explained below, this case does not in any way implicate Defendants' religious beliefs or freedoms. It merely seeks to hold them liable for their tortious acts.

## I.    This Lawsuit is Not Barred by the Ecclesiastical Abstention Doctrine

As this Court already recognized, "pursuant to the ecclesiastical abstention doctrine, 'civil courts lack jurisdiction to entertain disputes involving church doctrine and polity' unless the dispute can be resolved 'under neutral principles' of law without

'consideration of religious doctrinal matters.'"   See Doc. 39 at pp. 4-5 (citing See *Rutland v. Nelson*, 857 F. App'x 627, 628 (11th Cir. 2021) (citing *Crowder v. S. Baptist Convention*, 828 F.2d 718, 727 (11th Cir. 1987) and *Jones v. Wolf*, 443 U.S. 595, 602–03 (1979)); see also *Flynn*, 221 So.3d at 1245 ("The ecclesiastical abstention doctrine prevents civil [or secular] courts from deciding disputes requiring an adjudication of 'theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required.'"); *Watson v. Jones*, 80 U.S. 679, 733 (1871); *Malichi*, 945 So.2d at 529.

"The doctrine precludes secular courts from becoming arbiters of religious matters and the circumvention or erosion of church doctrine by those who disagree with it." *Flynn*, 221 So.3d at 1246.  It "has its core application in cases where a court intrudes on a church's autonomous management of its own internal affairs and property, thereby either burdening or inhibiting the exercise of religious freedom (free exercise clause) or fostering an excessive government entanglement with religion (establishment clause)." *Id*.

The abstention inquiry is twofold: does the case require the court to excessively entangle itself in (1) church doctrine or (2) church polity.  *Rutland*, 857 F. App'x at 628; *Myhre v. Seventh-Day Adventist Church Reform Movement American Union International Missionary Society*, 719 Fed. App'x 926, 928 (11th Cir. 2018) (citing *Jones*, 443 U.S. at 602).  When a case involves tortious behavior that does not involve church polity or doctrine, "judicial abstention is nonexistent and the theory does not apply."

6

*Lady v. First Baptist Church of Moore*, 2008 WL 5539161 (D. Ok. 2008) (citing *Guinn v. Church of Christ of Collinsville*, 775 P.2d 766 (Okla. 1989)).  Here, the claims alleged in the First Amended Complaint to not implicate church doctrine or polity.  Defendants certainly failed to meet their burden to establish otherwise.

Even if this were not the case, abstention still would not be required because Plaintiffs claims can be resolved by the application of neutral principles of law.  *Flynn,* 221 So.3d at 1247; *Springhill Missionary Baptist Church, Inc. v. Mobley*, 251 So.3d 281, 283 (Fla. 1st DCA 2018); *Auguste v. Hyacinthe*, 346 So.3d 67, 70 (Fla. 4th DCA 2022); *Mammon v. SCI Funeral Services of Fla., Inc.*, 193 So.3d 980, 984 (Fla. 4th DCA 2016)).

## A.    Plaintiffs' Claims Are Not Based on Church Doctrine

Under the First Amendment, secular courts cannot decide issues of religious doctrine or beliefs.  *Crowder*, 828 F.2d at 722.  Thus, abstention was required in cases such as *Mammon v. SCI Funeral Servs. Of Florida, Inc.*, 193 So.3d 980 (Fla. 4th DCA 2016) (claims at issue charged the defendant funeral home with conduct that violated "Jewish burial customs and traditions"), *Napolitano v. St. Jospeh Catholic Church*, 308 So.3d 274, 279 (Fla. 5th DCA 2020) (claims at issue would require a court to probe into religious canon Law"), and *Myhre*, 719 Fed. App'x at 928-929 (claims required court to "determine whether [church] exercised [its] religion in accordance with the [ ] doctrine, faith, custom, and rules of governance of the church"), because the claims at issue required the interpretation and application of religious law.  Here, however, Plaintiffs' claims do not accuse Defendants of violating any religious doctrine, custom,

or tradition.   To the contrary, Plaintiffs allege the absence of any such doctrinal relationship between the parties (Doc. 49 at ¶¶ 35-42).

