No. 25-10154

In the
United States Court of Appeals
for the Eleventh Circuit

CHARLES S. WEEMS, IV; KERRI WEEMS; CELEBRATION
GLOBAL, INC.; HONEY LAKE FARMS, INC.; NORTHSTREAM
MANAGEMENT GROUP, LLC; and WEEMS GROUP, LLC,
*Plaintiffs-Appellants*,
v.
ASSOCIATION OF RELATED CHURCHES;
CHRIS HODGES; and DINO RIZZO,
*Defendants-Appellees*.

Appeal from the United States District Court
for the Middle District of Florida, Hon. Marcia Morales Howard,
Docket No. 3:23-cv-811-MMH-LLL

BRIEF OF *AMICI CURIAE* LEGAL SCHOLARS
IN SUPPORT OF DEFENDANTS-APPELLEES

NICHOLAS REAVES
YALE LAW SCHOOL
FREE EXERCISE CLINIC
1919 Penn. Ave. N.W., Suite 400
Washington, D.C. 20006
(202) 955-0095
*nicholas.reaves@yale.edu*


ALEC SILVESTER
SIDLEY AUSTIN LLP
1001 Brickell Bay Dr., Suite 900
Miami, FL 33131
(305) 391-5256
*asilvester@sidley.com*

DINO L. LAVERGHETTA
   *Counsel of Record*
MACKENZI J.S. EHRETT
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
*dlaverghetta@sidley.com*
(202) 736-8885
*mehrett@sidley.com*


*Counsel for* Amici Curiae *Legal Scholars*

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 and 29-1, *Amici Curiae* Legal Scholars, through their undersigned counsel, certify that the list of interested persons identified by Defendants-Appellees in their Certificate of Interested Persons, filed on September 15, 2025, is correct and complete.

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 and 29-1, the Legal Scholars, through their undersigned counsel, certify that they are private, individual legal scholars acting on their own behalf. They are not, and do not represent, a publicly held corporation and do not have any parent corporation. They do not issue stock. No publicly held company or corporation has a direct financial interest in the outcome of this litigation.

Dated: September 17, 2025          Respectfully submitted,

                                   */s/ Dino L. LaVerghetta*
                                   Dino L. LaVerghetta

                                   *Counsel for* Amici Curiae
                                   *Legal Scholars*

i

# TABLE OF CONTENTS

**Title**                                                    **Page**

CERTIFICATE OF INTERESTED PERSONS ............................................i

TABLE OF AUTHORITIES ....................................................................iv

IDENTITY, INTEREST, AND AUTHORITY TO FILE FOR AMICI
    CURIAE ..............................................................................................1

STATEMENT OF THE ISSUES.................................................................3

SUMMARY OF ARGUMENT ....................................................................3

ARGUMENT ............................................................................................6

I.    Modern Supreme Court precedent—rooted in Founding Era
    principles—requires courts to abstain from second-guessing a
    religious institution's termination of its ministers.........................6

    A.    *Hosanna-Tabor* and *Our Lady of Guadalupe* support
        the decision below on ministerial exception grounds.............6

    B.    The ministerial exception is rooted in the historical
        context and meaning of the First Amendment....................10

II.    Nineteenth-century courts implemented the Founding Era
    promise of church autonomy..........................................................12

    A.    The modern ministerial exception follows logically from
        *Watson v. Jones*, the first Supreme Court case to
        articulate the principle of church autonomy. .......................12

    B.    Overlooked nineteenth-century case law served as the
        foundation of *Watson*. ...........................................................15

III.    Appellants cannot circumvent Celebration Church's protection
    from judicial interference by suing third parties...........................18

    A.    The ministerial exception prevents judicial
        entanglement in ecclesiastical matters.................................19

    B.    A court becomes impermissibly entangled in
        ecclesiastical affairs if the resolution of a claim
        requires resolving an employment dispute between a
        minister and his or her employer—regardless of the
        parties to the suit. ...................................................................22

C.  The Weems' claims are barred because their resolution would require judicial entanglement in ecclesiastical matters ..................................................................25

CONCLUSION ........................................................................28

CERTIFICATE OF COMPLIANCE ......................................30

CERTIFICATE OF SERVICE.................................................31

# TABLE OF AUTHORITIES

| Cases | Page(s) |
|---|---|

*Chase v. Cheney,*
  58 Ill. 509 (1871) ........................................... 17

*Crowder v. S. Baptist Convention,*
  828 F.2d 718 (11th Cir. 1987)........................... 8, 9

*Demkovich v. St. Andrew the Apostle Parish,*
  3 F.4th 968 (7th Cir. 2021) ....................... 20, 21, 28

*German Reformed Church v. Com. ex rel. Seibert,*
  3 Pa. 282 (1846)............................................ 18

*Gibson v. Brewer,*
  952 S.W.2d 239 (Mo. 1997) ............................. 21

*Harmon v. Dreher,*
  17 S.C. Eq. 87 (1843).................................. 16, 17

*Hosanna-Tabor Evangelical Lutheran Church and School v. E.E.O.C.,*
  565 U.S. 171 (2012) .................................. *passim*

