No. 25-10154

# In the United States Court of Appeals for the Eleventh Circuit

———————

CHARLES S. WEEMS, IV, KERRI WEEMS, CELEBRATION GLOBAL, INC.,
HONEY LAKE FARMS, INC., NORTHSTREAM MANAGEMENT GROUP, LLC AND
WEEMS GROUP LLC,

*Plaintiffs-Appellants,*

*v.*

ASSOCIATION OF RELATED CHURCHES, CHRIS HODGES AND DINO RIZZO,

*Defendants-Appellees,*

———————

On Appeal from the United States District Court
for the Middle District of Florida,
The Hon. Marcia Morales Howard, District Judge
Case No. 3:3-cv-811

———————

**CORRECTED BRIEF OF THE BECKET FUND FOR RELIGIOUS
LIBERTY AS *AMICUS CURIAE*
IN SUPPORT OF DEFENDANTS-APPELLEES**

———————

DANIEL H. BLOMBERG
  *Counsel of Record*
AMANDA G. DIXON
THE BECKET FUND FOR
  RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW
Suite 400
Washington, DC 20006
(202) 955-0095
*dblomberg@becketfund.org*

No. 25-10154, *Weems, et al. v. Association of Related Churches, et al.*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1(a)(1) and 26.1-2(b), the undersigned counsel certifies that the following listed persons and parties may have an interest in the outcome of this case:

1. Association of Related Churches, Appellee

2. Balogh, Bryan O., Former Attorney for Appellee, Chris Hodges

3. Barksdale, Oliver David, Attorney for Appellee, Dino Rizzo

4. Bedell, Dittmar, DeVault, Pillans & Coxe, P.A., Law firm of Attorney for Appellee, Dino Rizzo

5. Blomberg, Daniel H., Attorney for Amicus Curiae The Becket Fund for Religious Liberty

6. Buchalter, A Professional Corporation, Appellant

7. Burr & Forman LLP, law firm of former attorney for Appellee, Chris Hodges

8. Carlisle, John A., Attorney for Appellee, Chris Hodges

9. Celebration Church of Jacksonville, Inc., Non-Party

10. Celebration Global, Inc., Appellant

11. Clark, Elizabeth A., Amicus Curiae (Legal Scholars)

12. Clough, John C., Attorney for Appellants Charles Stovall Weems, IV, Kerri Weems, Celebration Global, Inc., Honey Lake Farms, Inc., NorthStream Management Group, LLP, and Weems Group, LLC.

13. Cochran Jr., Robert F., Amicus Curiae (Legal Scholars)

No. 25-10154, *Weems, et al. v. Association of Related Churches, et al.*

14. Coxe, Henry M. III, Attorney for Appellee, Dino Rizzo

15. Dixon, Amanda G., Attorney for Amicus Curiae The Becket Fund for Religious Liberty

16. Ehrett, Machenzi J.S., Attorney for Amici Curiae Legal Scholars

17. Fisher, Tousey, Leas & Ball, law firm of former attorney for Appellee Chris Hodges

18. George, Robert B., Former Attorney for Appellee, Chris Hodges

19. Gray, Vanessa N., Attorney for Appellee, Association of Related Churches

20. Hayes, David A., Former Attorney for Appellants

21. Hodges, Chris, Appellee

22. Holland & Knight, LLP, Former Attorney for Appellant, Chris Hodges

23. Honey Lake Farms, Inc., Appellant

24. Horovitz, Samuel J., Attorney for Non-Party, John Siebeling

25. Howard, Marcia Morales, District Judge

26. Hulsberg, Sarah J., Former Attorney for Appellee, Association of Related Churches

27. Kelley, Brian G., Attorney for Non-Party, John Siebeling

28. Lambert, Laura Lothman, Magistrate Judge

29. LaVerghetta, Dino L., Attorney for Amici Curiae Legal Scholars

30. Lockamy, Michael E., Attorney for Appellee, Dino Rizzo

31. McCarthy, Edward III, Attorney for Appellee, Dino Rizzo

No. 25-10154, *Weems, et al. v. Association of Related Churches, et al.*

32. Murphy, Niels P., Attorney for Appellee, Association of Related Churches

33. Murphy & Anderson, P.A., Attorney for Appellee, Association of Related Churches

34. NorthStream Management Group, LLC, Appellant

35. Reaves, Nicholas, Attorney for Amici Curiae Legal Scholars

36. Rizzo, Dino, Appellee

37. Rogers Towers, P.A., law firm of attorneys for Appellee, Chris Hodges

38. Siebeling, John, Non-Party/Former Defendant

39. Silvester, Alec, Attorney for Amici Curiae Legal Scholars

40. The Becket Fund for Religious Liberty, Amicus Curiae

41. The Liles Firm, P.A., law firm of former attorney for Appellee, Chris Hodges

42. Thomas, M. Scott, Former Attorney for Appellee, Chris Hodges

43. Turkel Cuva Barrios, P.A., former law firm of attorneys for Appellants

44. Vogt, Shane B., Former Attorney for Appellants

45. Wedekind, III, Lee D., Non-Party

46. Weems, Charles Stovall IV, Appellant

47. Weems Group, LLC, Appellant

48. Weems, Kerri, Appellant

49. Weinberger, Lael, Amicus Curiae (Legal Scholars)

No. 25-10154, *Weems, et al. v. Association of Related Churches, et al.*

50.  Woodlee, John G., Attorney for Appellee, Dino Rizzo

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1, 26.1-2, and 26.1-3, the undersigned counsel for *amicus curiae* certifies that the Becket Fund for Religious Liberty has no parent corporations, and that no publicly held corporation holds 10% or more of its stock.