Defendants have not argued and certainly have not established that **their** tortious acts require this Court to delve into any religious doctrine or were committed in accordance with any sincerely held religious beliefs.   Likewise, Defendants do not argue and failed to prove with respect to **their** tortious acts that "there is a conflict between conduct that is required by law and conduct that is prohibited by religious principles" *Malicki,* 814 So.2d at 360.   There is no such conflict because the parties to this case are not members of the same religion or religious institution.

Even if the Court were to go beyond the trot claims actually at issue here and consider the agreements and promises with which Defendants tortiously interfered, even those are governed by secular, not canonical law.   Defendants have not argued or established that any "canons" or religious doctrine controlled these agreements and promises.   And churches are "always free to burden [their] activities voluntarily through contracts, and such contracts are fully enforceable in civil court" and courts "may always resolve contracts governing 'the manner in which churches own property, hire employees, or purchase goods.'"   *Minker*, 894 F.2d at 1359 (citing *Watson*, 80 U.S. at 714 and *Jones v. Wolf*, 443 U.S. 595, 606 (1979)); *Goodman v. Temple Shir Ami, Inc.*, 712 So.2d 775, 777 (Fla. 3d DCA 1998) (reversing dismissal of a Rabbi's breach of contract claim for unpaid compensation because it "does not create excessive entanglements with religious beliefs"); *St. Brendan High School, Inc. v. Neff,* 283 So.3d

8

399, 402 (Fla. 3d DCA 2019) (denying petition for writ of prohibition based on ecclesiastical abstention because the plaintiffs' breach of contract and tort claims were more "secular/contractual" in nature rather than ecclesiastical).

### B.   Plaintiffs' Claims Are Not based on Church Polity

Plaintiffs' tortious interference and conspiracy claims in this case also do not require this Court to interfere in any matters of "internal church governance" nor "church polity and church administration." *Napolitano*, 308 So.3d at 278 (citing *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 710 (1976)).  Rather, Plaintiffs explicitly allege that there are no such governance, polity or administrative relationships between Plaintiffs and Defendants (Doc. 49 at ¶¶ 35-42).  Defendants cannot overcome this fundamental flaw in their argument by conflating themselves Celebration Church.  They are not one in the same.

**This** case (as opposed to some aspects of related litigation) does **not** involve opposing factions of members of the same congregation.  Plaintiffs and Defendants are not even members of the same church.  Thus, this Court is **not** being asked to "put[] the enforcement power of the state behind a particular religious faction."  *Crowder*, 828 F.2d at 721.  Likewise, the claims at issue in **this** case do **not** require this Court to reject any "decisions of religious organizations regarding the governance and discipline of their members."  *Rutland*, 857 Fed App's at 628; *Eglise Baptiste Bethanie De Ft, Lauderdale, Inc. v. Seminole Tribe of Florida*, 824 Fed. App's 680, 683 (11th Cir. 2020).  Simply stated, there are no religious doctrines at issue in this case.

SUPP APP 110

Notably, **every** case cited by Defendants involving an analysis of whether abstention is required based on the issue of church polity involves a dispute between parties **who were members of the same church or religious institution**.  This is not surprising because the First Amendment's protection of religious freedom works both ways.

Everyone has the "inalienable right" under the First Amendment to the U.S. Constitution and Article I Section 3 of the Florida Constitution to the free exercise of their religion "according to the dictates of their own consciences."  *Beckwith Elec. Co., Inc. v. Sebelius*, 960 F.Supp.2d 1328, 1340 (M.D. Fla. 2013); *Torcaseo v. Watkins*, 367 U.S. 488, 495 (1961).  "The constitutional freedom to question, to doubt, and to change one's convictions [is] protected by the Free Exercise and Establishment Clauses." *Zummo v. Zummo*, 574 A.2d 1130, 1146 (Pa. Super. 1990).  "Just as freedom of worship is protected by the First Amendment, so also is the liberty to recede from one's religious allegiance." *Guinn*, 775 P.2d at 776.  "One of the fundamental purposes of the First Amendment is to protect the people's right to worship as they choose. Implicit in the right to choose freely one's own form of worship is the right of unhindered and unimpeded withdrawal from the chosen form of worship."  *Id.* (emphasis added); see also *Bixler v. Super. Ct. of California, Cty. of L.A.*, 2022 WL 167792 (Cal. Sup. Jan. 19, 2022).  Applying the abstention doctrine to claims asserted amongst parties who are not members of the same church or religious institution violates this well-established First Amendment religious freedom.