*Hyman v. Rosenbaum Yeshiva of N. Jersey,*
  258 N.J. 208 (2024) (Patterson, J., concurring)........... 24, 27

*Jones v. Wolf,*
  443 U.S. 595 (1979) ......................................... 6

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church,*
  344 U.S. 94 (1952) ...................................... 7, 14

*Lee v. Sixth Mount Zion Baptist Church of Pittsburgh,*
  903 F.3d 113 (3rd Cir. 2018).............................. 25

*Lewis v. Seventh Day Adventists Regional Conf.,*
  978 F.2d 940 (6th Cir. 1992).............................. 21

*McClure v. Salvation Army,*
   460 F.2d 553 (5th Cir. 1972) ................................................ 21

*McKelvey v. Pierce,*
   173 N.J. 26 (2002) ................................................... 25, 27

*Myhre v. Seventh-Day Adventist Church Reform Movement*
   *Am. Union Int'l Missionary Soc'y,*
   719 F. App'x 926 (11th Cir. 2018) ........................................ 9

*Nat'l Ford Baptist Church Inc., v. Davis,*
   382 N.C. 115 (2022) .......................................................... 25

*Natal v. Christian and Missionary Alliance,*
   878 F.2d 1575 (1st Cir. 1989) ......................................... 24, 27

*Our Lady of Guadalupe School v. Morrissey-Berru,*
   591 U.S. 732 (2020) ................................................. *passim*

*Patton v. Jones,*
   212 S.W. 3d 541 (Tex. App. 2006) .................................... 24, 27

*Petruska v. Gannon Univ.,*
   462 F.3d 294 (3d Cir. 2006) .................................................. 21

*Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull*
   *Mem'l Presbyterian Church,*
   393 U.S. 440 (1969) ........................................................... 14

*Rutland v. Nelson,*
   857 F. App'x 627 (11th Cir. 2021) ........................................... 6

*Serbian E. Orthodox Diocese v. Milivojevich,*
   426 U.S. 696 (1976) ..................................................... 6, 20

*Shannon v. Frost,*
   3 B. Mon. 253 (Ky. 1842) .................................................. 16

*Starkey v. Roman Cath. Archdiocese,*
   41 F.4th 931 (7th Cir. 2022) ....................................... 22, 23, 27

*State v. Ancker*,
    31 S.C.L. 245 (1846) ............................................................. 18

*Watson v. Jones*,
    80 U.S. 679 (1871) ..................................................... *passim*

## Other Authorities

Fed. R. of App. P. 29(a)(2) ......................................................... 1

James Madison, *Selected Writings of James Madison* 24
    (Ralph Ketcham ed., 2006) ................................................ 11

Lael Daniel Weinberger, *The Origins of Church Autonomy:
Religious Liberty After Disestablishment* (draft of Feb. 4,
2025), available at https://ssrn.com/abstract=4933864 ............. *passim*

Lael Weinberger, *The Limits of Church Autonomy*, 98 NOTRE
DAME L. REV. 1253 (2023) ................................................. 20

Michael W. McConnell, *The Origins and Historical
Understanding of the Free Exercise of Religion*, 103 HARV.
L. REV. 1409 (1990) .......................................................... 10

## IDENTITY, INTEREST, AND AUTHORITY TO FILE
## FOR AMICI CURIAE[1]

The *Amici Curiae* legal scholars (the "Legal Scholars") are below:

Lael Weinberger is an assistant professor of law at George Mason University Scalia Law School, specializing in American legal history, constitutional law, and religious liberty. He has a strong interest in applying his expertise in these fields to aid this Court's application of the ministerial exception. Most relevant to this litigation is his draft article *The Origins of Church Autonomy*, which examines an overlooked series of nineteenth-century cases that informed the Supreme Court's development of the church autonomy doctrine and highlights the ministerial exception's theoretical underpinnings.

Robert F. Cochran Jr. is the Louis D. Brandeis Professor Emeritus at Pepperdine University Caruso School of Law and is a leading voice in the field of law and religion. He is the founding director of the Nootbaar Institute on Law, Religion, and Ethics at Pepperdine. His scholarship

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(2), the Legal Scholars have received consent from all parties to file this amicus brief. No counsel for any party authored this brief in whole or in part, and no person or entity, aside from *Amici* and their counsel, made any monetary contribution toward the preparation or submission of this brief. This brief is prepared by a clinic operated by Yale Law School, but does not purport to present the School's institutional views, if any.

explores the role of religious conviction in legal thought and practice, with a particular emphasis on religious freedom and the moral responsibilities of lawyers. He has edited and contributed to foundational works such as *Christian Perspectives on Legal Thought* and *Law and the Bible*, fostering interdisciplinary dialogue on faith and law.