Dated: September 24, 2025

/s/ *Daniel H. Blomberg*
Daniel H. Blomberg

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT ........................ CIP-1

TABLE OF AUTHORITIES ..................................................................iii

INTEREST OF THE AMICUS CURIAE...................................................1

STATEMENT OF THE ISSUE ................................................................2

SUMMARY OF THE ARGUMENT ........................................................2

ARGUMENT ...........................................................................................4

    I. The First Amendment bars Appellants' claims. ..............................4

       A. Civil courts may not entertain lawsuits over
       religious leadership disputes. .......................................................5

       B. Appellants' claims are barred because
       they require civil intrusion into a religious
       leadership dispute. .......................................................................9

          1. Appellants cannot circumvent the First
          Amendment via collateral attacks on
          religious-leadership choices................................................. 10

          2. Resolving Appellants' claims would
          violate church autonomy even beyond
          the religious leadership dispute. ........................................... 14

          3. Appellants' counter-arguments are wrong. ......................... 15

    II. The "neutral-principles" approach does
    not apply here................................................................................ 19

       A. The "neutral-principles" approach is meant
       to advance church autonomy, not bypass it. ..............................20

i

B. The approach is inapplicable to the claims here. ...................... 24

CONCLUSION ......................................................................... 25

CERTIFICATE OF COMPLIANCE ........................................ 27

CERTIFICATE OF SERVICE ................................................. 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bell v. Presbyterian Church (U.S.A.),*
  126 F.3d 328 (4th Cir. 1997) ........................................................ 10, 19

*Belya v. Kapral,*
  775 F. Supp. 3d 766 (S.D.N.Y. 2025) .................................................. 18

*Billard v. Charlotte Catholic High Sch.,*
  101 F.4th 316 (4th Cir. 2024) ....................................................... 1, 18-19

*Catholic Charities Bureau* v. *Wisconsin Lab.*
  *& Indus. Rev. Comm'n,*
  605 U.S. 238 (2025) .......................................................................... 1, 12

*Combs v. Cent. Tex. Ann. Conf. of United*
  *Methodist Church,*
  173 F.3d 343 (5th Cir. 1999) ................................................................ 17

*Conlon v. InterVarsity Christian Fellowship,*
  777 F.3d 829 (6th Cir. 2015) ...................................................... 6, 12, 18

*Crowder v. S. Baptist Convention,*
  828 F.2d 718 (11th Cir. 1987) ................................................... 5, 8, 20-24

*Demkovich v. St. Andrew the Apostle Parish,*
  3 F.4th 968 (7th Cir. 2021) ................................................. 1, 6, 8, 14, 17

*In re Diocese of Lubbock,*
  624 S.W.3d 506 (Tex. 2021) .................................................... 13, 24-25

*El-Farra v. Sayyed,*
  226 S.W.3d 792 (Ark. 2006) ............................................................... 24

*Fratello v. Archdiocese of N.Y.,*
  863 F.3d 190 (2d Cir. 2017) .................................................................. 1

*Gaddy v. Corp. of President of The Church of*
    *Jesus Christ of Latter-day Saints,*
    148 F.4th 1202 (10th Cir. 2025) ...................................................... 5, 24

*Gellington v. Christian Methodist*
    *Episcopal Church, Inc.,*
    203 F.3d 1299 (11th Cir. 2000)................................................ 7, 17, 23

*Hosanna-Tabor Evangelical Lutheran*
    *Church & Sch. v. EEOC,*
    565 U.S. 171 (2012) ............................................. 1, 5, 7-8, 16, 18, 22, 25

*Huntsman v. Corp. of the President of the*
    *Church of Jesus Christ of Latter-Day Saints,*
    127 F.4th 784 (9th Cir. 2025) ...................................................... 5-6, 25

*Hutchison v. Thomas,*
    789 F.2d 392 (6th Cir. 1986) ............................................................. 24

*Jones v. Wolf,*
    443 U.S. 595 (1979) ...................................................................... 20-21

*Kedroff v. St. Nicholas Cathedral of*
    *Russian Orthodox Church,*
    344 U.S. 94 (1952) ............................................................................ 5-6

*Lee v. Sixth Mount Zion Baptist Church,*
    903 F.3d 113 (3d Cir. 2018) ........................................................ 1, 7, 18

*Markel v. Union of Orthodox Jewish*
    *Congregations of Am.,*
    124 F.4th 796 (9th Cir. 2024) ...................................................... 12, 16

*McClure v. Salvation Army,*
    460 F.2d 553 (5th Cir. 1972)......................................................... 7, 16

*McMahon v. World Vision,*
    147 F.4th 959 (9th Cir. 2025) ............................................................. 1

iv

*McRaney v. N. Am. Mission Bd.*,
   ---F.4th---, 2025 WL 2602899
   (5th Cir. Sep. 9, 2025) ...........................................5, 7, 11-12, 16-21, 25

*Md. & Va. Eldership of Churches of God*
   *v. Church of God*,
   396 U.S. 367 (1970) .............................................................................. 20

*Natal v. Christian and Missionary All.*,
   878 F.2d 1575 (1st Cir. 1989) ............................................................... 6

*NLRB v. Catholic Bishop*,
   440 U.S. 490 (1979) ....................................................................8, 15-16

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
   591 U.S. 732 (2020) .......................................................1, 5-7, 13-14, 25

*Pfeil v. St. Matthews Evangelical Lutheran Church*,
   877 N.W.2d 528 (Minn. 2016) ............................................................ 24

*Presbyterian Church in U.S. v. Mary Elizabeth*
   *Blue Hull Memorial Presbyterian Church*,
   393 U.S. 440 (1969) ........................................................................20-21

*Rayburn v. Gen. Conf. of Seventh-Day Adventists*,
   772 F.2d 1164 (4th Cir. 1985)..........................................................8, 17

*Serbian E. Orthodox Diocese v. Milivojevich*,
   426 U.S. 696 (1976) .....................................................................14, 22

*Simpson v. Wells Lamont Corp.*,
   494 F.2d 490, (5th Cir. 1974).........................................................23, 25

*Starkey v. Roman Catholic Archdiocese*
   *of Indianapolis*,
   41 F.4th 931 (7th Cir. 2022) .........................................................7, 10-11

*Tomic v. Catholic Diocese of Peoria*,
   442 F.3d 1036 (7th Cir. 2006).............................................................. 18

*Watson v. Jones*,
  80 U.S. (13 Wall.) 679 (1872)..........................................................8, 20

*Weems v. Ass'n of Related Churches*,
  No. 3:23-cv-811, 2024 WL 5169901
  (M.D. Fla. Dec. 19, 2024) ..............................................................9, 19

*Weems v. Celebration Church*,
  No. 2022-CA-1047 (Fla. Cir. Ct. Sep. 28, 2022)....................................9