SUPP APP 111

This church membership aspect of ecclesiastical abstention is also important because, as the Court noted in its prior Order [Doc. 39 at p. 7 n. 9] and as Plaintiffs allege [Doc. 49 at ¶¶ 91-99], Defendants' tortious conduct includes acts committed **after** Plaintiffs were no longer church members and **outside** the church.  Applying the abstention doctrine to this type of tortious conduct also violates First Amendment religious freedom; which is why numerous courts have held that torts committed against **former** church members and **outside** the setting of the church do not require abstention.  *Guinn*, 775 P.2d at 774-781; *Hadnot v. Shaw*, 826 P.2d 978, 988 (Okla. 1992) ("the church has no power over those who live outside of the spiritual community"); *Gorman v. Swaggart*, 524 So.2d 915, 921-922 (4th Cir. La. 1988) ("by taking their accusations outside their church, the defendants have also taken themselves outside the scope of the First Amendment's protection and, to that extent, have exposed themselves to the jurisdiction of the civil courts"); *Doe v. First Presbyterian Church U.S.A. of Tulsa*, 421 P.3d 284, 290 (2017) (citing *Guinn*, 775 P.2d at 776); *Ausley v. Shaw*, 193 S.W.3d 892, 896 (Tenn. Ct. App. 2005) (statements made to people outside a church are not protected by the church autonomy rule); *Kliebenstein v. Iowa Conference of United Methodist Church*, 663 N.W.2d 404, 406-07 (Iowa 2003) (First Amendment did not bar a church member's defamation claim based on a letter that was "mailed not only to members of the congregation but also to other persons living in the Shell Rock community."); *Turner v. Church of Jesus Christ of Latter-Day Saints*, 18 S.W.3d 877, 896 (Tex. App.—Dallas 2000, pet. denied) (First Amendment did not

bar a church member's defamation claim arising from the church's disclosure of information regarding his mental condition outside the church, including to his grandparents.); *Lipscombe v. Crudup*, 888 A.2d 1171, 1173 & n.2. (D.C. 2005) (First Amendment did not bar a church member's defamation claim in part because the "statement was made 'to the public in an open meeting'" and that "was not part of any church service and members from the public, including accountants, heard the statement."); *Bowie v. Murphy*, 624 S.E.2d 74, 76–77, 79–80. (Va. 2006); *Banks v. St. Matthew Baptist Church*, 750 S.E.2d 605, 607–08 (S.C. 2013); *McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*, 966 F.3d 346, 349 (5th Cir. 2020); *Drevlow v. Lutheran Church*, 991 F.2d 468, 471–72 (8th Cir. 1993); *Tubra v. Cooke*, 225 P.3d 862, 864 (Or. 2010); *Connor v. Archdiocese of Phila.*, 975 A.2d 1084, 1107 (Pa. 2009); *McAdoo v. Diaz*, 884 P.2d 1385, 1390–91 (Alaska 1994).

There is a complete absence of any religious relationship between Plaintiff and Defendants.  The claims at issue here do not involve any religious doctrine or polity, and they are largely based on tortious conduct occurring after Plaintiffs were Celebration Church members and outside the confines of Celebration Church. And Defendants have not offered any argument (let alone proof) that their tortious acts were committed in accordance with any religious doctrine or law.  Their request for this Court to dismiss Plaintiffs' claims with prejudice based on ecclesiastical abstention is contrary to the law and violates Plaintiffs' own fundamental First Amendment rights.  It should be rejected.