Elizabeth A. Clark is Associate Director of the International Center for Law and Religion Studies at Brigham Young University and the U.S. member of the Organization for Security and Co-operation in Europe ("OSCE") Office for Democratic Institutions and Human Rights Advisory Panel for Freedom of Religion or Belief. Professor Clark has written extensively on freedom of religion or belief, particularly in Eastern Europe and Central Asia. Professor Clark has analyzed and drafted legislation on religion from over a dozen countries for the U.S. State Department, United States Agency for International Development, national governments, and international non-governmental organizations. She has spoken at United Nations and OSCE forums, and at over 100 academic conferences throughout the world. She has also testified before the U.S. Congress and the U.S. Commission on International Religious Freedom.

## STATEMENT OF THE ISSUES

1. Does the ministerial exception forbid secular courts from adjudicating disputes that turn on the decision of a church to terminate its minister?

2. Do the ministerial exception and the principles of church autonomy forbid artful pleading by ministers who challenge their termination by suing different legal entities and alleging that these entities conspired to cause their termination?

## SUMMARY OF ARGUMENT

The district court's decision below was correct in holding that the Weems' claims are barred by the First Amendment. To hold otherwise would allow artful pleading to grievously undermine the protections afforded by the Religion Clauses. The district court's decision relied on ample support from precedent of this Court and the Supreme Court. However, *Amici* also wish to draw this Court's attention to more recent Supreme Court precedent on the ministerial exception (unaddressed below), as well as an underappreciated line of nineteenth-century lower court decisions. This precedent further supports the district court's decision and provides valuable background describing the principles that underly religious liberty jurisprudence.

The ministerial exception derives from the larger church autonomy doctrine and forbids secular courts from adjudicating disputes that turn on a religious organization's decision to terminate its minister. The analysis hinges on the nature of the claim, not the parties to the suit. Accordingly, the protection afforded to a church's autonomy over its employment decisions cannot be circumvented by artful pleading. Suing non-church legal entities and alleging that they conspired to cause a minister's termination has no impact on the critical threshold question: is a court required to make a determination about any religious reasons behind such termination. If so, the court is prohibited from adjudicating.

In a broader sense, the church autonomy doctrine, rooted in the First Amendment, guarantees religious organizations freedom "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church*, 344 U.S. 94, 116 (1952). The selection of religious ministers is at the heart of these ecclesiastical decisions. Ministers shape a religious organization's mission, teach its faith, and permeate nearly every aspect of its religious life. Because of the inherently ecclesiastical nature of ministers' functions, the Supreme

Court in *Hosanna-Tabor* recognized the need to establish safeguards against interference to ensure that "the authority to select and control who will minister to the faithful . . . is the church's alone." *Hosanna-Tabor Evangelical Lutheran Church and School v. E.E.O.C.*, 565 U.S. 171, 195 (2012).

In so doing, the Supreme Court drew upon deeply rooted principles of church autonomy, tracing their history back to the Magna Carta and to the principles of religious freedom from the Founding Era. But, by ending its inquiry at the founding, the Court overlooked a rich body of nineteenth-century common law decisions supporting the idea that matters of internal church governance must be respected by civil courts. These underappreciated cases are not merely historical footnotes; rather, they serve as the direct doctrinal and philosophical foundation upon which the Supreme Court constructed its first church autonomy decision in *Watson v. Jones*, 80 U.S. 679 (1872).[2] They bridged the gap between the founding generation's conception of religious liberty and the

---

[2] While some give the date as 1871, the proper citation date is 1872. *Watson* was decided in the December 1871 term of the Court, but the opinion itself was issued in the spring of 1872. *See* Lael Daniel Weinberger, *The Origins of Church Autonomy: Religious Liberty After Disestablishment* at footnote 13 (draft of Feb. 4, 2025), available at https://ssrn.com/abstract=4933864.

development of the modern church autonomy doctrine. Uncovering these cases and understanding the values they reflect helps to carry forward the core principles that continue to animate the church autonomy doctrine today.

## ARGUMENT

### I. Modern Supreme Court precedent—rooted in Founding Era principles—requires courts to abstain from second-guessing a religious institution's termination of its ministers.

#### A. Hosanna-Tabor *and* Our Lady of Guadalupe *support the decision below on ministerial exception grounds.*

While the principles of ecclesiastical abstention outlined by the district court suffice to resolve this case, more recent Supreme Court precedent provides further confirmation that the district court's decision was correct. Below, the district court applied the ecclesiastical abstention doctrine found in this Court's decision in *Rutland v. Nelson*, 857 F. App'x 627 (11th Cir. 2021), which, in turn, primarily relied on Supreme Court cases from the 1970s. *See Id.* at 628 (citing *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696 (1976), and *Jones v. Wolf*, 443 U.S. 595 (1979)). However, it is important to highlight the fact that more recent Supreme Court decisions on the ministerial exception provide further support for the district court's decision.

In *Hosanna-Tabor*, the Supreme Court expressly endorsed what many lower courts had already recognized: a ministerial exception to employment discrimination laws. The Court unanimously held that both of the First Amendment's Religion Clauses prohibit the government from interfering with a religious organization's selection of its ministers, including hiring and firing decisions. And the Court recognized that this protection is not simply meant to avoid entangling employment disputes; at its core, it ensures churches and religious organizations remain free to determine who will teach, preach, and share their faith. As the Court explained:

> The purpose of the exception is not to safeguard a church's decision to fire a minister only when it is made for a religious reason. The exception instead ensures that the authority to select and control who will minister to the faithful—a matter "strictly ecclesiastical"—is the church's alone.