*Whole Woman's Health v. Smith*,
  896 F.3d 362 (5th Cir. 2018)..........................................................1, 17

**Other Authorities**

Asma Afsaruddin, *Shari'a and Fiqh in the United States*,
  *in The Oxford Handbook of American Islam* 174
  (Yvonne Y. Haddad & Hane I. Smith eds., 2014) ..............................13

Encyclopaedia Britannica, *Chief Rabbinate* (Oct. 1, 2013) ...................13

Carl H. Esbeck, *An Extended Essay on Church Autonomy*,
  Federalist Soc'y Rev. 244 (2021) .......................................................21

Paul Horwitz, *Churches As First Amendment
  Institutions: Of Sovereignty and Spheres*,
  44 Harv. C.R.-C.L. L. Rev. 79 (2009)................................................21

Michael W. McConnell & Luke W. Goodrich,
  *On Resolving Church Property Disputes*,
  58 Ariz. L. Rev. 307 (2016) ...............................................................20

Eleanor Nesbitt, *Sikhism and the third millennium*, in
  *Sikhism: A Very Short Introduction* (2005) ......................................13

U.S. Const. amendment I .......................................................................5

Lael Weinberger, *The Limits of Church Autonomy*,
  98 Notre Dame L. Rev. 1253 (2023) ..................................................21

vi

## INTEREST OF THE AMICUS CURIAE[1]

The Becket Fund for Religious Liberty is a non-profit, nonpartisan law firm dedicated to protecting the free expression of all religious traditions. Becket has represented agnostics, Buddhists, Christians, Hindus, Jews, Muslims, Santeros, Sikhs, and Zoroastrians, among others, in lawsuits across the country. Becket represented the prevailing parties in both of the Supreme Court's recent decisions applying the First Amendment's church autonomy doctrine. *See, e.g.*, *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732 (2020); *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012); *see also Catholic Charities Bureau v. Wisconsin Lab. & Indus. Rev. Comm'n*, 605 U.S. 238, 255 (2025) (Thomas, J., concurring) (applying church autonomy doctrine). Becket has also represented prevailing parties in numerous other church autonomy cases. *See, e.g., McMahon v. World Vision Inc*, 147 F.4th 959 (9th Cir. 2025); *Billard v. Charlotte Catholic High Sch.*, 101 F.4th 316 (4th Cir. 2024); *Demkovich v. St. Andrew the Apostle Parish*, 3 F.4th 968 (7th Cir. 2021) (en banc); *Lee v. Sixth Mount Zion Baptist Church*, 903 F.3d 113 (3d Cir. 2018); *Whole Woman's Health v. Smith*, 896 F.3d 362 (5th Cir. 2018); *Fratello v. Archdiocese of N.Y.*, 863 F.3d 190 (2d Cir. 2017).

---

[1]   No counsel for a party authored this brief in whole or in part, and no person other than amicus, its members, or its counsel made a monetary contribution to fund the brief's preparation or submission.

Appellants' arguments would harm the Constitution's structural limitations preserving Church independence from State control. Their argument that this protection applies only to employers within a single religious entity would harm the many religious groups which do not adopt a hierarchical form of ministry—Baptist, Jewish, Muslim, and Sikh religious communities among them. And Appellants' argument that any "neutral" principle of law can always override those structural limitations would harm the autonomy of every faith group.

## STATEMENT OF THE ISSUE

Whether the district court correctly applied the church autonomy doctrine, including by finding the "neutral principles" approach inapplicable, in dismissing a minister's tort claims seeking to collaterally attack his former church's religious-leadership decisions.

## SUMMARY OF THE ARGUMENT

This case is ultimately about a minister's disagreement with his former church's decision to remove him from a pastoral role in the church. Having lost a direct attempt to sue the church itself for that decision in state court, the minister now attempts a collateral attack by suing a third-party religious association and its religious leaders for their alleged participation in the decision. As the district court correctly recognized below, every claim against them ultimately turns on questioning the propriety of the church's underlying ministerial judgment and the process that led to it.

2

That is something civil courts may not do. The First Amendment's church autonomy doctrine protects the independence of religious groups in matters of faith, doctrine, and internal church governance. That includes barring civil courts from involvement in religious leadership disputes. The selection, supervision, and removal of a church's leaders are purely ecclesiastical matters for the church alone to decide. Civil judges and juries play no role. After confirming that a case centers on a ministerial disagreement, courts must terminate the case. Allowing the coercive process of discovery and trial to probe the mind of the church over its ministerial choices is just as unconstitutional as an eventual judgment against the church. Both chill the church's right to autonomy in religious matters and overstep the structural limit on state power imposed by the First Amendment.

This is why Appellants' two main arguments on appeal are mistaken. First, that Appellants are (now) suing non-employer third parties instead of Celebration Church doesn't change that they're still contesting both Celebration Church's decision to remove Pastor Weems and the disciplinary investigation and proceedings surrounding that decision. All the alleged injuries here, including the loss of ministry partnerships that Pastor Weems held, still flow from Celebration Church's determinations and its explanation of them to its religious community. Adjudicating Appellants' claims will thus impermissibly entangle courts in scrutinizing that decision through discovery, litigation, and trial.

3

Second, it is irrelevant that aspects of Appellants' claims can be framed in secular terms. That's true of every religious leadership dispute. Treating the relationship between churches, synagogues, and mosques with their priests, rabbis, and imams like Walmart's relationship with its store managers doesn't respect the First Amendment. It sidelines it. That's why the so-called "neutral-principles" approach that Appellants advocate cannot apply to ministerial choices, and was never meant to. Instead, it was developed to *advance* church autonomy within the unique context of church-property disputes over title to church assets. But transforming the approach into a permission slip for judges and juries to second-guess religious judgments would eviscerate church autonomy.

## ARGUMENT

## I. The First Amendment bars Appellants' claims.

The district court correctly determined that all of Appellants' claims turned on the process and outcome of Celebration Church's decision to remove Pastor Weems. Civil courts may not interfere in church leadership disputes. That remains true when plaintiffs seek interference via a collateral attack against religious third parties who allegedly supported the church's underlying decision. That's particularly clear here, where Appellants have already lost a state-court lawsuit directly challenging Celebration Church's leadership decision. Allowing this case to proceed will result in exactly the kind of probing and intrusion into internal ecclesiastical matters that the First Amendment bars.