### C.  Plaintiffs' Claims Can Be Decided Based on Neutral Principles of Law

Even if this were an ecclesiastical dispute (which it is not), abstention still is not required because Plaintiffs' claims can be decided based on neutral principles of law. The religious freedom guaranteed by the First Amendment is not violated by exercising jurisdiction over tort claims that can be resolved through the application of "neutral principles" of tort law, particularly where there is no allegation that the conduct in question was part of a sincerely held religious belief or practice. *Malicki,* 814 So.2d at 358; *Bilbrey,* 91 So.3d at 891; *Flynn*, 231 So.3d at 1245-1246; *Diocese of Palm Beach, Inc. v. Gallagher*, 249 So.2d 657, 662 (4th DCA 2018); *Springhill*, 251 So.3d at 283; *World of Life Ministry, Inc. v. Miller*, 778 So.2d 360, 362-363 (Fla. 1st DCAS 2001); *Bendross v. Readon*, 89 So.3d 258, 259-260 (Fla. 3d DCA 2012).

In deciding whether neutral principles of law can be applied to a dispute, courts are required to consider "the nature of the dispute" and whether it can be decided on without "intruding upon, interfering with, or deciding church doctrine."  *Flynn*, 221 So.3d at 1247.  Importantly, where there are aspects of a claim that can be adjudicated without resorting to, applying or interpreting church doctrine, those aspects of the claim should be litigated.  *See e.g., House of God Which is the Church of the Living God, The Pillar and Ground of the Truth Without Controversy, Inc. v. White*, 792 So.2d 491, 494 (Fla. 4th DCA 2001); *Goodman v. Temple Shir Ami, Inc.*, 712 So.2d 775, 777 (Fla. 3d DCA 1998).  A defendant "seeking to avoid the application of neutral state law must first show why application of the law requires the adjudication of an

13

ecclesiastical matter." *Malichi*, 945 So.2d at 530 (*citing Malicki*, 814 So.2d at 354). Here, Defendants failed to make such a showing.

Several courts have determined that tort claims similar to those at issue here can be decided based on neutral principles of law. *See e.g.*, *Bilbrey*, 91 So.3d at 890-891; *LeGrande v. Emmanuel*, 889 So.2d 991, 994 (Fla. 3d DCA 2004); *Mendes v. da Silva*, 980 So.2d 631, 632 (Fla. 2d DCA 2008). And at least one court determined in a similar factual situation that abstention was not required in a case asserting claims involving a "self-governing group of separate autonomous churches." *McRaney v. North American Mission Board of the Southern Baptist Convention*, 304 F.Supp.3d 514, 521 (N.D. Miss. 2018) (denying motion to dismiss based where case was not "one which, on the face of the complaint, involves a review of '*internal* policies, *internal* procedures, or *internal* decisions of the church' *[but rather]* "*external* actions toward separate autonomous organizations, rather than internal decisions").

Moreover, power struggles within "congregational" churches such as Celebration are governed by the same neutral laws that govern other voluntary associations. *Epperson*, 58 So.2d at 152 (Fla. 1952); *McMillan*, 153 So.2d at 342; *Austin v. Mt. Zion Primitive Baptist Church of West Palm Beach*, 165 So.2d 412, 414 (Fla. 1st DCA 1964); *Watson*, 80 U.S. at 714; *Matthews v. Adams*, 520 So.2d 334, 335 (Fla. 5th DCA 1988) ("When members of a church decide[] to incorporate their body under the laws of the state of Florida they submit[] themselves to the jurisdiction of the state court in all matters of a corporate nature.").

SUPP APP 115

Such "schisms" in congregational churches must be determined by ordinary principles governing voluntary associations. *Watson,* 80 U.S. at 713-714 (emphasis added); *Epperson*, 58 So.2d at 152 (Fla. 1952) ("When a 'faction' of the church arrogates authority to itself, disrupts the organization and sets at naught well-defined rules of church order, there is no course left for those who desire their rights settled through orderly processes but resort to the courts.")  The ouster of Pastor Weems and seizure of control over Celebration Church through acts committed in violation of its Bylaws and Chapter 617 is rather fittingly described as "a 'faction' of the church arrogating authority to itself, disrupt[ing] the organization and set[ting] at naught well-defined rules of church order." *Epperson*, 58 So.2d at 152.  Certainly, church outsiders responsible for engineering and controlling such a coup can be held responsible for their acts under neutral principles of tort law.