*Hosanna-Tabor*, 565 U.S. 171, 194–95 (2012) (quoting *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 119 (1952)).

Less than a decade later, the Supreme Court in *Our Lady of Guadalupe School v. Morrissey-Berru*, 591 U.S. 732 (2020), further refined its approach to the ministerial exception. The Court explained

that the ministerial exception flows from the Constitution's "general principle of church autonomy," which guarantees "independence in matters of faith and doctrine and in closely linked matters of internal government." *Id.* at 747. Consequently, it noted that *Hosanna-Tabor* relied heavily on cases addressing church autonomy generally instead of relying "exclusively" on cases "concerned with the selection or supervision of clergy." *Id.*

The Supreme Court in *Hosanna-Tabor* declined "to adopt a rigid formula for deciding when an employee qualifies as a minister," *Hosanna-Tabor*, 565 U.S. at 190, but in *Our Lady of Guadalupe*, the Court explained that the central inquiry concerned the religious function of the employee. Thus, the Supreme Court explained that the ministerial exception prohibits government interference in the selection and supervision of employees whose work plays "a vital part in carrying out the mission" of a religious organization.[3] *Id.* at 757.

*Hosanna-Tabor* and *Our Lady of Guadalupe* reinforce this Court's already-robust religious liberty jurisprudence. Under this Court's

---

[3] Pastor Weems, the "founder" of Celebration Church and creator and implementor of its "Missions Plan," indisputably qualifies as a minister under this standard. Amended Complaint ¶¶ 23, 27–30.

precedent, "courts may not adjudicate ecclesiastical disputes." *Crowder v. S. Baptist Convention*, 828 F.2d 718, 718 (11th Cir. 1987); *see also Myhre v. Seventh-Day Adventist Church Reform Movement Am. Union Int'l Missionary Soc' y*, 719 F. App'x 926, 928 (11th Cir. 2018). And the district court's holding already aligns with the Supreme Court's recent acknowledgment that the First Amendment "gives special solicitude to the rights of religious organizations." *Hosanna-Tabor*, 565 U.S. at 189.

Adjudicating an ecclesiastical dispute is unconstitutional under the ministerial exception because doing so would constitute "government interference with an internal church decision that affects the faith and mission of the church itself." *Id.* at 190. Courts may not decide questions that "would risk judicial entanglement in religious issues." *Our Lady of Guadalupe*, 591 U.S. at 761; *see also id.* at 751 n.10 (collecting cases emphasizing that judicial resolution of religious questions threatens the protection secured by the Religion Clauses). However, the Court in *Our Lady of Guadalupe* clarified: "this does not mean that religious institutions enjoy a general immunity from secular laws, but it does protect their autonomy with respect to internal management decisions that are essential to the institution's central mission." *Id.* at 746. The

Court went further, emphasizing that "a component of this autonomy is the selection of the individuals who play certain key roles." *Id*. Cases that require secular courts to resolve disputes over a religious minister's employment—undoubtedly a key role—constitute an area into which secular authorities simply may not tread.

B.    *The ministerial exception is rooted in the historical context and meaning of the First Amendment.*

The Constitution's solicitude for church autonomy is evident from the historical context of the Religion Clauses and from the historical practice of American courts. As *Hosanna-Tabor* recounted, colonial life was marked by the Crown's efforts to obtain control of internal religious governance. The Puritans, seeking religious liberty, left behind the Church of England for the New World, where "they hoped to elect their own ministers and establish their own modes of worship." *Hosanna-Tabor*, 565 U.S. at 182. Those ministers "were accorded a high degree of autonomy from civil control." Michael W. McConnell, *The Origins and Historical Understanding of the Free Exercise of Religion*, 103 HARV. L. REV. 1409, 1422 (1990). William Penn similarly labored to secure a New World realm of independence from the Church of England. *Hosanna-Tabor*, 565 U.S. at 183. Even in those colonies where the Church of

England still held sway, parish vestries clashed with the civil authorities over the selection of ministers. *Id.*

The Crown's interventions in religious exercise troubled many American colonists, and so "the founding generation sought to prevent a repetition of these practices in our country." *Our Lady of Guadalupe*, 591 U.S. at 748. "By forbidding the 'establishment of religion' and guaranteeing the 'free exercise thereof,' the Religion Clauses ensured that the new Federal Government—unlike the English Crown—would have no role in filling ecclesiastical offices." *Hosanna-Tabor*, 565 U.S. at 184. Indeed, the writings and speeches of James Madison, "the leading architect of the religion clauses of the First Amendment," confirm the Constitution's commitment to religious autonomy. *See Hosanna-Tabor*, 565 U.S. at 184 (internal citation omitted).