4

## A. Civil courts may not entertain lawsuits over religious leadership disputes.

The Religion Clauses of the First Amendment provide that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]" U.S. Const. amend. I. Together, they "protect[] a religious group's right to shape its own faith and mission" and "prohibit[] government involvement in such ecclesiastical decisions." *Hosanna-Tabor*, 565 U.S. at 188-89. That includes judicial involvement, because "adjudicating religious disputes" can result in "chilling the free exercise of religious beliefs," and because "putting the enforcement power of the state behind a particular religious faction … risks 'establishing' a religion." *Crowder v. S. Baptist Convention*, 828 F.2d 718, 721 (11th Cir. 1987). The Religion Clauses thus "radiate[]" a "spirit of freedom for religious organizations, an independence from secular control or manipulation." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church*, 344 U.S. 94, 116 (1952). This protection has come to be known as the "church autonomy" doctrine. *Our Lady*, 591 U.S. at 747.[2]

_____

[2] While courts also use the term "ecclesiastical abstention," the Supreme Court uses "church autonomy." *Our Lady*, 591 U.S. at 747; *Catholic Charities*, 605 U.S. at 246; *id.* at 255 (Thomas, J., concurring). So do the Fifth, Seventh, Ninth, and Tenth Circuits. *See McRaney v. N. Am. Mission Bd.*, ---F.4th---, 2025 WL 2602899, at *5 n.2 (5th Cir. Sep. 9, 2025); *Gaddy v. Corp. of the President of the Church of Jesus Christ of Latter-Day Saints*, 148 F.4th 1202 (10th Cir. 2025); *Huntsman v. Corp. of the President of the Church of Jesus Christ of Latter-Day Saints*, 127 F.4th 784, 792 (9th Cir. 2025) (en banc); *id.* at 795 (Bress, J., concurring);

The doctrine recognizes that religious groups must have the freedom to "decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Id.* at 737 (quoting *Kedroff*, 344 U.S. at 116). "State interference" to "dictate or even to influence such matters" would both "obviously violate the free exercise of religion" and "constitute one of the central attributes of an establishment of religion." *Id.* at 746.

One "component" of the church autonomy doctrine is robust protection for the selection, supervision, and removal of religious leaders. *Id.* at 746-47. This protection, often referred to as the "ministerial exception," "categorically prohibits federal and state governments from becoming involved in religious leadership disputes." *Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 836 (6th Cir. 2015). As courts have long recognized, "[h]owsoever a suit may be labelled, once a court is called upon to probe into a religious body's selection and retention of clergymen, the First Amendment is implicated." *Natal v. Christian and Missionary Alliance,* 878 F.2d 1575, 1577 (1st Cir. 1989).

---

*id.* at 800 (Bumatay, J., concurring); *Demkovich*, 3 F.4th at 975. And "ecclesiastical abstention" risks obscuring the nature of the right, which is not merely a discretionary abstention but a "broad" autonomy requiring courts to "stay out" of religious disputes. *Our Lady*, 591 U.S. at 746-47. The "church" in church autonomy is a shorthand; it extends to religious groups of any faith, just as the ministerial exception extends beyond those faiths using the title "minister." *Id.* at 752-53.

Whether a civil claim sounds in employment law, tort law, or contract, it is barred if it interferes in a religious group's freedom to choose its own pastors, priests, imams, rabbis, or other individuals with key roles representing the faith. *See, e.g.*, *Our Lady*, 591 U.S. at 742 (employment discrimination); *Starkey v. Roman Catholic Archdiocese of Indianapolis*, 41 F.4th 931, 944 (7th Cir. 2022) (tort); *Sixth Mount Zion*, 903 F.3d at 123 (contract). That includes tortious interference claims. *McRaney*, 2025 WL 2602899, at *6 (collecting examples).

This protection is meant to insulate religious bodies not only from attempts to reinstate ministers or pay damages for their removal. Rather, it protects against any judicial interference at all. The First Amendment "ensures that the authority to select and control who will minister to the faithful—a matter 'strictly ecclesiastical'—is the church's *alone*." *Hosanna-Tabor*, 565 U.S. at 194-95 (citation omitted, emphasis added). As this Court's decision in *McClure v. Salvation Army* explained, civil courts are barred from engaging in even the "investigation and review" of "[m]atters touching" the relationship between a church and its ministers, since the "coercive effect" of judicial meddling would inevitably burden religious independence. 460 F.2d 553, 559-60 (5th Cir. 1972).[3]

---

[3] *McClure* is "binding precedent" in this Circuit because it was issued before September 30, 1981. *Gellington v. Christian Methodist Episcopal Church, Inc.*, 203 F.3d 1299, 1301 n.1 (11th Cir. 2000).

The "very process of inquiry" into such matters will "impinge on rights guaranteed by the Religion Clauses," because probing the church's religious-leadership judgments will pressure it to make all such future decisions "with an eye to avoiding litigation or bureaucratic entanglement." *Demkovich*, 3 F.4th at 981, 983 (quoting *NLRB v. Catholic Bishop*, 440 U.S. 490, 502 (1979) and *Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985)). This Court has thus long refused to "adjudicat[e] religious disputes," because "putting the enforcement power of the state" behind one "religious faction" will "chill[] the free exercise of religious beliefs" and "risk[] 'establishing' a religion." *Crowder*, 828 F.2d at 721; *accord Hosanna-Tabor*, 565 U.S. at 205-06 (Alito, J., joined by Kagan, J., concurring) (the "mere adjudication" of ministerial disputes "pose[s] grave problems for religious autonomy").

In sum, the church autonomy doctrine upholds the proper "relations of church and state under our system of laws." *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 727 (1872). It both protects religious groups from those who would use "secular courts" for leverage in religious disputes, and it ensures the state will not entangle itself in matters beyond its authority and "[]competen[ce]." *Id.* at 731-32.