Consistent with the principles established in *Watson* and *Epperson*, numerous courts have held that exercising jurisdiction is proper in similar disputes involving members of congregational churches. *Bendross v. Readon*, 89 So.3d 258, 260 (Fla. 3d DCA 2012) (ecclesiastical abstention doctrine did not bar a suit alleging the defendants, acting without authority, attempted to remove specific board members from the church organization in derogation of the requirements of Chapter 617, *Florida Statutes*); *Ellerker*, 353 So.2d at 205 (in cases involving a "dispute between two factions of a congregational, as distinguished from a hierarchical church" courts have "the right, indeed the duty, of applying and enforcing sterile principles of property law"); *McMillan*, 153 So.2d at 340; *Word of Life Ministry, Inc. v. Miller,* 778 So.2d 360, 362 (Fla.

1st DCA 2001), (dispute between a congregational church and its members over corporate assets and the propriety of corporate dissolution involved only neutral legal principles and therefore could be judicially resolved); *Hemphill*, 447 So.2d at 977 (affirming exercise of subject matter jurisdiction where dispute turned on whether a minister's discharge was accomplished in accordance with the corporate charter)

### D.   Defendants' Alleged Tortious Conduct is Excepted from the Abstention Doctrine

Even if Defendants could somehow establish (contrary to the facts and law) that abstention should apply in this case, it still should not be at this stage of the proceeding because an exception to its application exists for fraud and collusion.  In *Serbian Orthodox Diocese v. Milivojevich*, the U.S. Supreme Court noted the possibility of this abstention exception for fraud or collusion "when church tribunals act in bad faith for secular purposes." 426 U.S. 696, 713 (1976).  One court evaluating this exception described it as involving situations where a defendant "engaged in a bad faith attempt to conceal a secular act behind a religious smokescreen."  *Moon v. Moon*, 833 Fed. App'x 876, 880 (2d Cir. 2020).  This entire case is predicated on a bad faith attempt to conceal secular misconduct and use religion as a smokescreen to conceal economically-motivated tortious acts.  Plaintiffs' pleading demonstrates a plausible basis for the application of this exception, which Defendants have not overcome.

## II.   Counts X through XV and Counts XIX and XX state actionable claims

### A.   NorthStream and Weems Group State Actionable Claims for Tortious Interference.

"[T]o state a claim for tortious interference with a contract, a plaintiff must allege four elements: (1) the existence of a contract, (2) the defendant's knowledge thereof, (3) the defendant's intentional and unjustified procurement of a breach thereof; and (4) damages. *Soho Ocean Resort TRS, LLC v. Rutois*, 21-11392, 2023 WL 242350, at *2 (11th Cir. Jan. 18, 2023). "Similarly, to state a claim for tortious interference with a business relationship, a plaintiff must allege four elements: (1) the existence of a business relationship, (2) the defendant's knowledge thereof; (3) the defendant's intentional and unjustified interference there-with; and (4) damages." *Id.*

Defendants contend NorthStream and Weems Group fail to adequately allege advantageous contractual or business relationships, interference, and damages.  For the reasons explained below, these arguments fail.

### 1.   NorthStream and Weems Group identify specific advantageous business relationships with which Defendants interfered.

Defendants claim NorthStream does not allege advantageous contractual or business relationships (Motion, p. 20), but Plaintiffs' allege NorthStream "was formed and funded to . . . provide centralized and shared management services to Celebration Church and numerous other churches and related entities . . ." one of the corporate entities that "would house and fund Celebration Church's significant administrative and personnel operations . . ." and stood to benefit through "management services agreements with Honey Lake Farms, Honey Lake Clinic, and AWKNG, pursuant to

SUPP APP 118

which NorthStream would have been paid management fees to provide management services for the operations at Honey Lake Farms and management services associated with launching RCD's." See Doc. 49 at ¶¶ 27-28, 76.  The argument that NorthStream failed to allege legally sufficient business relationships with Celebration Church, Honey Lake Farms, Honey Lake Clinic, and AWKNG is simply wrong.