In his *Memorial and Remonstrance*, Madison criticized the notion that "the Civil Magistrate is a competent Judge of Religious Truth," calling it "an arrogant pretension falsified by the contradictory opinions of Rulers in all ages, and throughout the world." James Madison, *Selected Writings of James Madison* 24 (Ralph Ketcham ed., 2006). And in a 1788 speech to the Virginia Convention, Madison further argued that under

the new Constitution "[t]here is not a shadow of right in the general government to intermeddle with religion. Its least interference with it would be a most flagrant usurpation." *Id*. at 155.

In short, the constitutional principles of church autonomy were a reaction to, and a safeguard against, government interference in religious disputes.

## II. Nineteenth-century courts implemented the Founding Era promise of church autonomy.

It was many years after the Founding Era before the Supreme Court first had occasion to grapple with a case implicating internal church matters. When it did—in a state law diversity case—the Supreme Court articulated the religious liberty considerations at stake. In doing so, it built on what was already a substantial body of lower court decisions that recognized that courts should stay out of the internal affairs of religious organizations.

### A. *The modern ministerial exception follows logically from* Watson v. Jones*, the first Supreme Court case to articulate the principle of church autonomy.*

In 1871, the Supreme Court took up *Watson v. Jones*, marking its first foray into the church autonomy doctrine. 80 U.S. 679. Two camps in a Presbyterian church debated "whether to renew employment of the

church's then-current minister." *See* Lael Daniel Weinberger, *The Origins of Church Autonomy* at 40. After a disputed election of new elders opposed to renewing the minister's employment (and a dispute over who had the right to physically control the church's assets), the new elders complained to the General Assembly, which granted them control. *Id.* at 41. Elders supporting the minister filed a complaint in state court. *Id.*

Ultimately, the Supreme Court refused to decide whether the General Assembly made the correct decision by the terms of its own governing documents. *Id.* at 43. Instead, the Court found that ecclesiastical bodies should be able to self-govern without tampering by agencies of the state. *Id.* The "subject-matter of dispute," the Court said, was "strictly and purely ecclesiastical in its character—a matter over which the civil courts exercise no jurisdiction." *Watson*, 80 U.S. at 733. The Court reasoned that secular courts should not adjudicate matters that are in the domain of religious bodies because "the judges of the civil courts" are not proficient in the ecclesiastical "law which should decide the case" like faith leaders are with their own systems of discipline, precedents, usage, and customs. *Id.* at 729.

Since *Watson*, the Supreme Court has continued to reinforce these principles to safeguard religious liberty in America. In 1952, the Court noted that *Watson* "radiates . . . a spirit of freedom for religious organizations . . . power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff*, 344 U.S. at 116. And in 1969, the Court favorably described *Watson* as a case that was "decided before the application of the First Amendment to the States but nonetheless informed by First Amendment considerations." *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 445 (1969). With "language which has a clear constitutional ring," *Watson* stands for the assertion that "civil courts [have] no role in determining ecclesiastical questions." *Id.* at 446–47.

The Supreme Court's recent ministerial exception decisions in *Hosanna-Tabor* and *Our Lady of Guadalupe* also reflect the fundamental principle from *Watson* that religious organizations must be free from judicial intervention in any "matter which concerns theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals

required of them." *Watson*, 80 U.S. at 733. In *Hosanna-Tabor*, the Court embraced *Watson*'s "broad and sound view of the relations of church and state under our system of laws." *Hosanna-Tabor*, 565 U.S. at 188 (internal citation omitted). Similarly, in *Our Lady of Guadalupe*, the Court quoted *Watson* in stating: "[i]t is not to be supposed that the judges of the civil courts can be as competent in the ecclesiastical law and religious faith of all these bodies as the ablest men in each are in reference to their own." *Our Lady of Guadalupe*, 591 U.S. at 751 n.10 (quoting *Watson*, 80 U.S. at 729).

Thus, the church autonomy principle enshrined in *Watson*—which embodied the vision of religious freedom emerging from early America—has guided the Court's recent ministerial exception cases in line with the original understanding of the Religion Clauses.

B. *Overlooked nineteenth-century case law served as the foundation of* Watson.

*Watson* provided the foundation upon which more recent church autonomy cases have been built. But *Watson* itself emerged out of prior state court decisions dealing with church autonomy. And the dominant conclusion of those decisions was that civil courts should not interfere in matters of ecclesiastical authority. *See generally* Weinberger, *The*

*Origins of Church Autonomy* at 14, 36. These state court decisions came from the era before the incorporation of the First Amendment against the states, and so they (like *Watson* itself) were not applications of the Constitution. But they demonstrate the "constitutional ring" of First Amendment considerations—early American courts thought that church autonomy was a necessary component of religious liberty. *Id.* at 40–45.

State courts before *Watson* repeatedly found that principles of religious freedom precluded civil court jurisdiction over ecclesiastical matters. In 1842, for example, the Kentucky Supreme Court explained that, as a civil court, it could neither "decide who ought to be members of the church, nor whether the excommunicated have been justly or unjustly, regularly or irregularly cut off from the body of the church." *Shannon v. Frost*, 3 B. Mon. 253, 258 (Ky. 1842). Because the court had "no ecclesiastical jurisdiction," it could not "revise or question ordinary acts of church discipline or excision." *Id.*

One year later, in *Harmon v. Dreher*—a case that *Watson* expressly relied upon—South Carolina's Court of Appeals of Equity lamented that it was "reduced to the deplorable necessity of delivering the judgment of a civil tribunal in a case of a spiritual nature." 17 S.C. Eq. 87, 91 (1843).