8

**B. Appellants' claims are barred because they require civil intrusion into a religious leadership dispute.**

The church autonomy doctrine's protection for religious leadership decisions squarely applies here to bar Appellants' claims. Appellants already lost one bid to dispute Celebration Church's leadership decision. *See Weems v. Celebration Church*, No. 2022-CA-1047 (Fla. Cir. Ct. Sep. 28, 2022). This case is just another attack on the same decision. As the district court concluded, every claim here turns on whether Celebration Church improperly colluded with Appellees to remove Pastor Weems. *Weems v. Ass'n of Related Churches*, No. 3:23-cv-811, 2024 WL 5169901, at *3 (M.D. Fla. Dec. 19, 2024) (each claim "depends on the contention that Pastor Weems' ouster as senior pastor was illegitimate because it was based upon a sham investigation orchestrated by Defendants"). Investigating that premise will cause precisely the harms of entanglement and intrusion that church autonomy exists to prevent.

Appellants' primary contrary argument is that the Religion Clauses apply only to "intra-church" disputes between ministers and the churches that employ them, and thus have no application here to Appellants' suit against former ministry allies that allegedly influenced Celebration Church's ministerial decisions. Weems Br.28. Courts have repeatedly rejected arguments along those lines, and for good reason. Accepting them would undermine the purposes of the church autonomy doctrine and create a massive loophole for challenging ministerial decisions.

### 1. Appellants cannot circumvent the First Amendment via collateral attacks on religious-leadership choices.

This is not the first time that a removed minister has sought to circumvent the First Amendment's bar on suing his or her church by instead targeting third parties alleged to have contributed to the removal decision. Federal courts have repeatedly rejected previous attempts.

The leading case is *Bell v. Presbyterian Church (U.S.A.)*, where the Fourth Circuit dismissed a case brought by a United Church of Christ pastor against Presbyterian, Methodist, and Baptist denominational entities that had financially supported the religious nonprofit that employed him. 126 F.3d 328, 332-33 (4th Cir. 1997). The pastor was not employed by the defendants, nor was he even of the same denomination, and he sued them for their role in interfering in his employment by ceasing their financial support. *Id.* at 329. While the pastor "characterize[d] this as a secular dispute between the [defendants] and a third party," the court held his claims still failed under the ministerial exception because resolving them "would interpose the judiciary into the Presbyterian Church's decisions, as well as the decisions of the other [defendant] churches, relating to how and by whom they spread their message … through the granting or withholding of funds." *Id.* at 332.

Similarly, in *Starkey v. Roman Catholic Archdiocese of Indianapolis*, the Seventh Circuit rejected tortious-interference claims against a non-employer. 41 F.4th at 945. There, the plaintiff sued both her school

10

employer and the archdiocese that allegedly influenced the school's decision to let her go. Like Appellants, she argued that the archdiocese was not protected by the Religion Clauses because it was not her employer and thus was liable under state tort law for interfering with her employment relationship with the school. Appellant's Br. at 42-43, *Starkey*, 41 F.4th 931 (No. 21-2524), 2021 WL 5145858. The Seventh Circuit was unmoved, finding that adjudicating such torts would still interfere in religious-leadership decisions and "result in excessive judicial entanglement in ecclesiastical matters." *Starkey*, 41 F.4th at 945.

Most recently, in *McRaney v. North American Mission Board,* the Fifth Circuit applied *Bell* and *Starkey* to bar the claims by the former head of a regional ministry against a partner national ministry. McRaney alleged tortious interference with his business relationships based on the national ministry's interactions with his employer and with other religious ministries. 2025 WL 2602899, at *2. And McRaney argued that because his employer was fully independent from the national ministry, the church autonomy doctrine didn't apply because his claims did "not involve an intra-church dispute." Appellant's Brief at 24, *McRaney*, No. 23-60494 (5th Cir. Sep. 9, 2025), 2023 WL 7441079. The Fifth Circuit disagreed. It recognized that suing a different religious organization that partnered with his employer "rather than his former employer" "does not change the analysis." *McRaney*, 2025 WL 2602899, at *18. His claims could not proceed because he sought to "litigate the employment

relationship between himself and [his employer] and would force a court to interpose itself into [the national ministry's] and [the employer's] decisions relating to how and by whom they spread their message and how they fund it." *Id*. at *19 (cleaned up).[4]

Those cases squarely apply here. As in each of the cases, Appellants are suing over the alleged influence that third-party religious actors had in their former religious employer's ministerial decision. As in each of them, adjudicating Appellants' claims would require second-guessing that ministerial decision. And as in *Bell* and *McRaney*, what matters is not that Celebration Church was independent from the Appellees, but that civil courts would have to second-guess matters of internal religious governance to resolve the claims. These principles required the dismissal below and support its affirmance here.

Further, Appellants' position would favor hierarchical religious bodies or those that have extensive formal ecclesiastical networks over those that maintain congregational autonomy or lack the resources to formalize their partnerships. That religious favoritism is not only unconstitutional in its own right, *see Catholic Charities*, 605 U.S. at 247-49, but would

_____

[4]   A variation on the theme has also been suing individual supervisors for their participation in a religious employer's ministerial decisions. Those have likewise failed. *See Markel v. Union of Orthodox Jewish Congregations of Am.*, 124 F.4th 796, 812 (9th Cir. 2024) ("[T]he same constitutional harm looms regardless of whether … claims are against the religious organization or its leaders"), *cert. denied*, No. 24-1204, 2025 WL 1727421 (U.S. June 23, 2025); *accord Conlon*, 777 F.3d at 837.

have perverse effects, too. Hierarchical churches would be free to warn their members against bad ministers, as in *In re Diocese of Lubbock*, 624 S.W.3d 506, 518 (Tex. 2021), but independent churches would have no such ability. Shepherds who prey on their flock would be allowed to leave one congregation and search for a new flock, and if sister churches asked the old church for information on pastoral fitness, the minister would be able to sue their old churches for saying anything negative about them. Other non-hierarchical faith groups, like Muslim, Jewish, and Sikh communities, would likewise be left unable to protect themselves against fallen imams, rabbis, and granthis.[5]

That is both unconstitutional and unwise. As the Supreme Court observed in *Our Lady*, "a church's independence on matters 'of faith and doctrine' requires the authority to select, supervise, and if necessary, remove a minister without interference by secular authorities" because "[w]ithout that power, a wayward minister's preaching, teaching, and counseling could contradict the church's tenets and lead the congregation away from the faith." 591 U.S. at 747.