Defendants' contention that the alleged management services agreements are legally insufficient to support a claim because Plaintiffs do not allege the management services agreements were actually executed is also wrong.  For purposes of a tortious interference claim, a "business relationship need not be evidenced by a contract, but it generally requires an understanding between the parties that would have been completed had the defendant not interfered." *Int'l Sales & Serv., Inc. v. Austral Insulated Prod., Inc.*, 262 F.3d 1152, 1154 (11th Cir. 2001).

With respect to Weems Group, Defendants acknowledge that Plaintiffs alleged that "Weems Group invested approximately $450,000 in NorthStream" but suggest Weems Group's tortious interference claim should be dismissed because specific details about the nature of Weems Group's investment is "left to the imagination" (Motion, p. 23).  Such detailed factual allegations are not required.  Fed. R. Civ. P. 8(a)(2); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  At this stage of the proceedings, Weems Group is not required to provide evidence of an actual agreement; but merely to plead facts that establish a business relationship. *See Henderson v. Todd Rhyne, Inc.*, 2019 WL 7567811, at *4 (M.D. Fla. 2019), *report and recommendation adopted*, 2020 WL 136520 (M.D. Fla. 2020)

(denying motion to dismiss tortious interference claim, stating that the plaintiff need not provide evidence of an actual agreement that would have been completed had the defendant not interfered). Weems Group's factual allegations concerning its business relationship with NorthStream are sufficient to support a tortious interference claim.

### 2. NorthStream and Weems Group sufficiently allege misconduct, interference, and resulting damages.

Defendants also claim Plaintiffs fail to allege any intentional interference with NorthStream's or Weems Group's advantageous business relationships (Motion p. 21, 23), but this is also incorrect.  The First Amended Complaint alleges in detail how Defendants tortiously coordinated and directed the unlawful takeover of Celebration Church to sabotage the Missions Plan and eliminate Plaintiffs as competition and benefit Defendants' own business and financial interests; which destroyed Honey Lake Farms and eliminated NorthStream's sources of management fees, rendering Weems Group's investment in the Missions Plan worthless.  *See* Doc. 49 at ¶¶ 78-100. These allegations—which must be accepted as true and construed in Plaintiffs' favor, along with all reasonable inferences arising therefrom—are more than sufficient to demonstrate misconduct amounting to actionable interference with advantageous business relationships that caused NorthStream and Weems Group to suffer damages. *See Henderson v. Todd Rhyne, Inc.*, 2019 WL 7567811, at *4 (M.D. Fla. 2019), *report and recommendation adopted*, 2020 WL 136520 (M.D. Fla. 2020) (at the motion to dismiss stage, plaintiff "need not provide actual evidence of his damages . . . . Whether [plaintiff] has actually suffered damages . . . is one that should be left to the discovery

SUPP APP 120

phase."); *Berkley Insurance Co. v. Banc of America Community Develop. Co., LLC*, 2024 WL 2267773 (Fla. 2d DCA May 17, 2024) (reversing dismissal of tortious interference and conspiracy claims for failure to state a cause of action).

**B.     NorthStream and Weems Group state actionable and valid claims for conspiracy.**

A conspiracy claim rises and falls with its underlying tort claim, and for the reasons stated above Plaintiffs alleged actionable tortious interference claims and have therefore sufficiently pled claims for conspiracy.   See e.g. *Berkley Insurance Co.,* , 2024 WL 2267773 at *1; *Carroll v. TheStreet.com, Inc.*, 2012 WL 13134547, *7 (S.D. Fla. May 25, 2012).

WHEREFORE, Plaintiffs respectfully request that the Court deny Defendants Motion, require Defendants to answer the First Amended Complaint, and grant such other and further relief as the Court deems just and appropriate.

Dated: May 23, 2024.

/s/ *Shane B. Vogt*
Shane B. Vogt – FBN 257620
LEAD COUNSEL
E-mail:  svogt@tcb-law.com
David A. Hayes - FBN 096657
E-mail:  dhayes@tcb-law.com
TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Tel:  (813) 834-9191
Fax: (813) 443-2193
*Attorneys for Plaintiffs*

SUPP APP 121

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on May 23, 2024, the foregoing document was filed with the Court's CM/ECF system, which will send electronic notice to all counsel of record.

*/s/ Shane B. Vogt*
Attorney

SUPP APP 122