The Court refused to analyze church doctrine and only engaged in factfinding for the purpose of understanding "who was the highest ecclesiastical authority involved" in the dispute, so as to defer decision-making authority to the ecclesiastical body. Weinberger, *The Origins of Church Autonomy* at 30. The Court explained that "[i]t belongs not to the civil power to enter into or review the proceedings of a Spiritual Court," and that "the structure of our government" protects "[r]eligious liberty from the invasion of the Civil Authority." *Harmon*, 17 S.C. Eq. at 120.

Furthermore, one year before *Watson*, in *Chase v. Cheney*, the Illinois Supreme Court refused to hear a complaint by a minister who claimed he was improperly disciplined by an ecclesiastical court. 58 Ill. 509 (1871). The Court stated: "We have no right, and, therefore, will not exercise the power, to dictate ecclesiastical law. We do not aspire to become de facto heads of the church, and, by construction or otherwise, abrogate its laws and canons." *Id.* at 535.

State courts before *Watson* also cited their own lack of competence to adjudicate religious matters as another reason for promoting church autonomy. In the mid-1840s, the Pennsylvania Supreme Court was asked to decide whether a member of the German Reformed Church of

Heidelberg had been wrongfully deprived of his membership in the church. The court refused to opine on the issue, declaring that "[t]he decisions of ecclesiastical courts, like those of every other judicial tribunal, are final; as they are the best judges of what constitutes an offence against the word of God and the discipline of the church." *German Reformed Church v. Com. ex rel. Seibert*, 3 Pa. 282, 291 (1846). Around the same time, a synagogue dispute came before South Carolina's Court of Appeals of Law. The Court's opinion highlighted the inability of secular courts to delve into religious matters—that is, "to go into the labyrinth of curious and recondite learning, without a clue by which he could escape from its bewildering perplexities." *State v. Ancker*, 31 S.C.L. 245, 273 (1846).

*Watson* wove together these many threads in a decision that would ultimately be recognized as holding constitutional significance. Weinberger, *The Origins of Church Autonomy* at 40–45. This history confirms that civil courts in America have a longstanding tradition of declining to adjudicate ecclesiastical questions.

## III. Appellants cannot circumvent Celebration Church's protection from judicial interference by suing third parties.

As the history confirms, avoiding judicial entanglement in ecclesiastical affairs has always been a key consideration in church autonomy cases. And at the core of the ecclesiastical matters that this doctrine was designed to protect are decisions related to hiring and firing religious ministers. When a claim turns on resolving a dispute over ministerial employment, the ministerial exception bars civil courts from resolving the claim. Courts should be wary about litigants using artful pleading to avoid application of the ministerial exception. What matters is the nature of the claim the court has been asked to adjudicate—far more than the names listed on the cover of the complaint.

Rather, where, as here, the substance of each claim requires second-guessing a religious organization's decision to terminate a minister, the claims are barred. Permitting claims to bypass ecclesiastical abstention through artful pleading would undermine the very essence of the ministerial exception, inviting courts to entangle themselves in theological disputes. Courts must remain vigilant, focusing on the substantive nature of disputes, especially when ministerial employment decisions lie at their heart.

*A.* *The ministerial exception prevents judicial entanglement in ecclesiastical matters.*

A primary purpose of the church autonomy doctrine is to prevent judicial entanglement in ecclesiastical matters. *See Our Lady of Guadalupe*, 591 U.S. at 761 (the ministerial exception aims to avoid "judicial entanglement in religious issues"); *Demkovich v. St. Andrew the Apostle Parish,* 3 F.4th 968, 977 (7th Cir. 2021) (the ministerial exception prevents "civil intrusion and excessive entanglement" in ecclesiastical decisions). Ecclesiastical matters arise whenever the "subject-matter of [a] dispute . . . concerns theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them . . . ." *Watson,* 80 U.S. at 733.

The "core of ecclesiastical concern" is a religious organization's decision regarding who will serve as its minister. *Milivojevich,* 426 U.S. at 717; *see also* Lael Weinberger, *The Limits of Church Autonomy*, 98 NOTRE DAME L. REV. 1253, 1310 (2023) (the ministerial exception is a part of the broader protection for the internal affairs of a religious organization). Ministers and religious leaders are crucial to a church's mission and touch nearly every aspect of its ecclesiastical life. Ministers are placed in "an important position of trust" and "perform[] vital

religious duties." *Our Lady of Guadalupe*, 591 U.S. at 752, 756. They are often "at the very core of the [Church's mission]." *Id.* at 754. Accordingly, courts have recognized that "[t]he relationship between an organized church and its ministers is its lifeblood." *McClure v. Salvation Army*, 460 F.2d 553, 558 (5th Cir. 1972).