---

[5] *See* Asma Afsaruddin, *Shari'a and Fiqh in the United States*, *in The Oxford Handbook of American Islam* 174, 177 (Yvonne Y. Haddad & Hane I. Smith eds., 2014), https://perma.cc/T6BQ-YRQP ( "no centralized religious hierarchy … in Sunni Islam")); The Editors of Encyclopaedia Britannica, *Chief Rabbinate* (Oct. 1, 2013), https://perma.cc/YC6X-QUP2 (Judaism has had "no central authority" for centuries); Eleanor Nesbitt, *Sikhism and the third millennium*, *in Sikhism: A Very Short Introduction* 108, 120 (2005), https://perma.cc/3ASR-3XMY ("no tidy, centralized hierarchy" in Sikhism).

### 2. Resolving Appellants' claims would violate church autonomy even beyond the religious leadership dispute.

Even beyond the ministerial component at issue here, resolving Appellants' theory of the case will inevitably draw civil courts into "religious thicket[s]." *Demkovich*, 3 F.4th at 981 (quoting *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 719 (1976)). Appellants have framed their claims as arising from Pastor Weems' rejection of the "modern church growth system" based on instructions received in a personal vision of Jesus Christ, and the opposition this engendered from Appellees as proponents of that "model." App.291-92. The complaint tells the story of a "coup" of Celebration Church and what Pastor Weems paints as a plot to sever Celebration Church from his new ministry vision and the organizations that he formed to carry it out. App.308, 310; *accord* Weems Br.13-15.

Resolving that central dispute would ultimately require extensive discovery to explore, and a civil jury to decide, numerous sensitive religious questions. Was there *actually* a conflict between "Weems' missionary vision," Weems Br.14, and the Appellees' allegedly similar ministries? Did Appellees have any other sincere religious basis for being concerned about the reliability of Pastor Weems as a spiritual leader? Were Celebration Church and the partners in Pastor Weems's other ventures scared off because of his financial dealings or because of "other pastoral issues under the Weemses' leadership of the Church"? App.19.

14

Did they cease their partnership in his theology school and pastoral-care ministry because the Weemses were "frame[d]" for "financial and other misconduct" or because of the finding that Pastor Weems's "leadership of the Church has been inconsistent and unbiblical … marked by rampant spiritual and emotional abuse" and "the antithesis of biblical leadership as described in scripture"? App.22, 36, 306, 310. Did Celebration Church post the report describing findings of misconduct by Pastor Weems because Appellees wanted to "frame" him as part of "legitimizing the takeover of Celebration Church, ensuring the failure of the Missions Plan," App.310, or to explain to the congregation and the world why the Church had determined that the Weemses had "disqualified themselves from pastoral leadership," App.37?

Whatever else might be said about it, this is not the stuff of a "garden variety civil claim." Weems Br.26. Courts have barred state power from probing far less religiously fraught matters. *See, e.g.*, *Catholic Bishop*, 440 U.S. at 502 n.10, 507-08 (noting inquiry into how often lay teachers had to attend mass was too intrusive). And, again, that's true even apart from the contested ministerial decision at the heart of this case.

### 3. Appellants' counter-arguments are wrong.

To support their argument that their claims may proceed, Appellants assert that "judgment in this case will not affect Celebration Church" and that Celebration Church would not be "require[d]" to "reinstate Stovall." Weems Br.26. Both contentions misunderstand the Religion Clauses.

15

As *Hosanna-Tabor* explained over a decade ago, the lack of a reinstatement demand is "immaterial." 565 U.S. at 194. What matters is that the relief Appellants seek here ultimately "would depend on a determination that [Celebration Church] was wrong to have relieved [Weems] of h[is] position," because "it is precisely such a ruling that is barred." *Id.*

Further, even if there were no judgment *against* Celebration Church's pastoral decision, there would necessarily still be discovery *into* it. Discovery would inevitably involve deposing Celebration Church, its pastors, and its leadership to determine their reasons for investigating Pastor Weems, rejecting his religious vision, and seeking new leadership. And it would pull in the representatives of other ministries who severed ties with the Weemses to delve into the motivation for their religious partnership choices, including how they had been influenced by Celebration Church's decisions.

As explained above, that "very process of inquiry" would violate "rights guaranteed by the Religion Clauses." *Catholic Bishop*, 440 U.S. at 502. Churches are "constitutionally protected against *all* judicial intrusion into [their] ecclesiastical affairs." *McRaney*, 2025 WL 2602899, at *13. Thus, the inherently "coercive effect" of the "investigation and review" of ministerial decisions is itself impermissible. *McClure*, 460 F.2d at 560. Allowing "merits discovery and trial" into ministerial decisions itself constitutes "unconstitutional judicial action." *Markel*, 124 F.4th at 809

16

n.5, 810; *accord Combs v. Cent. Tex. Ann. Conf. of United Methodist Church*, 173 F.3d 343, 350 (5th Cir. 1999) (permitting merits discovery "necessarily intrude[s] into church governance in a manner that would be inherently coercive," which "alone is enough to bar the involvement of the civil courts").

And the loss of First Amendment rights here would be irreparable. "Church personnel and records would inevitably become subject to subpoena, discovery, cross-examination, [and] the full panoply of legal process designed to probe the mind of the church in the selection of its ministers." *Rayburn*, 772 F.2d at 1171; *accord Demkovich*, 3 F.4th at 977-78, 983 ("depositions of fellow ministers and the search for a subjective motive behind" their actions necessarily "cause[s] civil intrusion into, and excessive entanglement with, the religious sphere"); *accord Gellington*, 203 F.3d at 1304 (investigating clergy decisions "almost always entail[s] excessive government entanglement into the internal management of the church"). After those kinds of intrusions chill a church's exercise of its religious judgment, a church "cannot be made whole by a take-nothing judgment months or years later." *McRaney*, 2025 WL 2602899, at *13; *see also Whole Woman's Health*, 896 F.3d at 372 (involvement of court and litigants in sorting through subpoenaed internal religious deliberations "itself invades the religious body's integrity"). The damage would have been done.