Given the fundamental significance of ministers to the life of a religious organization, it is no surprise that courts have adopted a clear rule (the ministerial exception) barring civil court interference in this inherently ecclesiastical relationship. *See, e.g.*, *Petruska v. Gannon Univ.*, 462 F.3d 294, 306 (3d Cir. 2006) ("A minister serves as the church's public representative, its ambassador, and its voice to the faithful. Accordingly, the process of selecting a minister is *per se* a religious exercise."); *Demkovich*, 3 F.4th at 980 (claims related to ministerial employment "necessarily intrude upon the religious realm"); *Gibson v. Brewer,* 952 S.W.2d 239, 246–47 (Mo. 1997) ("Questions of hiring, ordaining, and retaining clergy . . . necessarily involve interpretation of religious doctrine, policy, and administration."); *Lewis v. Seventh Day Adventists Regional Conf.,* 978 F.2d 940 (6th Cir. 1992) ("[A] minister's employment relationship with his church implicates internal church

discipline, faith, and organization, all of which are . . . [ecclesiastical]."
(internal quotation marks omitted)).

> B.   *A court becomes impermissibly entangled in ecclesiastical affairs if the resolution of a claim requires resolving an employment dispute between a minister and his or her employer—regardless of the parties to the suit.*

Since disputes concerning ministerial employment are at the heart of church autonomy, the ministerial exception functions to bar adjudication of these disputes in a wide variety of contexts. Indeed, circuit courts around the country have applied the ministerial exception to tort claims closely analogous those presented by Appellants here. In these cases, the threshold question is whether a court would be required to make a religious determination—not who the parties are to the suit.

For instance, in *Starkey v. Roman Cath. Archdiocese,* a guidance counselor brought claims for tortious interference against a Roman Catholic Archdiocese. 41 F.4th 931 (7th Cir. 2022). Starkey alleged that the Archdiocese caused Roncalli Catholic High School to refuse to renew her employment contract after they discovered she was in a same-sex marriage. *Id.* at 938. Relying on *Hosanna-Tabor* and *Our Lady of Guadalupe,* the Seventh Circuit held that the ministerial exception

barred Starkey's tortious interference claims against the archdiocese because they implicated ecclesiastical matters:

> We hold that the ministerial exception applies to state law claims, like those for breach of contract and tortious conduct, *that implicate ecclesiastical matters.* A claim implicates ecclesiastical matters if it is "[o]f, relating to, or involving the church, esp[ecially] as an institution." Ecclesiastical, BLACK'S LAW DICTIONARY (11th ed. 2019). To hold otherwise would entangle courts in matters the First Amendment treats as "strictly ecclesiastical," and therefore the church's alone.

*Starkey,* 41 F.4th at 994 (emphasis added).

As the Court explained, each claim required the court to assess the validity of the employment relationship between Roncalli—a religious organization—and Starkey, its minister. Judicial review of that ministerial employment relationship would therefore "result in excessive judicial entanglement in ecclesiastical matters." *Id.* at 945. The court paid no heed to Starkey's argument that the ministerial exception did not apply because she sued a third party rather than her religious employer.[4] Instead, the Seventh Circuit focused on the nature of the dispute it was

---

[4] *See* Opening Br. of Pl.-Appellant Lynn Starkey, Doc. 14, pg. 44 (arguing the ministerial exception does not apply because "Starkey's intentional interference claims are against the Archdiocese only, not Roncalli," "[t]he Archdiocese . . . was not Starkey's employer," and thus "Starkey has suffered harm from [ ] third party interference").

being asked to resolve, and thus refused to adjudicate the tortious interference claim.

Likewise, in *Natal v. Christian and Missionary Alliance*, the First Circuit took a functional approach to deciding whether the ministerial exception applies, explaining that courts must "look to the substance and effect of plaintiffs' complaint, not its emblemata. Howsoever a suit may be labelled, once a court is called upon to probe into a religious body's selection and retention of clergymen, the First Amendment is implicated." *Natal,* 878 F.2d 1575, 1577 (1st Cir. 1989).

Numerous other cases have reaffirmed this principle, holding that the ministerial exception hinges on the nature of the claim and whether it implicates a ministerial employment decision. *See, e.g., Patton v. Jones,* 212 S.W. 3d 541, 548 (Tex. App. 2006) ("[C]ourts consider the substance and nature of the plaintiff's claims to determine whether the First Amendment prevents subject matter jurisdiction."); *Hyman v. Rosenbaum Yeshiva of N. Jersey,* 258 N.J. 208, 234–36 (2024) (Patterson, J., concurring) (courts must analyze "each element of a claim and decide whether the court's determination of the claim would require it 'to choose between competing religious visions, or cause interference with a

church's administrative prerogatives, including its core right to select, and govern the duties of, its ministers'" (quoting *McKelvey v. Pierce*, 173 N.J. 26, 51 (2002))); *cf. Nat'l Ford Baptist Church Inc., v. Davis,* 382 N.C. 115, 126–27 (2022) ("[I]f Pastor Davis's second claim for relief is based on a theory that the third-party defendants tortiously interfered with the employment relationship by criticizing his leadership . . . this claim for relief is barred on First Amendment grounds. A secular court cannot second-guess the Board's evaluation of Pastor Davis's job performance.").