Nor would the church be the only entity harmed: the state itself would have been drawn outside its proper authority. Like the separation of powers, church autonomy is "grounded" in "constitutional structure," "confin[ing] the state and its civil courts to their proper roles." *Billard*, 101 F.4th at 325; *accord McRaney,* 2025 WL 2602899, at *12 ("structural"); *Conlon*, 777 F.3d at 836 (same); *Sixth Mount Zion*, 903 F.3d at 118 n.4 (similar). Thus, a court "ha[s] an interest independent of party preference" to avoid "allow[ing] itself to get dragged into a religious controversy." *Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1042 (7th Cir. 2006), *abrogated on other grounds by Hosanna-Tabor*, 565 U.S. at 194-95.

For a cautionary tale, take *McRaney*. There, the pastor was allowed to proceed to merits discovery on his tortious interference claims. The result was "protracted discovery" into both the religious defendant *and* the religious employer on matters regarding "the selection of … ministers," with "multiple pastors" deposed and "many sensitive internal ministry records" produced. *McRaney*, 2025 WL 2602899, at *3, *21. All of this, the Fifth Circuit later regretfully recognized, had been an "unconstitutional violation of church autonomy." *Id*. at *21; *see also Belya v. Kapral*, 775 F. Supp. 3d 766, 779 (S.D.N.Y. 2025) (concluding—after depositions of over a dozen clergy and bishops, including the most senior hierarch of the church—that "trying this case would be impossible without violating the church's autonomy").

18

It is precisely to avoid that violation that the First Amendment "immunizes" and "exempt[s] from legal process" the "decisions of religious entities about the appointment and removal of ministers." *Billard*, 101 F.4th at 324-25 (quoting *Bell*, 126 F.3d at 331). And it is why, "like other immunities from suit, church autonomy must be resolved at the threshold of litigation." *McRaney*, 2025 WL 2602899, at *9. The district court correctly did so below. This Court should affirm the judgment.[6]

## II.  The "neutral-principles" approach does not apply here.

The district court also correctly determined that it could not resolve this case by applying the so-called "neutral-principles" approach without interfering with church autonomy. Courts designed the approach for the special context of church property disputes involving competing internal factions, which is not the case here. And it was meant to advance church autonomy principles, not replace them. Appellants' contrary arguments are in error.

---

[6]  The district court dismissed for lack of subject matter jurisdiction, following this Court's recent unpublished decisions. *Weems*, 2024 WL 5169901, at *3-5. Courts and scholars are divided on whether church autonomy is jurisdictional. *See, e.g.*, *McRaney*, 2025 WL 2602899, at *10-11 (collecting authorities). But Appellants do not dispute the issue, and it would not change the outcome here. Either way, church autonomy remains a threshold issue that must be addressed at the earliest opportunity to avoid unnecessary entanglement. And here, it was capable of resolution on the pleadings.

## A. The "neutral-principles" approach is meant to advance church autonomy, not bypass it.

The neutral-principles approach—also known as the "formal title" or "ordinary principles" approach—was developed to allow courts to resolve certain types of disputes that "concern formal title to property" of churches. *Crowder*, 828 F.2d at 725-26; *see also Md. & Va. Eldership of Churches of God v. Church of God*, 396 U.S. 367, 370 (1970) (Brennan, J., concurring) ("formal title"); *McRaney*, 2025 WL 2602899, at *14 ("ordinary principles"). The types of disputes to which the approach can apply are those concerning "which of two factions within [a] church should be recognized as the 'true'" church entitled to ownership of the church's property. *Crowder*, 828 F.2d at 722 (citing *Watson*, 80 U.S. (13 Wall.) 679); Michael W. McConnell & Luke Goodrich, *On Resolving Church Property Disputes*, 58 Ariz. L. Rev. 307, 316-19, 336 (2016).

In that unique context, courts may sometimes apply "neutral principles of law, developed for use in all property disputes," to effectuate the factions' pre-dispute intent regarding who should control church property. *Crowder*, 828 F.2d at 723 (quoting *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969)). This is done by looking for formal instruments such as "deeds to the properties" and "the corporate charter." *Id* at 723 n.12 (citing *Jones v. Wolf*, 443 U.S. 595 (1979)).

But even then, the "First Amendment severely circumscribes the role that civil courts may play." *Id.* at 723 (quoting *Hull Church*, 393 U.S. at 449). For instance, courts could not employ the approach for property disputes that ultimately turn on "resolution … of controversies over religious doctrine and practice." *Id.*

Crucially, the neutral-principles approach is "an effort to accommodate church autonomy, not to eliminate it." Paul Horwitz, *Churches As First Amendment Institutions*, 44 Harv. C.R.-C.L. L. Rev. 79, 118 (2009); *McRaney*, 2025 WL 2602899, at *15 (explaining that the approach is an "endogenous" application of church autonomy in the property-dispute context, not an exception to it). The approach can do this in appropriate cases by minimizing the "risk of excessive government entanglement" that would result from engaging in "a searching and therefore impermissible inquiry into church polity" to discern the "true" church. *Crowder*, 828 F.2d at 723-24 (quoting *Jones*, 443 U.S. at 605).

But the special considerations at issue in church-property cases aren't at issue in other church autonomy matters, which is why the Supreme Court has "never applied the neutral-principles analysis outside of the property-law context." *McRaney*, 2025 WL 2602899, at *15 (quoting Lael Weinberger, *The Limits of Church Autonomy*, 98 Notre Dame L. Rev. 1253, 1277 (2023)); Carl H. Esbeck, *An Extended Essay on Church Autonomy*, 22 Federalist Soc'y Rev. 244, 249 (2021) (noting the Court has employed the framework exclusively when "the only matter that remains

21

for civil resolution … is who gets legal title to the church property"). Rather, both the Supreme Court and this Court have repeatedly "held that civil courts may not use the guise of the 'neutral principles' approach to delve into issues concerning" internal religious matters. *Crowder*, 828 F.2d at 725 (quoting *Milivojevich*, 426 U.S. at 721-24).

In *Milivojevich*, the Supreme Court held that "reli[ance] on purported 'neutral principles'" to decide a fraud claim against a church and grant an injunction giving control of church assets was inappropriate because doing so probed "a matter of internal church government" regarding the defrocking of a bishop and reorganization of a diocese. 426 U.S. at 714-15, 714 n.8, 717, 721. The Court recognized that such matters are "obviously" beyond the "competence" of "[c]ivil judges." *Id.* at 714 n.8. *Milivojevich* accordingly reversed the lower court's decision to employ the neutral-principles approach.