### C. The Weems' claims are barred because their resolution would require judicial entanglement in ecclesiastical matters.

The claims brought by the Weems are barred by the ministerial exception because they turn on a church's decision to terminate its minister. Regardless of the Plaintiffs' artful pleading, adjudicating the Weems' tortious interference and conspiracy claims would still require this Court to determine whether Celebration Church terminated Pastor Weems for legitimate reasons or due to the Association of Related Churches (ARC) alleged intermeddling. And parsing the motives behind a religious organization's discharge of a minister is "an inquiry the Supreme Court has explicitly said is forbidden by the First Amendment's ministerial exception." *Lee v. Sixth Mount Zion Baptist Church of*

*Pittsburgh,* 903 F.3d 113, 121 (3rd Cir. 2018) (quoting *Hosanna-Tabor*, 565 U.S. at 194); *Hosanna-Tabor,* 565 U.S. at 205 (Alito, J., concurring) (explaining that "to probe the real reason" behind ministerial terminations would result in impermissible entanglement in ecclesiastical matters).

The body of precedent described herein bars interference in decisions of ministerial employment because disputes over such decisions inherently implicate religious faith and doctrine—and require evaluating whether a church properly applied its rules, customs, and laws. That is precisely what the Weems' claims would require here. Celebration Church's rationale for removing the Weems would require the court to make inherently ecclesiastical determinations after sifting through numerous grievances rooted in religious doctrine. *See, e.g.,* Report, PG 6 (explaining that the Weems' leadership was "unbiblical" and characterized by "rampant spiritual . . . abuse").

Accordingly, the Weems' claims are barred, full stop. It matters not that the Weems sued a third party. Even so, what matters in this case is that the dispute itself still turns on resolving issues of faith or religion and would require this Court to interfere in ecclesiastical governance.

Precedent prohibits this Court from doing so. To hold otherwise would eviscerate the ministerial exception and thereby undermine centuries of Supreme Court and lower court precedent. *See, e.g.*, *Hosanna-Tabor*, 565 U.S. 171; *Our Lady of Guadalupe*, 591 U.S. 732; *Starkey*, 41 F.4th 931; *Natal,* 878 F.2d 1575; *Patton,* 212 S.W. 3d 541, *Hyman,* 258 N.J. 208; *McKelvey v. Pierce*, 173 N.J. 26.

## CONCLUSION

If a dispute requires a court to make ecclesiastical determinations, "avoidance, rather than intervention, should be a court's proper role […]" *Demkovich,* 3 F.4th at 975. Accordingly, the Supreme Court's ministerial exception precedent—supported by two centuries of lower court caselaw—requires that courts abstain from disputes related to ministerial employment. These cases make clear that the touchstone of the analysis is whether the dispute would require a court to make religious determinations in order to resolve the case. If so, the claims are barred.

A similar analysis in this case leads to the inescapable conclusion that the ministerial exception precludes adjudication of the Weems' claims, notwithstanding Celebration Church's absence from the list of named parties. The substance of this dispute plainly concerns the Church's decision to remove the Weems from ministerial office, and all the concerns animating the ministerial exception are fully present in this case.

To allow the Weems to circumvent the ministerial exception doctrine through artful pleading would be inconsistent with Supreme

Court precedent and the First Amendment and would improperly invite courts to make ecclesiastical determinations that they are neither permitted, nor competent, to make.

For the foregoing reasons, *Amici* respectfully ask that this Court affirm the decision below.

September 17, 2025                    Respectfully submitted,

NICHOLAS REAVES
**YALE LAW SCHOOL**
**FREE EXERCISE CLINIC**
1919 Penn. Ave. N.W., Suite 400
Washington, D.C. 20006
(202) 955-0095
*nicholas.reaves@yale.edu*


ALEC SILVESTER
**SIDLEY AUSTIN LLP**
1001 Brickell Bay Dr., Suite 900
Miami, FL 33131
(305) 391-5256
*asilvester@sidley.com*

DINO L. LAVERGHETTA
   *Counsel of Record*
MACKENZI J.S. EHRETT
**SIDLEY AUSTIN LLP**
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
*dlaverghetta@sidley.com*
(202) 736-8885
*mehrett@sidley.com*

*Counsel for* Amici Curiae *Legal Scholars*

# CERTIFICATE OF COMPLIANCE

The undersigned counsel certifies that this motion:

(1) Complies with the word limit of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7) because it contains 5,655 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f); and

(2) Complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point size and Century Schoolbook font.

Respectfully submitted,

/s/ *Dino L. LaVerghetta*
Dino L. LaVerghetta

*Counsel for* Amici Curiae
*Legal Scholars*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 17, 2025, I electronically filed the foregoing with the Clerk of the Court using the Court's CM/ECF system, which will send notification of such filing to all registered CM/ECF users.

Respectfully submitted,

*/s/ Dino L. LaVerghetta*
Dino L. LaVerghetta

*Counsel for* Amici Curiae
*Legal Scholars*