Similarly, in another religious-leadership-dispute case, *Hosanna-Tabor*, the Court unanimously refused to apply "neutral" employment discrimination laws to a religious organization's decision to terminate a minister. 565 U.S. at 188-90. *Hosanna-Tabor* explained that the termination was "more than a mere employment decision" but part of "the internal governance of the church." *Id.* at 188. And the Court emphasized that the church autonomy doctrine's purpose is to *prevent* "neutral" laws from "interfer[ing] with an internal church decision that affects the faith and mission of the church itself." *Id.* at 190.

This Court has twice held the same. In *Simpson v. Wells Lamont Corp.*, this Court rejected the invitation to use the "neutral principles of law" approach to adjudicate a suit for damages brought under various civil rights statutes concerning "who will preach from the pulpit of a church." 494 F.2d 490, 492, 493 (5th Cir. 1974).[7] *Simpson* emphasized that "matters of church government as well as those of faith and doctrine" are strictly ecclesiastical and must be resolved by the church alone. *Id.* at 493. Similarly, in *Crowder*, this Court held that the neutral principles approach does not apply outside of appropriate church property disputes. 828 F.2d at 725-26 (noting that the "state's interest" in religious disputes is "substantially diminished where the controversy does not concern formal title to property").[8] *Crowder* accordingly rejected becoming involved in a contractual dispute that was just "one step removed from a major doctrinal conflict," even one where courts "might" have been able to avoid "questions of religious beliefs or doctrines," because intervention would still have failed to respect the church's independence "concerning a matter of church governance." *Id.* at 726.

---

[7]    *Simpson* is precedent in this Circuit. *Gellington*, 203 F.3d at 1301 n.1.

[8]    *Crowder*, 828 F.2d at 727 (Edmondson, J., concurring) (recognizing the "generous zone of judicial noninterference" around "religious affairs," and that while "neutral legal principles" may be used to adjudicate "certain church property disputes," the "Framers of the Bill of Rights" did not otherwise permit intrusion into the "internal administration of religious groups").

Other courts agree that the neutral-principles approach is inapplicable in matters of faith, doctrine, and church governance. *See, e.g.*, *Gaddy*, 148 F.4th at 1211-16 (rejecting argument that "the neutrality and general applicability of fraud laws" could "thwart the church autonomy doctrine's application"); *Hutchison v. Thomas*, 789 F.2d 392, 396 (6th Cir. 1986) (stating the "neutral principles" approach "has never been extended to religious controversies in the areas of church government, order and discipline, nor should it be"); *Diocese of Lubbock*, 624 S.W.3d at 516 ("neutral principles" inapplicable to claim over "the character and conduct of [church] leaders"); *El-Farra v. Sayyed*, 226 S.W.3d 792, 795-96 (Ark. 2006) (rejecting "neutral principles" approach to resolve claims regarding statements "over [plaintiff's] suitability to remain as Imam"); *Pfeil v. St. Matthews Evangelical Lutheran Church*, 877 N.W.2d 528, 541 (Minn. 2016) (rejecting "neutral principles" approach to resolve a defamation claim "based on statements made during the course of a church disciplinary proceeding").

## B. The approach is inapplicable to the claims here.

This case falls well outside the neutral-principles approach. A rule designed for dealing with churches split into two factions disputing over property isn't applicable here, in a non-property fight between third-party religious entities and the individuals leading those entities—and over issues that aren't even "one step removed from a major doctrinal conflict." *Crowder*, 828 F.2d at 726. And what fundamentally *is* at issue

24

here—how and why a church decided to part ways with its ministers—is precisely the kind of internal governance issue to which the neutral-principles approach cannot apply. *Hosanna-Tabor,* 565 U.S. at 190; *Simpson*, 494 F.2d at 493-94.

Further, even with "facially 'neutral' causes of action," the neutral-principles approach is not permissible where the "*application* of the neutral rules to religious institutions" would result in "interference with an internal church decision that affects the faith and mission of the church itself." *McRaney*, 2025 WL 2602899, at *18 (quoting *Hosanna-Tabor,* 565 U.S. at 190); *accord Diocese of Lubbock*, 624 S.W.3d at 516 ("[C]ourt[s] may not rely on neutral principles when *application* of those principles would impose civil liability on a church that complies with its own internal governance"). As detailed above, there's no place for this litigation to go that will not result in "invad[ing] a religious institution's 'autonomy with respect to internal management decisions that are essential to the institution's central mission.'" *Diocese of Lubbock*, 624 S.W.3d at 518 (quoting *Our Lady,* 591 U.S. at 746). Thus, allowing the case to proceed under "neutral principles" effectively "sideline[s] the church autonomy doctrine." *Huntsman*, 127 F.4th at 798 (Bress, J., concurring in judgment). Courts cannot even "emcee religious disputes, much less decide them," and so cases cannot be allowed to "go any further" once it becomes clear that the "inescapable outcome" will intrude upon a religious body's protected autonomy. *Id*. at 792-93, 800.

25

# CONCLUSION

This Court should affirm the district court's judgment.


Dated: September 24, 2025

Respectfully submitted,

/s/ *Daniel H. Blomberg*

DANIEL H. BLOMBERG
  *Counsel of Record*
AMANDA G. DIXON
THE BECKET FUND FOR
  RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW
Suite 400
Washington, DC 20006
(202) 955-0095
*dblomberg@becketfund.org*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation for an amicus brief because it contains 5,894 words. Fed. R. App. P. 29(a)(5); 11th Cir. Rule 29(a)(6). This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) and 11th Cir. Rule 32-4 because this brief has been prepared in a proportionally spaced typeface (Century Schoolbook 14-point type) using Microsoft Word for Office 365.

Dated: September 24, 2025

/s/ *Daniel H. Blomberg*
Daniel H. Blomberg

## CERTIFICATE OF SERVICE

I hereby certify that on September 24, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit using the Appellate Electronic Filing system, which will provide electronic notice of such filing to all parties.

Dated: September 24, 2025

/s/ *Daniel H. Blomberg*
Daniel H. Blomberg